UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
IN RE: NATURAL GAS
COMMODITY LITIGATION                          Master File No.
------------------------------------------------------------------ x   03 CV 6186(VM)(AJP)
                                                                       ECF Case
THIS DOCUMENT RELATES TO:  ALL ACTIONS
                                                                       Hon. Victor Marrero, USDJ
------------------------------------------------------------------ x


## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT


**FINKELSTEIN, THOMPSON
& LOUGHRAN**

1050 30th Street, NW
Washington, DC 20007
Telephone:  (202) 337-8000
Facsimile:  (202) 337-8090


**LOVELL STEWART HALEBIAN LLP**

500 Fifth Avenue
New York, NY 10110
Telephone: (212) 608-1900
Facsimile: (212) 719-4677


**GOODKIND LABATON RUDOFF
& SUCHAROW LLP**

100 Park Avenue – 12th Floor
New York, NY 10017
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477


**LOWEY DANNENBERG
BEMPORAD & SELINGER, P.C.**

The Gateway, One North Lexington Avenue
White Plains, NY 10601
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035


Attorneys for Plaintiffs


(Additional Counsel on Signature Page)

Cornerstone Propane Partners, L.P., Roberto Calle Gracey and Dominick Viola (hereinafter as "Plaintiffs"),[1] individually, and on behalf of all others similarly situated, by their undersigned attorneys, for their Amended Consolidated Class Action Complaint ("Complaint")[2] against AEP Energy Services, Inc.; American Electric Power Co., Inc.; Aquila Energy Marketing Corporation; Aquila Merchant Services, Inc.; Calpine Energy Services, L.P.; Cinergy Marketing & Trading, L.P.; CMS Field Services; CMS Marketing Services & Trading; Cook Inlet Energy Supply, LLC; Coral Energy Resources, L.P.; Duke Energy Trading and Marketing, LLC; Dynegy Marketing & Trade; El Paso Merchant Energy, L.P.; Enserco Energy, Inc.; Entergy-Koch Trading, L.P.; E Prime, Inc.; MidAmerican Energy Company; Mieco, Inc.; Oneok Energy Marketing and Trading Company, L.P.; Oneok, Inc.; Reliant Energy Services, Inc.; Sempra Energy Trading; WD Energy Services; West Coast Power, LLC; Williams Companies, Inc.; Williams Energy Marketing and Trading Company and DOES 1-100 (collectively "Defendants"),[3] upon personal knowledge as to matters relating to themselves and to information obtained during the course of their attorneys' investigation and upon information and belief as to all other matters, allege as follows:

---

[1] On December 5, 2003, the Court entered Pretrial Order No. 1, consolidating the following cases: Cornerstone Propane Partners, LP v. Reliant Energy Services Inc., et al., Case No. 03 CV 6186 (S.D.N.Y. filed Aug. 18, 2003); Calle Gracey v. American Electric Power Co., Inc., et al., Case No. 03 CV 7750 (S.D.N.Y. filed Oct. 1, 2003); Cornerstone Propane Partners, LP v. Coral Energy Resources, LP, et al., Case No. 03 CV 8320 (S.D.N.Y. filed Oct. 21, 2003); and Viola v. Reliant Energy Servs., et al., Case No. 03 CV 9039 (S.D.N.Y. filed Nov. 14, 2003). This Complaint is filed on behalf of all Plaintiffs to these four actions.

[2] On September 24, 2004, the Court issued its Decision and Order denying Defendants' joint motions to dismiss filed in all four actions consolidated by Pretrial Order No. 1. See, In re Natural Gas Commodity Litig., __ F. Supp. 2d. __, 2004 WL 2181115 (S.D.N.Y. Sept. 24, 2004). The Court also denied Defendants MidAmerican Energy Company's; Calpine Energy Services, LP's; E Prime, Inc's; Oneok Energy and Marketing Co., LP's and Oneok, Inc.'s; and Reliant Energy Services, Inc's motions to dismiss. The Court granted Defendants Cinergy Corporation's, Encana Corporation's, El Paso Corporation's, Coral Energy Holding LP's and Coral Energy Resources' motions to dismiss without prejudice. This Amended Consolidated Class Action Complaint is filed within twenty (20) days of the Court's Decision and Order.

[3] A list of Defendants is also attached to this Complaint as Exhibit A.

## **NATURE OF THE ACTION**

1.      This action arises from Defendants' unlawful manipulation of the prices of natural gas futures and option contracts traded on the New York Mercantile Exchange ("NYMEX") during the period from January 1, 2000 to December 31, 2002 ("Class Period").

2.      Defendants deliberately reported inaccurate, misleading and false trading information -- including artificial volume and price information -- to trade publications that compile and publish widely-followed indices of natural gas spot prices.  In addition, Defendants engaged in a variety of fraudulent trade reporting strategies, including wash trades, whose purpose was to create the perception of increased liquidity and demand for natural gas, and thus to manipulate the spot prices of natural gas.  Defendants, through their employees and agents, were direct participants in this unlawful conduct to manipulate the prices of natural gas futures and options traded on NYMEX.

3.      Defendants trade not only in the natural gas physical market and NYMEX natural gas futures market but also buy and sell over-the-counter ("OTC") contracts in natural gas and other energy derivatives.  Reported prices of physical natural gas transactions not only affect prices in the futures market but also affect prices in OTC traded natural gas derivatives.  Defendants' motive in manipulating NYMEX natural gas futures and option prices to artificial levels was, among other things, to obtain trading profits on their OTC natural gas financial contracts whose prices were affected by the reported prices for purchases and sales of exchange traded futures contracts (e.g., NYMEX look-alike OTC swaps)[4] and of physical natural gas.

---

[4]   A NYMEX look-alike swap is one of the most common OTC natural gas derivative products and is a swap transaction that derives its value from the price of the NYMEX natural gas futures contract.  The NYMEX look-alike swap settles financially based upon the NYMEX futures settlement price on a given day.

4.      Upon information and belief, Defendants were in regular and virtually continuous contact with one another, including regular and extremely frequent communications with respect to the spot price of natural gas and natural gas futures contracts.  During these ongoing communications, Defendants, worked to report misinformation and to create false impressions of trading activity, specifically intending to manipulate the prices of natural gas futures and options to benefit their market positions to the detriment of other market participants.

5.      Natural gas spot prices are published in trade reports including <u>Natural Gas Intelligence</u>, <u>Gas Daily</u>, and <u>Inside FERC</u>, and play an integral part in determining the spot prices for natural gas, including the prices of natural gas futures and options traded on the NYMEX. Cognizant of that fact, Defendants intentionally and systematically supplied these trade report publications with false information about their own natural gas trades in order to manipulate natural gas prices, including natural gas futures and options traded on NYMEX.  As a consequence, the price of natural gas futures and options traded on the NYMEX was manipulated to artificial levels by Defendants.

6.      The Federal Energy Regulatory Commission ("FERC"), in an August 2002 report titled <u>Initial Report on Company-Specific Separate Proceedings and Generic Reevaluations; Published Natural Gas Price Data</u>; and Enron Trading Strategies ("FERC Initial Report"), states that "there is a significant incentive on the part of certain market participants to deliberately misreport prices, given that natural gas is the fuel input for the electricity generators that set the market price in California and the rest of the West.  Unscrupulous traders could manipulate natural gas price indexes in order to increase the profitability of their electricity positions.  The

means by which this misreporting could occur is actually quite simple. Traders overstate prices to the reporting firms, which in turn publish price data that incorporate the overstated prices."[5]

7.      Defendants' unlawful conduct led to a year-long investigation by the FERC that culminated in a 344-page report, titled <u>Final Report on Price Manipulation in Western Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices</u> ("FERC Final Report"), dated March 2003, detailing Defendants' efforts to manipulate the market.

8.      Defendants' illegal trading activities have led to investigations by the Commodity Futures Trading Commission ("CFTC") and felony charges in connection with the manipulation of natural gas prices, including false reporting.

9.      On December 4, 2003, CFTC Commissioner Sharon Brown-Hruska spoke at the Energy Bar Association Mid-Year Meeting, at which time she stated:

> **False price reporting by traders in the natural gas market was pervasive.**
> Since December of last year, the CFTC has entered into eight settlements with a number of prominent energy companies and power merchants, collecting a total of $130 million in civil money penalties for attempting to manipulate prices reporting on energy indices. In all of these matters, the Commission has alleged that the firms knowingly delivered false or misleading or knowingly inaccurate and, in effect, artificial trade prices and volumes in an attempt to skew those indices for their financial benefit. In early October, the CFTC announced the filing of a complaint in federal district court against another major power company [American Electric Power Co., Inc., and its subsidiary AEP Energy Services Inc.] for attempting to manipulate natural gas prices in a similar manner.

(emphasis added)

10.      To date, at least nineteen companies, including the Defendants, have paid an aggregate of $217 million to settle CFTC administrative actions seeking the imposition of civil penalties. This action, unlike the claims pursued by the CFTC, seeks to recover monetary damages for the victims of Defendants' unlawful conduct.

---

[5] FERC Initial Report at 47 <u>available at</u> http://www.ferc.gov/industries/electric/indus-act/wem/pa02-2.asp.

11.     The CFTC has settled claims for civil penalties with the following companies:

(a)     Dynegy Marketing & Trade and West Coast Power, LLC
        $5 million – December 19, 2002

(b)     El Paso Merchant Energy, L.P.
        $20 million – March 26, 2003

(c)     WD Energy Services, Inc. (formerly known as Encana Energy Services, Inc.)
        $20 million – July 28, 2003

(d)     The Williams Companies, Inc. and Williams Energy Marketing & Trading (currently known as Williams Power Company)
        $20 million – July 29, 2003

(e)     Enserco Energy, Inc.
        $3 million – July 31, 2003

(f)     Duke Energy Trading and Marketing, LLC
        $28 million – September 17, 2003

(g)     Reliant Energy Services
        $18 million – November 25, 2003

(h)     CMS Marketing Services & Trading and CMS Field Services
        $16 million – November 25, 2003

(i)     Aquila Merchant Services, Inc.
        $26 million – January 28, 2004

(j)     Entergy-Koch Trading, LP
        $3 million – January 28, 2004

(k)     E Prime, Inc.
        $16 million – January 28, 2004

(l)     Oneok Energy Marketing and Trading Company, L.P. and Oneok, Inc.
        $3 million – January 28, 2004

(m)     Calpine Energy Services, L.P.
        $1.5 million – January 28, 2004

    (n)    Western Gas Resources, Inc.[6]
           $7 million – July 1, 2004

    (o)    Coral Energy Resources, L.P.
           $30 million – July 29, 2004

12.    Settlements with other companies, including those named as Defendants herein, are likely to occur, according to Gregory G. Mocek, Director, CFTC Division of Enforcement:

> As part of our aggressive investigation of these companies, we uncovered significant violations of the Commodity Exchange Act.  We will continue to pursue all other companies that potentially committed the same types of egregious acts.  **Since false reporting can have serious repercussions on the futures market, we will bring down the hammer on all violators.**  These respondents and their counsel did the right thing by cooperating with our staff.[7]

(emphasis added)

13.    Defendants, directly or through their subsidiaries, affiliates or agents, planned and executed a scheme designed to cause price instability and increase volatility in spot prices and thereby manipulate the price of natural gas futures and options traded on the NYMEX to artificial levels.  Defendants' unlawful conduct produced exorbitant illegal profits, and caused actual damage to Plaintiffs and others similarly situated, in violation of the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. § 1 *et seq.*  In addition, Defendants, Does 1-100, and other unnamed parties including affiliates of Defendants aided and abetted each other in the commission of violations of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

---

[6] On September 17, 2004, Plaintiffs filed a related case against Western Gas Resources, Inc. and Hunter Shively alleging facts similar as those alleged herein.  Cornerstone Propane Partners L.P. et al v. Western Gas Resources, Inc. et al., Case No. 04 CV 7415 (S.D.N.Y. filed Sept. 17, 2004).  On July 1, 2004, Western Gas Resources, Inc. settled with the CFTC for $7 million.  On March 12, 2003, Hunter Shively settled with the CFTC for $300,000.

[7] Press Release No. 4728-02, CFTC, (Dec. 19, 2002) available at http://www.cftc.gov/opa/enf02/opa4728-02.htm.

## JURISDICTION AND VENUE

14.     Natural gas is a "commodity" and is the "commodity underlying" NYMEX natural gas futures and options, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25.

15.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. §§ 1331 and 1337.

16.     Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), because each of the Defendants transact business in the Southern District of New York and the claims arose in the Southern District of New York.   The conduct described herein has been carried out, in part, within the Southern District of New York. Defendants' unlawful acts manipulated the prices of NYMEX natural gas futures and options which were traded in this district in which NYMEX is located, at One North End Avenue, New York, New York.

17.     The Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## THE PARTIES

**Plaintiffs**

18.     Cornerstone Propane Partners, L.P. ("Cornerstone") is a limited partnership organized under the laws of Delaware, with its principal place of business in Watsonville, California.  Cornerstone, through its unincorporated division Coast Energy Group, markets natural gas in the United States. Throughout the Class Period (as hereinafter defined),

Cornerstone bought and sold natural gas futures and options on NYMEX.  For example, beginning in April 2000, Cornerstone sold "short" hundreds of NYMEX June 2000 natural gas futures contracts.  Cornerstone liquidated these contracts by buying equal amounts of offsetting June 2000 natural gas futures contracts and suffered losses by reason of Defendants' manipulation of the natural gas market as alleged herein.

19.     Roberto Calle Gracey ("Gracey"), a resident of Madrid, Spain, traded natural gas futures contracts on the NYMEX during the Class Period.  During the Class Period, Gracey entered into a series of transactions in which he bought and sold NYMEX natural gas futures contracts.  Gracey suffered losses on his short positions by reason of Defendants' manipulation of the natural gas market as alleged herein.

20.     Dominick Viola ("Viola"), a resident of Chatham, New Jersey, purchased and sold natural gas futures contracts on the NYMEX during the Class Period.  During that period, Viola entered into a series of transactions in which he sold NYMEX natural gas futures contracts in "nearby" months and purchased NYMEX natural gas futures contracts in the "forward" or "distant" months.  A holder of the type of positions Viola accumulated during the Class Period suffers losses if the "nearby" NYMEX natural gas futures prices increase relative to the "forward" or "distant" NYMEX natural gas futures prices.  Viola suffered losses by reason of Defendants' manipulation of the natural gas market as alleged herein.

**Defendants**

21.     AEP Energy Services, Inc. ("AEP Energy") is a wholly-owned subsidiary of American Electric Power Co., Inc., organized under the laws of Ohio, with its principal place of business in Columbus, Ohio.

22.     American Electric Power Co., Inc. ("AEP") is a corporation organized under the laws of New York, with its principal place of business in Columbus, Ohio.  AEP created AEP

Energy to trade and market energy commodities, including natural gas.  AEP exercises control over AEP Energy, including AEP Energy's energy traders.  AEP wholly owns AEP Energy, and, by virtue of its ownership, fully controls AEP Energy.    On October 1, 2003, the CFTC announced that it had filed a complaint in federal district court in Columbus, Ohio, charging AEP and its subsidiary AEP Energy with violations of federal law for false reporting and attempted manipulation of natural gas prices.

23.    Aquila Energy Marketing Corporation ("Aquila Energy") is a corporation organized under the laws of Delaware, with its principal place of business in Kansas City, Missouri.

24.    Aquila Merchant Service, Inc. ("Aquila") is a corporation organized under the laws of Delaware, with its principal place of business in Kansas City, Missouri.  Prior to March 23, 2001, Aquila was known as Aquila, Inc.

25.    Calpine Energy Services, L.P. ("Calpine") is a limited partnership organized under the laws of Delaware, with its principal place of business in Houston, Texas.  Calpine is a wholly owned subsidiary of Calpine Corporation.[8]  Calpine has settled with the CFTC in connection with the manipulation of natural gas futures and options, including the reporting of false natural gas prices, as discussed below.

26.    Cinergy Marketing & Trading, L.P. ("Cinergy Marketing") is a corporation organized under the laws of Delaware, with its principal place of business in Cincinnati, Ohio.  It is a wholly owned subsidiary of Cinergy Corporation.

---

[8] Calpine Corporation is a Delaware Corporation with headquarters at 50 West San Fernando Street, San Jose, California.  The company is engaged in the development, construction, ownership and operation of power generation facilities and the sale of electricity predominantly in the United States, but also in Canada and the United Kingdom.

27.     CMS Field Services ("CMS Field") is a corporation organized under the laws of Michigan, with its principal place of business in Jackson, Michigan.  CMS Field has settled with the CFTC in connection with the manipulation of natural gas futures and options, including reporting false natural gas prices, as discussed below.  On or about July 02, 2003, CMS Energy sold CMS Field to Cantera Natural Gas, Inc. for $112.6 million cash and a $50 million face-value note.

28.     CMS Marketing Services & Trading ("CMS Marketing") is a corporation organized under the laws of Michigan, with its principal place of business in Jackson, Michigan.  CMS Marketing has settled with the CFTC in connection with the manipulation of natural gas futures and options, including reporting false natural gas prices, as discussed below.

29.     Cook Inlet Energy Supply, LLC ("Cook Energy") is a limited liability company organized under the laws of Delaware, with its principal place of business in Los Angeles, California.

30.     Coral Energy Resources, L.P. ("Coral Energy") is a limited partnership organized under the laws of Delaware, with its principal place of business in Houston, Texas.  Coral Energy is the sole marketer of daily production of 2.1 billion cu. ft. of natural gas in the United States for its ultimate parent, the Royal Dutch/Shell Group of Companies.  Coral Energy has settled with the CFTC in connection with the manipulation of natural gas futures and options, including the reporting of false natural gas prices, as discussed below.

31.     Duke Energy Trading and Marketing, LLC ("Duke") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Houston, Texas.   In September 2003, Duke settled with the CFTC in connection with the manipulation of natural gas prices, including false reporting, as discussed below.

32.     Dynegy Marketing & Trade ("Dynegy") is a general partnership organized under the laws of Colorado, with its principal place of business in Houston, Texas.  Dynegy has settled with the CFTC in connection with the manipulation of natural gas futures and options, including the reporting of false natural gas prices, as discussed below.

33.     El Paso Merchant Energy, L.P. ("El Paso Merchant") is a limited partnership organized and existing under the laws of the State of Texas and is headquartered in Houston, Texas.  El Paso Merchant is a business unit of El Paso, Inc. ("El Paso"),[9] and during all times relevant herein, it was El Paso Merchant's function to conduct El Paso's marketing and trading of natural gas and power generation.  El Paso Merchant has settled with the CFTC in connection with the manipulation of natural gas prices, including false reporting, as discussed below.

34.     Enserco Energy, Inc. ("Enserco") is a corporation organized under the laws of South Dakota, with its principal place of business in Golden, Colorado.  Enserco is a marketer of natural gas and is a wholly owned subsidiary of Black Hills Corp.  Enserco has settled with the CFTC in connection with the manipulation of natural gas prices, including false reporting, as discussed below.

35.     Entergy-Koch Trading, L.P. ("Entergy Trading") is a limited partnership organized under the laws of Delaware, with its principal place of business in Houston, Texas.  Entergy Trading is wholly owned by Entergy-Koch, L.P., a limited partnership organized under the laws of Delaware, with its principal place of business in Houston, Texas.  Entergy

---

[9] On November 13, 2003, the FERC approved El Paso Corp.'s $1.55 billion settlement with the State of California over allegations that El Paso manipulated natural gas prices during that state's electricity crisis during the period November 2000 through March 2001.  On December 6, 2003, San Diego Superior Court Judge J. Richard Haden approved the $1.55 billion settlement between California and El Paso Corp. units, the largest antitrust class-action settlement in California's history.  The judge's action follows the FERC's settlement approval in mid-November.  The settlement now awaits approval by a U.S. District Court in San Diego.  Under the terms of the agreement, El Paso Electric Co. would pay about $551 million in cash and equivalents up front, make semiannual payments of about $875.6 million and reduce the price of energy to Californians by $125 million (This means cheaper electricity rates for affected Californians for 15 to 20 years).

Corporation and Koch Industries, Inc. have a 100% interest in Entergy Trading and by virtue of their ownership control Entergy Trading.

36.    E Prime, Inc. ("E-Prime") is a corporation organized under the laws of Colorado, with its principal place of business in Denver, Colorado.  E-Prime is a wholly owned, non-utility gas trading and marketing subsidiary of Xcel Energy.[10]  E-Prime has settled with the CFTC in connection with the manipulation of natural gas futures and options, including the reporting of false natural gas prices, as discussed below.

37.    MidAmerican Energy Company ("MidAmerican") is a corporation organized under the laws of Iowa, with its principal place of business in Des Moines, Iowa.  MidAmerican is a wholly owned subsidiary of MidAmerican Energy Holdings Company.

38.    Mieco. Inc. ("Mieco") is a corporation organized under the laws of California, with its principal place of business in Long Beach, California.  Mieco is a subsidiary of the Japanese general trading company Marubeni Corporation.

39.    Oneok Energy Marketing and Trading Company, L.P. ("Oneok Energy") is a limited partnership organized under the laws of Texas, with its principal place of business in Tulsa, Oklahoma.  Oneok Energy is a wholly owned subsidiary of Oneok, Inc.  Oneok Energy has settled with the CFTC in connection with the manipulation of natural gas futures and options, including the reporting of false natural gas prices, as discussed below.

---

[10] Xcel Energy is a Minnesota corporation headquartered in Minneapolis, Minnesota.  Xcel Energy was formed in August 2000 by the merger of New Century Energies, Inc. ("NCE"), a Delaware corporation with principal offices in Denver, Colorado, and Northern State Power ("NSP"), a Minnesota corporation with principal offices in Minneapolis, Minnesota.  Xcel Energy is the fourth largest combination electricity and natural gas energy company in the United States and provides energy-related products and services to nearly 5 million customers in 11 states. Xcel Energy owns more than 32,700 miles of natural gas pipelines.  Xcel Energy and its subsidiaries engage in electric utility operations, gas utility operations, operation of independent power production facilities, energy marketing and trading, and transportation, storage, and marketing of natural gas.

40.     Oneok, Inc. ("Oneok") is a corporation organized under the laws of Oklahoma, with its principal place of business in Tulsa, Oklahoma.  Oneok is an energy company involved in oil and gas production, natural gas processing, gathering, storage and transmission in the mid-continent areas of the United States. The company's energy marketing and trading operations, focusing primarily on natural gas, provide service to customers in most states.  Oneok has settled with the CFTC in connection with the manipulation of natural gas futures and options, including the reporting of false natural gas prices, as discussed below.

41.     Reliant Energy Services, Inc. ("Reliant") is a corporation organized under the laws of Delaware, with its principal place of business in Houston, Texas.  Reliant is a wholly owned subsidiary of Centerpoint Energy Houston Electric LLC (formerly known as Reliant Energy, Inc.).  Reliant has settled with the CFTC in connection with the manipulation of natural gas futures and options, including the reporting of false natural gas prices, as discussed below.

42.     Sempra Energy Trading ("Sempra") is a corporation organized under the laws of Delaware with its principal place of business in Stamford, Connecticut.

43.     WD Energy Services, Inc.[11] ("WD Energy") is a corporation organized under the laws of Delaware with its principal place of business in Denver, Colorado.  WD Energy is a business unit of Encana Energy Holdings, Inc., which is incorporated in Delaware.  Encana Energy Holdings, Inc. is a holding company for Encana Corporation.  During all times relevant herein, it was WD Energy's function to conduct Encana Corporation's trading of natural gas. WD Energy has settled with the CFTC in connection with the manipulation of natural gas prices, including false reporting, as discussed below.

---

[11]   During the Class Period, WD Energy Services, Inc. operated under the name PanCanadian Energy Services, Inc.  On April 8, 2002, PanCanadian Energy Services, Inc. changed its name to EnCana Energy Services, Inc. and on February 11, 2003, EnCana Energy Services, Inc., changed its name to WD Energy Services, Inc.

44.     West Coast Power, LLC ("West") is a joint venture equally owned by a subsidiary of Dynegy and another energy company.  Under the joint venture agreement, Dynegy handled all the administrative services and all commodity-related issues.  To carry out these services, Dynegy used its own personnel, who then billed their time to West, because West did not have any of its own employees.

45.     Williams Companies, Inc. ("Williams") is a corporation organized under the laws of Delaware, with its principal place of business in Tulsa, Oklahoma.  Williams wholly owns Williams Energy and by virtue of its ownership controls Williams Energy.  Williams has settled with the CFTC in connection with the manipulation of natural gas prices, including false reporting, as discussed below.

46.     Williams Energy Marketing and Trading Company ("Williams Energy") is a limited liability corporation organized under the laws of Delaware, with its principal place of business in Tulsa, Oklahoma.

47.     Plaintiffs allege on information and belief that at all relevant times DOES 1-100, inclusive, also were engaged in the manipulation of natural gas spot, futures and options prices as alleged herein.  Plaintiffs are presently unaware of the true names and identities of those defendants sued herein as DOES 1-100.  Any reference made to such defendants by specific name or otherwise, individually or plural, is also a reference to the actions of DOES 1-100, inclusive.

48.     The acts alleged in this Complaint to have been committed by each of the Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of each of the Defendants' affairs.

## SUBSTANTIVE ALLEGATIONS

**A.      Relevant Background**

49.      NYMEX has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  NYMEX submits to the CFTC various rules and regulations for approval through which the NYMEX designs, creates the terms of, and conducts trading in, various commodity futures and options, including futures and option contracts for natural gas.

50.      A futures contract is an agreement to buy or sell a commodity, such as natural gas, at a date in the future.  Every aspect of a futures contract traded on the NYMEX is standardized, except the price.  Futures markets are specifically designed to facilitate and ease trading in one central market place for traders who are located throughout the United States.

51.      An option is a contract that gives the buyer the right but not the obligation to buy or sell a specified quantity of futures contracts at a predetermined price on or before a given date, regardless of the market price of the futures contract at the time the option is exercised.

52.      Natural gas futures contracts have two sides.  The "long" side is the buyer of the contract and is obligated to take delivery and pay for the commodity if the buyer holds the contract until the delivery date.  The "short" side is the seller of the contract and is obligated to make delivery of the commodity on the delivery date.

53.      Only a small percentage of all natural gas futures contracts traded each year result in delivery of the underlying commodities.  Instead, traders generally offset their futures positions before their contracts mature.  For example, a purchaser of a futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of natural gas by selling an offsetting futures contract.  The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

54.     NYMEX uses the "Henry Hub" as the point of delivery for its natural gas futures contracts.  The Henry Hub is the largest centralized point for natural gas spot trading in the United States and is located at Sabine's Henry Gas Processing Plant.  The Henry Hub is owned and operated in Louisiana by Sabine Pipe Line, LLC, which is a wholly owned subsidiary of ChevronTexaco.

55.     On April 3, 1990, the NYMEX began trading and has continually traded ever since contracts for the delivery of natural gas during the current calendar month (sometime called the spot month contract or spot contract) and for each of the next 72 consecutive calendar months.  Prices for all natural gas futures contracts are quoted in 10,000 million British Thermal Units ("Btus").  The market for Henry Hub natural gas futures contracts is the industry-wide benchmark for forward natural gas markets because of its liquidity and transparency.

56.     Henry Hub is an example of a "Market Hub," which operates as a physical transfer point (commonly known as a "header"), where numerous pipelines are connected to a facility that allows for the redirection of gas volumes from one pipeline to another.  Additionally, Market Hubs offer services that facilitate the buying, selling and transportation of gas within the local facility including, but not limited to, making arrangements for storage and plant processing services, transfer of title for gas sales and purchases, and transportation of the natural gas.

57.     The Henry Hub links nine interstate and four intrastate pipelines, which include Acadian, Columbia Gulf, Dow, Equitable (Jefferson Island), Koch Gateway, LRC, Natural Gas Pipe Line, Sea Robin, Southern Natural, Texas Gas, Transco, Trunkline and Sabine's mainline.

In 2000, approximately 49 percent of U.S. wellhead production either occurred near the Henry Hub or passed close to the Henry Hub.[12]

58.     For a storable commodity, such as natural gas, there is a clear relationship between spot and futures contracts prices.  The FERC Final Report explains, "[I]n power markets, a relationship between spot and forward prices can exist when current spot prices convey information about spot prices in the future.  For example, if one component of the current spot price represents market 'dysfunction,' market participants might use current spot prices to formulate expectations about future dysfunctions."[13]

59.     The FERC Final Report also explains that "the futures market for gas delivered to Henry Hub provides transparent signals about future input prices.  Forward prices for delivery of gas to specific locations in the West are less transparent.  Nonetheless, market participants had access to forward market price quotations for gas to be delivered in the western United States, and could use these to project likely power prices."[14]

**B.     Defendants Manipulated Natural Gas Futures Contracts Prices by Falsely Reporting Natural Gas Prices and Volume Information to Industry Publications and Price Indices**

60.     During the Class Period, Defendants methodically and purposely manipulated the price and volume information of their natural gas trades to trade publishers.

61.     Defendants manipulated NYMEX natural gas futures and options prices through the issuance of false natural gas price reports to publications such as <u>Natural Gas Intelligence</u>,

---

[12] Energy Information Administration, U.S. Natural Gas Markets: Relationship Between Henry Hub Spot Prices and US Wellhead Prices, July 2002, <u>available at</u> http://www.eia.doe.gov/oiaf/analysispaper/henryhub/index.html.

[13] FERC Final Report at V-5.

[14] <u>Id.</u> at V-4 and V-5.

Gas Daily and Inside FERC.  Platts publishes a daily price index in Gas Daily and a monthly index in Inside FERC.

62.     Energy industry publications compile information from the previous day's natural gas trades by contacting energy companies, including Defendants, and then publishing the gathered information in the form of daily and weekly price indices.  After receiving the information, the trade publications average the data to produce indices that report pricing, volume and other valuable information regarding recent natural gas trades at different natural gas price points and markets.  This published information represents prevailing market pricing and other information regarding natural gas.

63.     These publications calculated their indices using the false trade data that Defendants represented as their actual natural gas transactions.  These publications are widely used and relied on by NYMEX natural gas futures traders to determine the price at which they will buy or sell NYMEX natural gas futures.[15]  According to the CFTC, Platts' indices "have a financial impact upon billions of dollars worth of natural gas transactions."[16]

64.     The FERC Final Report explains that the Gas Daily is "published three daily natural gas prices for more than 100 pricing points:  the absolute range, the common range, and the midpoint of the common range.  Through interviews (primarily via telephone or fax) with natural gas market participants such as traders, end users, and producers, Platts reporters collect

---

[15] As part of a subpoena enforcement action brought by the CFTC against The McGraw-Hill Companies and their Platts division, in the U.S. District Court for the Southern District of Texas on May 19, 2003, the CFTC alleged that Platts obtained energy price information from energy trading companies and used it to create indices of natural gas prices for various natural gas trading hubs throughout the United States  Platts calculated these indices, which are then used by market participants, including natural gas futures trades such as our Plaintiffs, for price discovery and for assessing price risks.  The CFTC's subpoena enforcement action alleged that McGraw-Hill failed to comply with two CFTC subpoenas seeking documents related to trade data submitted by various energy trading companies to McGraw-Hill.

[16] U.S. Commodity Futures Trading Commission v. The McGraw-Hill Companies, Inc., No. MC-03-187 (S.D. Tex.  filed May. 19, 2003) at 5.

prices, dates, volumes, and sometimes counterparties for individual deals.  According to Platts, it then sorts prices from low to high, looks for 'outliers' (those prices that are greater than two standard deviations from the mean), cross-checks supplied with counterparties, and calculates descriptive statistics (e.g., mean, median, variance, and range).  The index price is based on this analysis."[17]

65.     The FERC Final Report also states that <u>Inside FERC</u> is based on a "bid-week fixed price transaction for gas . . . the entire next month."[18]  In a footnote, the FERC explains that a "fixed-price transaction is a bilateral deal based on an agreed upon price rather than a price based on an index or a basis differential off an index."[19]

66.     Instead of calling traders on the phone, <u>Inside FERC</u> used a standardized spreadsheet on which traders would enter prices, volumes and location for every fixed-price deal during the bid-week and would then email this document to Inside FERC for publication.

67.     During the Class Period, Defendants submitted false natural gas trading information, including artificial natural gas price and volume information, to numerous industry publications and reporting firms that publish natural gas spot price indices.

68.     Defendants, as major participants in the physical natural gas market, had the ability through their reporting of physical natural gas transactions to influence the price of NYMEX natural gas futures.

69.     Natural gas spot prices strongly impact NYMEX natural gas futures prices.  The CFTC explains: "[N]atural gas futures traders refer to the prices published by the reporting firms for price discovery and for assessing price risks.  For instance, an increase in prices at a natural

---

[17] FERC Final Report at III-3.
[18] <u>Id.</u>
[19] <u>Id.</u> at III-3 n.3.

gas trading hub signals either stronger demand or weakened supply and futures traders take account of both price movements and changes in the supply/demand balance when conducting their futures trading."[20]

70.     Defendants knew that the artificial price and volume information they submitted was used by the industry publications and reporting firms to calculate published indices of natural gas spot prices for various hubs throughout the United States.  They also knew that this information impacted NYMEX natural gas futures prices.  Defendants intended to manipulate NYMEX natural gas futures prices during the Class Period through their manipulation of the published indices.  Defendants manipulated the prices of NYMEX natural gas futures prices during the Class Period by submitting artificial price and volume information.

71.     On November 18, 2002, Michele Markey, a desk trader at Reliant, provided this testimony before the State of California Senate Select Committee to Investigate Price Manipulation of the Wholesale Energy Market:

> Common practice was to exaggerate your transactions to the price reporters, report more volume, and report a higher price than that was actually transacted. You stretched your price in favor of what the company's position was, or don't report at all, because you would know whether or not your indices – your volume and price could in fact affect the index (sic).[21]  [Emphasis added.]

72.     On November, 20, 2002, California's Lieutenant Governor Cruz Bustamante, as a citizen of the State of California, filed suit on behalf of California consumers against Reliant, Dynegy, El Paso Merchant, Williams, and Duke alleging they conspired to report and publish fraudulent natural gas prices to manipulate the market price of natural gas.

73.     On December 16, 2002, <u>The Houston Chronicle</u> reported:

---

[20] <u>Order Instituting Proceedings Pursuant to Section 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions</u>, CFTC Docket No. 03-20, dated July 28, 2003 at 2-3.

[21] <u>Hearing Regarding Natural Gas Investigation Update Before Senate Select Committee to Investigate Price Manipulation of the Wholesale Energy Market</u>, Nov. 18, 2002 (testimony of Michele Markey) at 62.

. . . it was standard practice for . . . analysts to circulate on the trading floor each month and find the price that would most benefit each desk at each reported location.  The analyst would then create trades that totaled the amount of gas the company traded at a location and work the prices to arrive at the weighted average cost that would most benefit the company.  These trades would then be reported to publications compiling indices . . . .[22]

74.    Defendants Dynegy, AEP, Williams Energy, CMS Energy and El Paso Merchant have publicly admitted that their traders provided artificial natural gas price data to various natural gas publishers.

75.    Plaintiffs and others similarly situated were damaged because NYMEX natural gas futures prices were not determined by market forces, but instead by the Defendants' illicit manipulative activities and improperly-wielded market power.

### DYNEGY and WEST

76.    Beginning from at least January 2000 through June 2002, Dynegy and West reported false natural gas trading information, that included price and volume information, to various indices.  On September 25, 2002, Dynegy admitted that it had reported artificially inflated trade data.[23]

77.    The FERC Final Report included evidence that a Dynegy trader conspired with a trader at another company to report off-setting trades in an attempt to move the price to benefit their positions.[24]  The FERC further explained:

In another example, the Dynegy trader and the other trader are coordinating their data reporting to Inside FERC for bid week at Malin and PG&E citygate – two significant natural gas trading points in the western United States.  In both cases,

---

[22] Michael Davis, Energy Insiders Say Indictment Reflects Rampant Falsifications, Hous. Chron., Dec. 16, 2002, at 3, available at 2002 WL 103972163.

[23] FERC Final Report at III-5.

[24] FERC Final Report at III-7.

the traders are discussing coordinating their reporting to ensure that their false numbers are included in the index calculations.[25]

78.     The FERC investigation also reported that Dynegy fabricated trades in its monthly reports to the indices to come to a predetermined average.  With regard to the daily indices, Dynegy traders and other employees inflated volume information pertaining to their trades.  The FERC Final Report states that traders were told that this sort of manipulation "is how the game is played and you need to play it too."  Traders were also told to "make the volume 2 or 3 times greater and make the price range higher . . . ."[26]

79.     To ensure that the indices used its reported information, Dynegy also caused West, as a result of its ownership interest and control, to submit false information that West was counterparty to the fabricated trades.  To further its conspiracy, Dynegy failed to maintain adequate records regarding the trade data, which it provided to the indices as required by CFTC regulations.

80.     The following email from a Dynegy employee to apparently another employee establishes the procedure Dynegy engaged in to give an appearance of propriety to the false data it was submitting to the indices:

> Enron owns the index.  Unless we start increasing our volumes we are going to continue to take pain on the cash index.  I will get you the contact for [the reporting firm].  I would suggest representing yourself as [W]est [C]oast [LLC]….  We can show offsetting transactions on our activity.[27]

81.     The CFTC summarizes Dynegy's and West's relationship by saying that "dual submission of the false information to the reporting firms was designed to elude detection from the reporting firms by showing trades with an actual counterparty."  Dynegy had "knowingly

---

[25] Id.

[26] Id.

[27] Order Instituting Proceedings Pursuant to Section 6 (c) and 6 (d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 03-03, dated December 18, 2002 at 3.

submitted false information to the reporting firms in an attempt to skew those indices to Dynegy Marketing & Trades' financial benefit."[28]

82.     Dynegy agreed to a $5 million settlement with the CFTC of charges that it had reported false natural gas prices, and attempted to manipulate prices of natural gas between January 2000 and June 2002.

### AEP and AEP ENERGY

83.     AEP and AEP Energy divided their natural gas traders into groups, commonly referred to as "Desks," which corresponded with geographic regions such as the Gulf Coast, the West, the Northeast and the Mid-continent.  There was also a Desk for trading natural gas futures and options contracts on the NYMEX.

84.     According to the FERC Final Report, their traders were instructed by their superiors "to adjust the prices and volumes of trades they had made and, in some cases, to report trades that never occurred" because it was common practice in the industry.[29]

85.     Between November 2000 and October 2002, more than three-quarters of the trades the Gulf, Mid-continent and Northeast Desks submitted to Platts were knowingly false or misleading.

86.     According to the CFTC's complaint filed against AEP and AEP Energy in the Southern District of Ohio on September 30, 2003, AEP and AEP Energy delivered over 3,600 purported natural gas trades to Platts, and "of those trades, approximately 78% or 2,800 were false or misleading or knowingly inaccurate."[30]

---

[28] Id. at 2.
[29] Id. at III-8.
[30] Id. ¶ 22.

87.      These Defendants went as far as maintaining "a computer spreadsheet named 'IFERC Bogus' for the purpose of preparing reports to *IFERC*[31] containing false or misleading or knowingly inaccurate market information."[32]

88.      As a result of these fraudulent actions, between November 2000 through October 2002, AEP and AEP Energy had trading profits of approximately $63.5 million. [33]

89.      According to AEP's own October 9, 2002 press release, as early as 1998, its subsidiary, AEP Energy, was engaged in providing inaccurate and false natural gas trade information to trade publications.[34]   AEP admits that AEP Energy "provided inaccurate price information for use in [the natural gas] indexes" to financially benefit its own trading positions.

### WILLIAMS and WILLIAMS ENERGY

90.      From at least January 2000 through at least June 2002, Williams Energy reported false natural gas trade data, including price and volume information, to certain indices in order to financially benefit its trading position.  Moreover, Williams Energy failed to report actual trades.

91.      On October 25, 2002, Williams Energy admitted that it provided artificial trade data to an energy industry publication.[35]  Specifically, the volume of trades it was reporting exceeded the actual volume of its trading activity.

92.      The FERC Final Report indicates that Williams Energy stated it was engaged in this illegal behavior to better compete with larger companies such as Enron Corporation

---

[31] The CFTC refers to Inside FERC as *IFERC*.

[32] U.S. Commodity Futures Trading Commission v. American Electric Power Company, Inc. and AEP Energy Services, Inc., No. C2-03-00891 (S.D. Ohio filed Sept. 30, 2003) at 5, ¶ 21.

[33] Id. at 4, ¶ 19.

[34] FERC Final Report at III-8.

[35] Securities and Exchange Commission Form 8-K, as submitted by Williams Energy on October 25, 2002.

("Enron")[36] and El Paso, and also to appear as a player in the natural gas market.[37]  The FERC

Final Report also indicates that this behavior was rampant in the industry.[38]

93.     On July 29, 2003, Williams and Williams Energy agreed to a $20 million

settlement with the CFTC of charges that they reported false natural gas trading information to

companies that compile price indices, including price and volume data, and attempted to

manipulate prices of natural gas.

### CMS MARKETING and CMS FIELD

94.     On November 4, 2002, CMS Energy[39] announced that an internal review of its

natural gas trade information confirmed that two of its subsidiaries, CMS Marketing and CMS

Field, had engaged in false reporting and wash trading.[40]

95.     According to the FERC Final Report, of the 472 trades reported by CMS Energy

to Inside FERC from December 2000 to June 2002, there were only 116 exact matches because

CMS Marketing and CMS Field infrequently reported their actual trades.  "The reasons for the

356 reported trades that did not have an exact match were:  (1) reporting the sense of the market,

(2) rounding off, (3) aggregation of small deals, and (4) reporting what they saw in the market"[41]

(emphasis added).

---

[36] Enron is a corporation organized under the laws of Oregon with its principal place of business in Houston, Texas.  Enron has been in bankruptcy proceedings since December 2001 but was until that time one of the largest energy companies in the United States.  Enron's natural gas trading unit was based in Houston, Texas.  On March 12, 2003, the CFTC filed a complaint in federal district court in Houston charging Enron and Hunter S. Shively, Vice President, with operating an illegal futures exchange named Enron Online (EOL) from November 1999 through at least December 2001.

[37] FERC Final Report at III-10.

[38] Id.  Enron Corporation, along with certain of its subsidiary companies ("Enron"), is included in the allegations of this Complaint, but Enron is not named as a defendant, because the company is in bankruptcy proceedings and cannot be made a party to this case because of the automatic stay applicable to bankruptcy matters.

[39] CMS Energy is not a defendant in this action.

[40] Securities and Exchange Commission Form 8-K, as submitted by CMS on November 4, 2002.

[41] FERC Final Report at III-11.

609969 v1
[10/14/2004 15:42]

96.     The FERC discovered that "during the winter of 2000-2001 the difference between the natural gas prices (basis differential) at two significant Midwestern trading points was unusually large.  The [CMS] trader's boss (the desk head) wanted him to narrow the basis differential between the two prices.  The trader then reported high prices for the lower one in order to narrow the spread between the two."  The FERC Final Report goes on to detail how another trader was asked "to create a spreadsheet with fictitious trades designed to narrow another basis differential.  The trader claims that he did create such a spreadsheet to send to Inside FERC and e-mailed it to the desk head."[42]

97.     On November 25, 2003, CMS Marketing and CMS Field agreed to a $16 million settlement with the CFTC of charges that from at least November 2000 through September 2002, they reported false natural gas trading information to companies that compile price indices, including price and volume data, and attempted to manipulate prices of natural gas.

**EL PASO MERCHANT**

98.     From at least June 2000 through November 2001, El Paso Merchant reported false natural gas trade data, which included price and volume information, to certain indices.  El Paso Merchant also failed to keep adequate records regarding the information it was providing to the indices in violation of CFTC regulations.

99.     According to the CFTC, El Paso Merchant falsely reported artificial trade data to financially benefit its trading positions and to manipulate the natural gas market.[43]

100.    On December 2, 2002, United States Attorney's Office in Houston obtained an indictment against Todd Geiger, a former vice president of El Paso on charges of false reporting

---

[42] Id.

[43] In re El Paso Merchant Energy, L.P., Commodity Futures Trading Commission Docket No. 03-09 (March 2003) available at http://www.cftc.gov/files/enf/03orders/enfelpaso-order.pdf.

and wire fraud in connection with his reporting of false trades to <u>Inside FERC</u>.  A FERC

investigation revealed that in the Western market, 20 percent of the trades El Paso submitted did

not match their actual trades, and that "[o]f the 20 percent (145 trades) that were not perfect

matches, 23 reported transactions had the same price but a volume different from the actual

transaction."[44]  Moreover, "the percentage of exact matches between actual trades and reported

trades was 1.2 percent, 1.0 percent, and 0.5 percent for the Northeast, Mid-Continent, and Gulf

trading desks, respectively.  That is, for these regions, approximately 99 percent of the reported

trades did not represent actual trades conducted by El Paso."[45]

102.    On December 11, 2003, Geiger pleaded guilty to reporting at least 48 fake trades

in November 2001 to the publication <u>Inside FERC</u>.  Geiger admitted in court that he knew the

trades were false and that the "index was used to price natural gas . . . ."

102.    On March 26, 2003, El Paso Merchant agreed to a $20 million settlement with the

CFTC of charges that it reported false trading information to companies that compile price

indices, including price and volume data, in connection with the manipulation of prices of natural

gas.

**<u>DUKE</u>**

103.    From at least January 2000 through August 2002, Duke's trading desks located in

Houston, Texas reported false natural gas data including price and volume information.

104.    Duke did not report its actual fixed-price physical natural gas trades.  Instead,

Duke reported on its impression of the market movement which led to artificial spot prices.[46]

The FERC Final Report indicates that "8 percent of the reported monthly trades were inaccurate

---

[44] FERC Final Report at III-13.

[45] <u>Id.</u>

[46] <u>Id.</u> at III-20 to -22.

in terms of price, volume or both, and 22 percent of reported daily trades were inaccurate in terms of price, volume or both."[47]

105.    On September 17, 2003, Duke agreed to a $28 million settlement with the CFTC of charges that it reported false trading information to companies that compile price indices, including price and volume data, in connection with the manipulation of prices of natural gas.

**CORAL ENERGY**

106.    Coral Energy reported trades it observed or heard about, frequently and knowingly misrepresenting them as its own, which manipulated the published price indices. This type of reporting is frequently identified as "survey reporting."[48]

107.    The FERC Final Report states, "Coral does not address the seemingly obvious problem with reporting prices and volumes of trades that traders had 'heard about' or 'seen on electronic trading platform.'  If a trade on EOL was witnessed by 100 traders that does not mean the trade happened 100 times."[49]  EOL is Enron's online trading platform, as discussed below.

108.    The CFTC discovered that from at least January 2000 through September 2002, Coral Energy's employees knowingly delivered price and volume data to natural gas publishers from trades that were fictitious.  Coral Energy "traders reported price and volume data to those reporting firms as if such information was derived from fixed price, physical, natural gas trades CER had actually executed.  However, CER never actually executed many of the trades reported. CER traders also reported executed trades with altered price and/or volume data.  CER traders also failed to report some actual trades to the reporting firms.  Respondent's employees knew

---

[47] Id. at III-20.
[48] Id. at III-22.
[49] Id.

that the reports they delivered to these reporting firms contained false, misleading or knowingly inaccurate information."[50]

109.    On July 29, 2004, Coral Energy agreed to a $30 million settlement with the CFTC of charges that it reported false trading information to companies that compile price indices, including price and volume data, in connection with the manipulation of prices of natural gas.

**AQUILA**

110.    Aquila has admitted that it manipulated natural gas spot prices because it believed that other companies were manipulating the published indices for their own advantage to the detriment of Aquila.[51]

111.    Aquila's false reporting continued for at least five months in 2000.  "In one case, a trader stated that the desk head provided a range of prices that he knew were not based on real prices and a volume-weighted average price that he knew was not accurate, and gave instructions to fill in fictitious numbers within the false range on the spreadsheet to arrive at the false weighted average."[52]

**CINERGY MARKETING**

112.    In July 2003, the CFTC issued a subpoena to Cinergy Corporation seeking information about Cinergy Marketing's trading practices, including the reporting for false and misleading energy prices to various indices.

113.    Cinergy Marketing conducted an internal investigation in response to the CFTC's subpoena.  Upon information and belief, Cinergy Marketing uncovered evidence of false reporting by at least one employee.

---

[50] In re Coral Energy Resources, L.P., Commodity Futures Trading Commission Docket No. 04-21 (July 2004) at 3, available at http://www.cftc.gov/opa/enf04/opa4964-04.htm.

[51] Id. at III-27 to -28.

[52] Id.

114.     Cinergy Marketing has implicitly admitted that its internal trading regulations and procedures were allowing its traders to report inaccurate and misleading natural gas prices to the natural gas publishers because, to date, at least one employee has been terminated as a result of his or her false reporting to natural gas publications.

**<u>RELIANT</u>**

115.     Reliant reported artificial volumes of trades that favored their position and understated volumes of trades that hurt their position.

116.     As described earlier, <u>Inside FERC</u> provides a standard spreadsheet to companies to submit their bid-week trades for its monthly index.  The FERC discovered that "Reliant did not use actual trades to fill in the bid-week survey; rather, it used a three-part process to generate a set of fictitious trades to enter into the spreadsheet:  First, the traders agreed to a 'consensus' range of trades.  Next, an analyst determined the midpoint of the consensus range.  Finally, 'the analyst would generate a list of prices - all falling within the consensus range – and volumes that arithmetically led to a weighted average at the consensus midpoint.'"[53]

117.     The FERC also discovered that "[o]f 514 price reports for which comparisons could be made, the reported volume was less than the actual trade volume in 432 cases (84 percent).  In the cases where Reliant underreported its volume, the volume reported was approximately 15 percent of the actual volume.  In 84 cases (approximately 16 percent), the reported volume was greater than the actual volume – on average, approximately 100 percent above the actual volume."

118.     The FERC states that from its investigation it concluded "that one of the ways in which companies tried to manipulate the published price indices was reporting inaccurate

---

[53] <u>Id.</u> at III-25.

volumes – both by overstating volumes of trades that favored their position and by understating volumes of trades that hurt their position."[54]  Reliant also engaged in "churning," a form of wash trading, discussed in more detail below.

119.    In a November 25, 2003, press release regarding its <u>Order Instituting Proceedings Pursuant to Section 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions</u> against Reliant, the CFTC stated that from at least February 1999 through May 2002, Reliant knowingly reported false trade, volume and price information to certain indices for its own financial benefit.  The CFTC also found that Reliant heavily engaged in wash transactions as described more fully below.  Reliant paid $18 million to settle charges of false reporting and wash transactions.

### WD ENERGY

120.    From at least June 2000 through at least August 2001, WD Energy reported false natural gas trade data which included price and volume information to certain indices.  WD Energy also failed to disclose trades that it did actually engage in to further benefit its financial trading positions.

121.    A WD Energy employee notified the CFTC that he or she discussed false reporting with traders at two other unnamed energy companies.

122.    According to the CFTC, WD Energy provided artificial price data to the indices.  "These reports, submitted telephonically and through electronic mail, contained nonexistent trades, as well as certain actual trades in which the price and/or volume was altered"[55]

---

[54] <u>Id.</u> at III-26.

[55] <u>Order Instituting Proceedings Pursuant to Section 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions</u>, CFTC Docket No. 03-20, dated July 28, 2003 at 3.

123.    On July 28, 2003, WD Energy agreed to a $20 million settlement with the CFTC of charges that it reported false trading information to companies that compile price indices, including price and volume data, in connection with the manipulation of prices of natural gas.

**ENSERCO**

124.    Based on the CFTC's investigation, Enserco traders "routinely made separate false reports to a reporting firm to increase significantly the likelihood that they could affect the published prices.  They coordinated their reports in view of their existing positions, as exemplified by the following taped telephone conversation:

| | |
|---|---|
| Trader A: | Okay. Let's fire away at Sumas. |
| Trader B: | So we want – you didn't buy enough [index based transaction], so you want it high; right? |
| Trader A: | That's correct.  That's correct.  So I'm going to go 19 – |
| Trader B: | 19 and a half is my mid.  I'm going a high of 20 bucks too. |
| Trader A: | Okay |
| Trader B: | And SoCal we want low. |
| Trader A: | Yeah.[56] |

125.    On July 31, 2003, Enserco agreed to a $3 million settlement with the CFTC of charges that it reported false trading information to companies that compile price indices, including price and volume data, and attempted to manipulate prices of natural gas.

**SEMPRA**

126.    Upon information and belief, from at least January 2000 through December 2001, Sempra's trading desks reported false natural gas data including price and volume information.

127.    Sempra did not report its actual fixed-price physical natural gas trades.  Instead, Sempra reported on its impression of the market movement which led to artificial spot prices.[57]

---

[56] Order Instituting Proceedings Pursuant to Section 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions, CFTC Docket No. 03-22, dated July 31, 2003 at 4.

[57] FERC Final Report at III-26.

The FERC Final Report indicates that some employees "reported their knowledge of various trades in the market based on data available on electronic trading platforms."[58]

128.    Sempra has implicitly admitted that its trading regulations and procedures were allowing its traders to report inaccurate and misleading natural gas prices to the natural gas publishers.  Subsequent to an investigation, the FERC ordered Sempra to show that it had taken steps to prevent the manipulation of natural gas trade data.[59]  A spokesman for Sempra admitted that Defendant "has disciplined one employee who provided inaccurate data to trade publications."

### E-PRIME

129.    From at least April 2000 through September 2002, E-Prime reported trades that did not occur and reported false natural gas data including price and volume information using telephones and via electronic mail.

130.    E-Prime submitted false reports and nonexistent natural gas trade data in an attempt to skew the indices to benefit its own trading positions.

131.    According to the CFTC, E-Prime "[i]n anticipation of the institution of an administrative proceeding and prior to any adjudication of any issues of fact or law by the Commission, [E-Prime] . . . submitted an Offer of Settlement . . ."[60][emphasis added].

132.    On January 28, 2004, E-Prime agreed to a $16 million settlement with the CFTC of charges that it reported false trading information to companies that compile price indices, including price and volume data, in connection with the manipulation of prices of natural gas.

---

[58] Id. at III-26.

[59] See, Toby Eckert, Sempra Ordered to Show Its Price-Data Safeguards, San Diego Union-Tribune, May 1, 2004.  See also, Order Accepting Submission of Information with Respect to Internal Processes for Reporting Trading Data, Federal Energy Regulatory Commission 104 FERC ¶ 61,153 (July 29, 2003).

[60] In re E Prime, Inc., Commodity Futures Trading Commission Docket No. 04-12 (January 2004) available at http://www.cftc.gov/files/enf/04orders/enfeprime-order.pdf.

## ONEOK ENERGY and ONEOK

133.    From at least July 2000 through October 2002, Oneok Energy and Oneok reported false and misleading natural gas trade data including price and volume information to indices via electronic mail.

134.    The false reports contained information regarding natural gas trades that did not exist and false natural gas price and volume information regarding trades that did occur.

135.    According to the CFTC, Oneok Energy and Oneok "[i]n anticipation of the institution of an administrative proceeding and prior to any adjudication of any issues of fact or law by the Commission, [Oneok Energy and Oneok] . . . submitted an Offer of Settlement . . ."[61] [emphasis added].

136.    On January 28, 2004, Oneok Energy and Oneok each agreed to a $1.5 million settlement, totaling $3 million, with the CFTC of charges that it reported false trading information to companies that compile price indices, including price and volume data, in connection with the manipulation of prices of natural gas.

## CALPINE

137.    From at least September 2001 through October 2002, Calpine reported false and misleading natural gas trade data including price and volume information to indices by telephone.

138.    The false reports contained information regarding trades that did not exist and false information regarding trades that did not occur.

---

[61] In re Oneok Energy Marketing and Trading Company, L.P. and Oneok, Inc., Commodity Futures Trading Commission Docket No. 04-09 (January 2004) available at http://www.cftc.gov/files/enf/04orders/enfoneok-order.pdf.

139.    According to the CFTC, Calpine "[i]n anticipation of the institution of an administrative proceeding and prior to any adjudication of any issues of fact or law by the Commission, [Oneok Energy and Oneok] . . . submitted an Offer of Settlement . . ."[62] [emphasis added].

140.    At least one Calpine employee has been terminated as a result of the CFTC investigation and Calpine's false reporting activities.

141.    On January 28, 2004, Calpine agreed to a $1.5 million settlement with the CFTC of charges that it reported false trading information to companies that compile price indices, including price and volume data, in connection with the manipulation of prices of natural gas.

142.    On information and belief, all Defendants named herein, or their subsidiaries or affiliates, engaged in similar practices designed to report inaccurate, misleading and false trade and volume data to intentionally manipulate the natural gas prices as necessary to benefit their positions.  Defendants possessed, by virtue of their position as major physical natural gas market participants, the ability to manipulate the price of NYMEX natural gas futures contracts.

**C.    Defendants CMS Marketing, CMS Field, Dynegy, Williams, Williams Energy, Reliant, Entergy Trading, Cook Energy, MidAmerican, Mieco, Calpine and Sempra Manipulated Natural Gas Spot Prices and Extracted Supra-Competitive Profits by Engaging in Wash Trades**

143.    Defendants CMS Marketing, CMS Field, Dynegy, Williams, Williams Energy, Reliant, Entergy Trading, Cook Energy, MidAmerican, Mieco, Calpine and Sempra carried out their manipulation of natural gas futures contracts prices through participation in wash trades and market gaming strategies on Enron Online ("EOL"), discussed below, for the purpose of

---

[62] In re Calpine Energy Services, L.P., Commodity Futures Trading Commission Docket No. 04-11 (January 2004) available at http://www.cftc.gov/files/enf/04orders/enfcalpine-order.pdf.

manipulating higher natural gas futures prices, among other results.  (These Defendants are referred to below as "Wash Trading Defendants.")

144.    According to the FERC Final Report, Defendants CMS, Dynegy, Williams and Reliant "have publicly admitted to engaging in 'wash transactions.'"[63]

145.    Wash trades and market gaming schemes involve "a prearranged pair of trades of the same good between the same parties, involving no economic risk and no net change in beneficial ownership.  These trades expose the parties to no monetary risk and serve no legitimate business purpose."[64]  These transactions exaggerated market demand for natural gas and thus manipulate natural gas prices.

146.    From November 1999 through at least December 2001, Enron Corporation's Internet-based trading system, EOL, was the dominant Internet-based platform for trading both physical energy (electricity and natural gas products) and energy derivatives such as NYMEX natural gas look-alike swaps.  Traditional exchanges, such as the New York Stock Exchange and NYMEX, determine price by matching the buy and sell orders of many traders in a many-to-many trading format.  In contrast, EOL used a one-to-many trading format, where an Enron affiliate was always on one side of each energy transaction, either as a seller or a buyer.

147.    The FERC explains that Enron set up EOL in such a way that it "gave Enron proprietary knowledge of market conditions not available to other market participants," including trading histories, limit orders, and volumes of trades, and therefore understood how it could manipulate the liquidity of the market through the orchestration of wash trades with Market

---

[63] FERC Final Report at 47.
[64] FERC Final Report at VII-1.

Makers.  The FERC Final Report states that "Enron's use of its EOL platform created a fertile ground for wash trading that resulted in multiple forms of manipulation in energy markets."[65]

148.    According to the FERC, EOL had a significant effect on the spot price of natural gas:

> EOL's former prominence may have been a significant source of error, both actual and potential, in the price reporting process.  That is, there was a self-referential or circular nature to the prices being reported to the reporting firms because of how traders relied on EOL:  Many market participants used EOL for price discovery; Because of the large quantities traded on EOL, a price posted on EOL would often be used by a trader as its own when contacted by the reporting firms; Even if the reporting firm had in fact randomly sampled traders (of which there is no evidence), the traders would be reporting the same prices they saw on EOL; and Traders' bids and offers that were posted on EOL in turn were based on the prices published by the reporting firms.[66]

149.    For example, trading activity on EOL on January 31, 2002 at Topock indicates 227 trades made and the price rose from $11.30 per MMBtu to $15.00 per MMBtu.  "Of the 227 trades, 174 were made with a single counterparty.  The total volume on EOL for next day-day Topock gas for the day was 2,240,000 MMBtu, of which 1,740,000 MMBtu was with that single counterparty."[67]

150.    Enron's EOL traders ("Market Makers") were always assigned to quote both a bid price and an offer price for Enron's own purchase or sale of natural gas.  Through its investigation, the FERC discovered that during specific periods of time, the Market Makers set the bid-offer spread to zero, commonly referred to as making a "Choice Market."  The FERC explains that the Choice Markets "may, in effect, have been an invitation to EOL customers to engage in wash trading."[68]

---

[65] FERC Final Report at VII-1.
[66] FERC Initial Report at 48-49.
[67] Id. at 49.
[68] FERC Final Report at VII-2.

151.    The FERC Final Report further explains that Choice Markets are generally identifiable by the following characteristics:

> All Trades in the sequence occurred at identical prices;
>
> At least one trade in the sequence was an EOL buy and at least one was an EOL sell;
>
> The Sequence contained at least four trades; and
>
> All trades in the sequence are for the same product at the same volume.[69]

152.    That Enron and the Wash Trading Defendants' motives were opportunistic and manipulative is perhaps best conveyed by an Enron promotional campaign promoting the use of the EOL platform:  Enron offered and awarded a big-screen television to the trader with the highest volume of trades.  The Aquila trader who won the prize engaged in a 40-minute spree of 93 wash trades, and engaged in this market-distorting activity during a Choice Market, thus involving no trading risk to Aquila.  "The combined volume of trades involved in this incident was approximately 1.6 million MWh at a total value of $180 million, but at a net cost of $0.  It is not known to what extent these data may have been reported in market indices or financial statements."[70]  This offer coincided with the month of the highest level of wash trades, October 2000.[71]  Aquila Energy has been implicated as one of the heaviest wash traders, completing 112 wash trades or 29 percent of the total wash trading during Choice Markets.[72]

153.    According to the FERC Final Report, Entergy Trading completed 61 wash trades (16.1 percent of the total wash trading during Choice Markets); Cook Energy completed 22 wash trades (5.8 percent); MidAmerican completed 21 wash trades (5.6 percent); and Mieco

---

[69] Id.

[70] Id. at VII-11.

[71] Id.

[72] Id. at VII-8, Table VII-5 (Wash Trades Completed During Choice Markets by Counterparty).

completed 19 wash trades (5 percent).[73]  According to the FERC report, on September 27, 2001,

Calpine engaged in three wash trading transactions during Choice Markets on the EOL system.[74]

154.    The Counties of San Diego, Santa Clara and San Francisco have recently filed

actions, alleging that Sempra engaged in 245 wash trades, in an effort to manipulate the spot

price of natural gas.[75]  The California suits also claim that Sempra worked with Reliant in wash

trading and churning, for the purpose of inflating natural gas prices.  "Sempra basically ripped

off this city and all the consumers in the county," stated San Diego County Supervisor Dianne

Jacob.  "I'm disgusted by it.  They've lied to the people off San Diego and picked our pockets."

155.    Through EOL, the Wash Trading Defendants had unprecedented influence over

the natural gas market.  Through their use of Choice Markets on EOL, the Wash Trading

Defendants exploited the EOL system and had unprecedented influence to manipulate natural gas

spot prices by taking advantage of the fact that Enron was the counterparty to every wash trade.

156.    Wash trading has a significant effect on natural gas prices, including NYMEX

natural gas futures prices.  According to the FERC Initial Report, "wash trading can adversely

affect the accuracy of published price data . . . .  For example, wash trading provides the illusion

of a deep market (that is, more volume than absent wash trades), which may lead buyers to

assume they are getting a competitive price and trading in a liquid market when in fact they are

not.  Another problem is that, because the daily closing price is often based on the last trade, a

wash trade at the end of a trading day could be used to deliberately move that price."[76]

---

[73] Id.

[74] FERC Final Report at VII-10.

[75] See, Craig D. Rose, Sempra Energy Settles Power Market-Manipulation Allegations for $7.2 Million, San Diego Union-Tribune, July 29, 2004.

[76] FERC Initial Report at 54.

157.    The FERC explains that the "Potential motives for wash trading are numerous. Wash trades might be used to create the illusion that a market is liquid and active, or to increase reported trading revenue figures.  Wash trades might be arranged at prices that diverge from the prevailing market in an attempt to send false signals to other market participants.  Alternatively, the intent might be to affect the average or index price reported for a market, which in turn could benefit a derivatives position or affect the magnitude of payments on a contract linked to the index price."[77]  As Market Makers on EOL, the Wash Trading Defendants had the ability to influence NYMEX natural gas futures prices.

158.    The Wash Trading Defendants manipulated the natural gas market by manipulating natural gas spot prices and NYMEX natural gas futures prices from on or about January 1, 2000 to December 31, 2002 by their false trading activity.

**D.      Defendant Reliant Manipulated Natural Gas
          Futures Contracts Prices by "Churning" Trades**

159.    Beginning as early as June 2000, Reliant abused its dominant position in the natural gas spot market by employing commodities trading strategies for buying physical spot natural gas designed to manipulate natural gas spot prices and NYMEX natural gas futures contracts.  Reliant engaged in this strategy, commonly referred to as "churning," on the EOL system.

160.    EOL had a significant effect on natural gas prices as discussed above.  Reliant's use of EOL was a deliberate, intentional and successful effort to significantly manipulate the spot price of natural gas and thereby the price of NYMEX natural gas futures.

161.    The amount of natural gas it was repeatedly purchasing and selling in short succession on EOL was far in excess of the amount it sold to Los Angeles Department of Water

---

[77] FERC Final Report at VII-1.

and Power ("LADWP").  Reliant's primary use of the natural gas it was purchasing was to generate and sell power into the spot market and to fulfill its commitment to supply natural gas to LADWP.

162.     The FERC discovered that "[o]n the day of the highest Topock prices (flow date of December 12), Reliant accounted for more than 70 percent of the trading volume."[78] Moreover, the FERC concluded that "Reliant's rapid-fire sale and purchase of gas in amounts far in excess of its needs raised the price of gas on EOL significantly.  On average, the price is $9/MMBtu higher on churn days than on other days."[79]

163.     Reliant's churning strategy involved a pattern of natural gas purchases and sales where (a) Reliant both bought and sold during the trading interval, so that the trades largely offset each other; (b) their gross trading volume greatly exceeded net trading volume; and (c) Reliant made a relatively large number of consecutive purchases and/or sales in a short amount of time, often being the only buyer and/or seller during the burst of transactions.

164.     According to the FERC Final Report, Reliant "entered into transactions at the rate of one every 10 seconds.  No other firm ever made 15 or more trades in a single location within 5 minutes; Reliant did this 36 times. Reliant dominated the churn trading, accounting for 24 of the 26 instances we found; this includes 8 consecutive trading days for December 2000, which encompass the highest-ever gas prices in California.  Over this critical 8-day churn period, Reliant's churn volume comprised more than 70 percent of its gross trading volume.  On the day after this string of churning ends, prices drop by more than $25/MMBtu."[80]  From December

---

[78] Id. at II-58.
[79] Id.
[80] FERC Final Report at II-58.

2000 through February 2001, "nearly 50 percent of the spot gas trades on EOL were with Reliant."[81]

165.    On days when Reliant churned, its gross purchases and sales far exceeded its net purchases or sales.  Reliant would often buy at least 200 percent of its actual physical natural gas.  Increasing the volume of natural gas it churned increased the efficacy of Reliant's manipulations because the effect of these churning transactions was to enable Reliant to profit by selling natural gas at or near the top of the price it created by its conduct.

166.    Reliant's churning enabled it to artificially manipulate the day's average price by initially buying (which raised the prices), and then selling (which brought prices back down).  In addition to enabling Reliant to profit by selling natural gas at or near the artificial spot price it had caused, the company's conduct also had the effect of artificially inflating the natural gas spot prices as discussed above.  As a result of Reliant's conduct, natural gas futures contracts traded at artificially manipulated prices during the Class Period.

167.    In December 2000, Reliant's actions led to an increase of $8.54 per MMBtu in the daily average price of natural gas. [82] To implement this manipulation and maximize profits, Reliant engaged in the following illicit activities:

> Sought and obtained a transaction netting agreement ("Netting Agreement") with Enron (Reliant's primary churning counterparty).  Pursuant to the Netting Arrangement, all of Reliant's purchases from Enron were taken together to form a volume-weighted average price.  All Reliant sales to Enron were combined in the same way.  When there were both sales and purchases, the matching amounts were first netted out against each other and the balance was then settled at the respective average prices.  In addition, where there were both sales and purchases, the off-setting or matching amounts would be netted against each other and settled first. Reliant could retain any net profit from the sales even though it was a net

---

[81] Id.
[82] FERC Final Report at ES-5.

buyer and actually owed Enron money overall.  This Netting Agreement provided an incentive for Reliant to churn;

Drove index prices higher by its churning and realized lower costs for its net natural gas purchases through its Netting Agreement by unloading its unneeded gas at the higher prices;

Actively traded in "swing swaps," otherwise known as balance-of-month swaps. These are intra-month swaps that are applied for the remainder of the month, with settlement based on daily spot market prices throughout the duration of the contract.  Reliant had an incentive to churn heavily in the spot natural gas market after purchasing swing swaps because it made profit if natural gas prices rose.

168.    Stating the same point slightly differently, the FERC Final Report states that "Defendant Reliant priced all the spot gas it sold to LADWP at index prices.  Reliant used the spot gas it purchased for itself to generate and sell power at spot market prices, which reflected the indices.  Therefore, Reliant was largely insulated from the increase it caused in the market price of spot gas and effectively bought cheaper gas for itself at everyone else's expense."[83]

169.    Reliant's churning behavior was not typical of other traders on the market, nor was the volume of natural gas Reliant traded.  For instance, Reliant would often trade back and forth with Enron between 20 and 174 times a day.  Further, Reliant was the most likely firm to engage in consecutive trading.  On January 31, 2001, for example, Reliant engaged in 43 consecutive trades before another firm engaged in a single trade.  Reliant was the only firm to make more than 13 consecutive trades and was the only counterparty for 34 of the 40 longest streaks of consecutive trades.  From November 2000 through June 2001, only once did another firm conduct as many as 10 trades within a single clock minute; Reliant did this 14 times.

170.    During the winter of 2000-2001, Reliant engaged in rapid-fire churning on 24 occasions:

---

[83] Id. at II-60.

| Date | Gas Purchased (MMBtu) | Gas Sold (MMBtu) | Net Buy (MMBtu) | Percentage of Reliant's total transaction volume that was "churned" | Percentage of total EOL trading volume |
|---|---|---|---|---|---|
| Nov. 13, 2000 | 390,000 | 380,000 | 10,000 | 97% | 35% |
| Nov. 30, 2000 | 502,000 | 364,000 | 138,000 | 72% | 54% |
| Dec. 1, 2000 | 760,000 | 500,000 | 260,000 | 65% | 62% |
| Dec. 4, 2000 | 513,000 | 406,000 | 107,000 | 79% | 52% |
| Dec. 5, 2000 | 911,000 | 622,000 | 289,000 | 68% | 62% |
| Dec. 6, 2000 | 803,000 | 626,000 | 177,000 | 78% | 59% |
| Dec. 7, 2000 | 700,000 | 440,000 | 260,000 | 62% | 58% |
| Dec. 8, 2000 | 480,000 | 300,000 | 180,000 | 62% | 49% |
| Dec. 11, 2000 | 1,354,000 | 1,108,000 | 246,000 | 81% | 71% |
| Dec. 13, 2000 | 773,000 | 216,000 | 557,000 | 27.9% | 51% |
| Dec. 19, 2000 | 670,000 | 400,000 | 270,000 | 59% | 54% |
| Jan. 31, 2001 | 1,740,000 | 1,460,000 | 280,000 | 83% | 77% |
| Feb. 2, 2001 | 1,235,000 | 880,000 | 355,000 | 71% | 77% |
| Feb. 13, 2001 | 710,000 | 340,000 | 370,000 | 47% | 68% |
| Feb. 28, 2001 | 330,000 | 240,000 | 90,000 | 72% | 40% |
| Mar. 1, 2001 | 315,000 | 310,000 | 5,000 | 98% | 55% |
| Mar. 2, 2001 | 405,000 | 240,000 | 165,000 | 59% | 51% |
| Mar. 20, 2001 | 270,000 | 220,000 | 50,000 | 81% | 44% |
| Mar. 22, 2001 | 200,000 | 230,000 | (30,000) | 87% | 40% |
| Mar. 23, 2001 | 670,000 | 640,000 | 30,000 | 95% | 60% |
| Apr. 3, 2001 | 200,000 | 220,000 | (20,000) | 90% | 40% |
| Jun. 11, 2001 | 624,000 | 448,000 | 176,000 | 71% | 52% |
| Jun. 13, 2001 | 489,479 | 220,000 | 269,479 | 44% | 47% |

171.    The FERC concludes that "[w]e know Defendant Reliant had the ability to unilaterally move the market price through churning, and that it did so. Our econometric evidence is clear on this point. Second, we know that Defendant Reliant had a financial incentive to influence prices by churning, and that it profited by doing so. Our analysis of the netting arrangement makes this clear. Third, we know that churning pushed up the price paid by all participants whose costs were tied in one way or another to spot market index prices."[84]

---

[84] Id.

172.    Reliant, by churning and issuing false reports, manipulated the price of NYMEX natural gas futures contracts from on or before June 1, 2000 to December 31, 2002.

## CLASS ACTION ALLEGATIONS

173.    Plaintiffs bring this action as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:

> All persons, other than Defendants and their employees, affiliates and subsidiaries (whether or not named in this complaint), who purchased and/or sold NYMEX natural gas futures and options contracts between January 1, 2000 and December 31, 2002, and who suffered losses by reason of Defendants' manipulation of the natural gas market.

174.    The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believes that at least thousands of Class members traded NYMEX natural gas futures and options during the Class Period.

175.    Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class.  These common questions of law and fact include, without limitation:

Whether the alleged false reporting and wash trading by Defendants violate the CEA;
Whether Defendants' aiding and abetting violates the CEA;
What effect Defendants' conduct had on the prices of natural gas futures and options purchased or sold by Plaintiffs and the Class during the Class Period; and
The appropriate measure of damages sustained by Plaintiffs and the other members of the Class.

176.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class sustained injuries and damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

177.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are adequate representatives of the Class and have no interests which are adverse to the interests of absent Class members.  Plaintiffs have retained counsel who have substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation class action litigation.

178.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

179.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**FRAUDULENT CONCEALMENT**

180.     By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing.  Defendants, *inter alia*, falsely reported prices and volume trade information to trade publications in order to manipulate the spot price for natural gas futures and options on the NYMEX.

181.    Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until it became public.  The first public reports of any government action relating to Defendants' unlawful conduct occurred on or about November 20, 2002, when California's Lieutenant Governor Cruz Bustamante filed an action on behalf of California consumers against Defendants Reliant, Dynegy, El Paso Merchant, Williams, and Duke, alleging that they conspired to report and publish fraudulent natural gas prices to artificially inflate the market price of natural gas.

182.    Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in November 2002.

183.    Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class has been tolled during the period of such fraudulent concealment.

## COUNT I

## MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
### (7 U.S.C. § 1 et seq.)

184.    Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

185.    Plaintiffs purchased and sold one or more NYMEX natural gas futures and options contracts during the Class Period, and were injured as a result of the Defendants' manipulations of the price of those contracts, and/or the price of the natural gas underlying those contracts, in violation of the Commodity Exchange Act, 7 U.S.C. § 1 et seq.

186.    Defendants' trading activities alleged herein constitute manipulation of the price of natural gas futures and options, and/or the price of natural gas underlying those contracts, in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

187.    As set out more fully above, during the Class Period, Defendants submitted false natural gas trading information, including artificial price and volume information to several industry publications and reporting firms that publish natural gas spot price indices, with the knowledge that, as a result of the false reports, the market prices for natural gas would be distorted to the benefit of Defendants.

188.    Defendants entered into transactions involving natural gas known as "wash sales," "accommodation trades," and fictitious sales, and intentionally undertook these transactions to cause natural gas futures and option prices to be reported, registered or recorded that were not true and bona fide prices, in violation of Section 4c of the CEA, 7 U.S.C. §6c.  Defendants were direct participants in this unlawful conduct to manipulate the spot price of natural gas futures and option.

189.    Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## COUNT II

### AIDING AND ABETTING VIOLATIONS OF SECTION 22 OF THE COMMODITY EXCHANGE ACT
(7 U.S.C. § 25)

190.    Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

191.    Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of other Defendants'

manipulations of natural gas and natural gas futures and option prices, including false reporting and wash sales, and willfully intended to assist these manipulations to cause the price of NYMEX natural gas futures contracts and options to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

192.    Does 1-100 and other unnamed parties including affiliates of Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.  Does 1-100 and other unnamed parties including affiliates of Defendants did so knowing of Defendants' manipulations of natural gas and natural gas futures and option prices, including false reporting and wash sales, and willfully intended to assist these manipulations to cause the price of NYMEX natural gas futures contracts and options to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

193.    Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

194.    As a further direct and proximate result of the acts of Defendants, Plaintiffs and the Class have been required to act in the protection of their interests by filing this action, and have incurred attorneys' fees and other expenditures, in a sum to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs denominated as Class representative and Plaintiffs' counsel be appointed as counsel for the Class;

(B)     That Plaintiffs and the Class recover actual damages, as provided by law,

determined to have been sustained for violations of the CEA, and that judgment be entered

against Defendants on behalf of Plaintiffs and the Class;

(C)     That Plaintiffs and the Class recover their costs of the suit, including attorney's

fees; and

(D)     For such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

Dated:  October 14, 2004

**GOODKIND LABATON RUDOFF &
SUCHAROW LLP**


By    /S/ BERNARD PERSKY
        Bernard Persky, Esq. (BP-1072)
        Craig L. Briskin, Esq. (CB-1285)
100 Park Avenue – 12th Floor
New York, NY 10017
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

Douglas G. Thompson, Jr., Esq.
Richard M. Volin, Esq.
Ali Oromchian, Esq.
**FINKELSTEIN, THOMPSON & LOUGHRAN**
1050 30th Street, NW
Washington, DC 20007
Telephone:  (202) 337-8000
Facsimile:  (202) 337-8090

Christopher Lovell, Esq. (CL-2595)
Gary S. Jacobson, Esq. (GJ-2481)
Christopher J. Gray, Esq. (CG-0334)
**LOVELL STEWART HALEBIAN, LLP**
500 Fifth Avenue
New York, NY 10110
Telephone: (212) 608-1900

Facsimile: (212) 719-4677

Stephen Lowey, Esq. (SL-7677)
Richard W. Cohen, Esq. (RC-5220)
Geoffrey M. Horn, Esq. (GH-4179)
Peter St. Phillip, Jr., Esq. (PS-0726)
**LOWEY DANNENBERG**
**BEMPORAD & SELINGER, P.C.**
The Gateway, One North Lexington Avenue
White Plains, NY 10601
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

Of Counsel:


Steven A. Schwartz, Esq.
**CHIMICLES & TIKELLIS, LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Telephone:  (610) 642-8500
Facsimile:  (610) 649-3633

James C. Krause, Esq.
Ralph B. Kalfayan, Esq.
**KRAUSE & KALFAYAN**
1010 Second Avenue, Suite 1750
San Diego, CA 92101
Telephone:  (619) 232-0331
Facsimile:  (619) 232-4019

Louis F. Burke, Esq.
**LOUIS F. BURKE, P.C.**
360 Lexington Avenue, 14th Floor
New York, NY 10017
Telephone: (212) 682-1700
Facsimile: (212) 808-4280

Marvin A. Miller, Esq.
Patrick E. Cafferty, Esq.
**MILLER FAUCHER and CAFFERTY LLP**
30 North LaSalle Street, Suite 3200
Chicago, IL 60602
Telephone: (312) 782-4880
Facsimile:  (312) 782-4485

Bryan Clobes, Esq.
**MILLER FAUCHER and CAFFERTY LLP**
One Logan Square
18th & Cherry Streets, Suite 1700
Philadelphia, PA 19103
Telephone:  (215) 864-2800
Facsimile:  (215) 864-2810

Robert S. Schachter, Esq.
**ZWERLING, SCHACHTER & ZWERLING, LLP**
845 Third Avenue, 6th Floor
New York, NY 10022
Telephone:  (212) 223-3900
Facsimile:  (212) 371-5969

EXHIBIT A

| | |
|---|---|
| AEP ENERGY SERVICE, INC. | ("AEP Energy") |
| AMERICAN ELECTRIC POWER CO., INC. | ("AEP") |
| AQUILA ENERGY MARKETING CORP. | ("Aquila Energy") |
| AQUILA MERCHANT SERVICE, INC. | ("Aquila") |
| CALPINE ENERGY SERVICES, L.P. | ("Calpine") |
| CINERGY MARKETING & TRADING, L.P. | ("Cinergy Marketing") |
| CMS FIELD SERVICES | ("CMS Field") |
| CMS MARKETING SERVICES & TRADING | ("CMS Marketing") |
| COOK INLET ENERGY SUPPLY, LLC | ("Cook Energy") |
| CORAL ENERGY RESOURCES, LP | ("Coral Energy") |
| DUKE ENERGY TRADING AND MARKETING, LLC | ("Duke") |
| DYNEGY MARKETING & TRADE | ("Dynegy") |
| EL PASO MERCHANT ENERGY, L.P | ("El Paso Merchant"). |
| ENSERCO ENERGY, INC. | ("Enserco") |
| ENTERGY-KOCH TRADING, L.P. | ("Entergy Trading") |
| E PRIME, INC. | ("E-Prime") |
| MIDAMERICAN ENERGY COMPANY | ("MidAmerican") |
| MIECO, INC. | ("Mieco") |
| ONEOK ENERGY MARKETING AND TRADING COMPANY, L.P. | ("Oneok Energy") |
| ONEOK, INC. | ("Oneok") |
| RELIANT ENERGY SERVICES, INC. | ("Reliant") |
| SEMPRA ENERGY TRADING | ("Sempra") |
| WD ENERGY SERVICES, INC. | ("WD Energy") |
| WEST COAST POWER, LLC | ("West") |
| WILLIAMS COMPANIES, INC. | ("Williams") |
| WILLIAMS ENERGY MARKETING AND TRADING COMPANY | ("Williams Energy") |
| DOES 1-100 | |

609969 v1
[10/14/2004 15:42]