UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In Re NATURAL GAS COMMODITY LITIGATION

                      :       03 Civ. 6186 (VM) (AJP)

                      :       **OPINION AND ORDER**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Chief Magistrate Judge:**

Plaintiffs, natural gas futures traders, have moved to compel the production of documents from defendants American Electric Company, Inc. ("AEP") and Aquila Merchant Services ("Aquila" or "AMS") (for purposes of this decision, collectively "defendants"). (5/2/05 Plfs. Letter Br.)[1] Defendants claim that these documents are privileged and that their prior production of these documents to governmental agencies has not waived this privilege, since that production was pursuant to non-waiver agreements.

For the reasons discussed below, plaintiffs' motion to compel is <u>DENIED</u>.

<u>FACTS</u>

The facts pertaining to the underlying action have been set forth in Judge Marrero's opinion denying defendants' motion to dismiss. <u>See</u> <u>In re Natural Gas Commodity Litig.</u>, 337 F. Supp. 2d 498 (S.D.N.Y. 2004). Only those facts relevant to this motion are set forth below.

---

[1] The parties did not docket and file most of their submissions with the Clerk of Court.

**AEP's Internal Investigation**

In September 2002, in response to media reports exposing the inaccurate reporting of another natural gas trading company, AEP subsidiary American Electric Power Energy Services, Inc. ("AEPES") asked all AEPES traders to certify that they had not engaged in inaccurate reporting of natural gas transactions to trade publications. (5/16/05 Routh Aff. ¶ 2.) In October 2002, AEP dismissed five traders who had been unable to certify their trading conduct, publicly reported the dismissals, and reported them to the Federal Energy Regulatory Commission ("FERC") and the Commodity Futures Trading Commission ("CFTC"). (5/16/05 Routh Aff. ¶ 2.) At a meeting a week later between FERC, CFTC (collectively "the governmental agencies") and AEP outside counsel Stephen Routh from Hogan & Hartson, the governmental agencies said that "AEP would have to conduct an internal investigation of the circumstances surrounding inaccurate reporting and provide the agencies with a report of that investigation before the agencies would resolve claims regarding the conduct of the AEPES traders through settlement, as opposed to through litigation." (Id. ¶ 3.) Hogan & Hartson retained an outside consultant, Cornerstone Research, to aid in the internal investigation. (5/16/05 AEP Letter Br. at 7.)

The internal investigation involved comparison/analysis of two different types of data, both of which have been produced to plaintiffs in this litigation. (5/16/05 Routh Aff. ¶ 4.) The first type of data, referred to by AEP as "spreadsheet data," contained information "in a form consistent with data transmitted by natural gas traders to trade publications," reflecting daily high, low and average prices from different trading hubs or reflecting monthly trade-by-trade price and volume information for each trading hub. (Id.) While the data in these spreadsheets was in the form

generally used to transmit data to the trade publications, AEP does not know whether these spreadsheets were in fact transmitted to the trade publications because the trader responsible for doing so was one of the dismissed traders. (Id.) The second type of data, referred to by AEP as "system data," was from AEP's database of "trades actually made by traders on behalf of AEP." (Id.) The system data includes data for all trades made by AEP, including "physical and financial natural gas trades as well as trades for other types of commodities." (Id. ¶ 7.)

**Aquila's Internal Investigation**

Aquila's outside counsel Orrick, Herrington & Sutcliffe conducted a similar internal investigation. (5/2/05 Plfs. Letter Br. Ex. E: 7/14/03 Orrick, Herrington Letter to CFTC.) Orrick, Herrington hired the forensic accounting firm Kroll Zolfo Cooper LLC ("Kroll") to assist in the analysis. (Id.; see also Dkt. No. 279: Deacon 5/26/05 Aff. ¶¶ 1-2.) Kroll conducted an analysis comparing "trade data recorded internally by AMS to available trade data that AMS employees sent or may have sent to natural gas trade publications." (Deacon Aff. ¶ 2.) This analysis, finalized in a Kroll Report, compared

> certain spreadsheets containing reported trading data for certain months with corresponding data recorded in AMS's internal Gas Works system. Kroll analyzed all of the trades contained on these spreadsheets and did not selectively analyze any specific individual reported trades. Kroll's analysis was limited to a review of the data contained in these documentary sources, and was not based on witness interviews or other non-documentary sources.

(Deacon Aff. ¶ 3.) One type of data Kroll analyzed were spreadsheets that apparently were reported to trade publications, which spreadsheets were made available to plaintiffs in this case in October 2004. (Id. ¶ 4.) A second type of data Kroll analyzed were spreadsheets containing similar trade

data presumed to have been reported to the trade publications, and produced to plaintiffs in this litigation in October 2004. (Id. ¶ 5.) The third type of data which AMS located but was not used in the Kroll Report were draft spreadsheets, which AMS produced to plaintiffs as well. (Id. ¶ 6.) Finally, AMS produced to plaintiffs the recorded trading data from its internal Gas Works system that was analyzed in the Kroll Report. (Id. ¶ 7.)

**The Non-Waiver Agreements**

**AEP**

In February 2003, in connection with ongoing settlement discussions between the CFTC and AEP, the CFTC requested review of a draft AEP attorney-client memorandum that "in part summarized certain data analyses undertaken by and at the direction of AEP's outside legal counsel, including" Routh. (Routh Aff. ¶ 11.) Before producing this information to the CFTC, Routh secured the CFTC's agreement that it would keep the information confidential, that it would not consider it a waiver of privilege "with respect to any information beyond what was specifically set forth in the memorandum," and that the CFTC would not disclose information to anyone else. (Id. ¶ 12.) Routh memorialized that agreement in a letter dated February 24, 2003 (id.), which stated:

> We are providing the enclosed Memorandum in reliance on the Division's agreement that, in deference to our concerns regarding preservation of privilege set forth below, the Division will return the Memorandum to us at our meeting scheduled for February 27, 2003 and not retain any copy.
>
> We submit this Memorandum as a selective and limited disclosure of a confidential and privileged attorney-client communication and of attorney work product solely for the purpose of exploring and negotiating a possible settlement and resolution of the Division's investigation as to AEPES. We intend that its privileged

character be preserved. As to the Division Staff, no waiver of privilege is intended beyond the specific statements contained in the Memorandum (there is no general waiver of privilege to the subject matters discussed in the Memorandum or of any underlying information or analyses referenced in the Memorandum). As to third parties, there is no waiver of privilege at all; the information in the Memorandum is disclosed for the Division's Staff alone in furtherance of our settlement discussions and the resolution of the investigation as to AEPES.

(Routh Aff. Ex. 1: 2/24/03 Letter from Routh to CFTC.)[2/]

In April 2003, attorneys for FERC and the DOJ requested that AEP's counsel provide them with the same attorney-client memorandum and appendices that AEP had given the CFTC. (Routh Aff. ¶ 13.) The governmental agencies also requested "back-up information" for and additional information on "the data analyses that had been undertaken by and at the direction of AEP's legal counsel." (Id.)

Before producing the requested documents, AEP counsel Routh secured non-waiver agreements from each agency with respect to all material produced. (Id. ¶ 14.) The terms of the non-waiver agreements were substantially the same as those outlined in the February 2003 letter and were memorialized in a letter dated April 15, 2003. (Id. ¶ 14; Routh Aff. Ex. 2: 4/15/03 Routh letter to CFTC, FERC, DOJ.) The only differences were that in the April 15, 2003 letter, the privileged documents were produced in cooperation with "investigations being conducted by each [agency]," instead of as part of ongoing settlement discussions as had been the case in the February 2003 letter; there was no reference to any of the agencies returning the documents after any set point, as had been the case in the February 2003 letter; and the April 2003 letter said that in addition to being covered

---

[2/] At oral argument, the Court addressed whether the settlement privilege should enter into analysis of the waiver issue, and because both parties agreed it should not, it is not considered here. (See 5/19/05 Conf. Transcript ["Tr."] at 45.)

by attorney-client and work product privilege, the materials were within the scope of 17 C.F.R. §

145.9(d)(1)(i)-(iv), and that AEP requested that the government maintain the confidentiality under

the Freedom of Information Act ("FOIA") of submitted documents, while the February 2003 only

referenced that regulation at the top of the letter.  (Compare Routh Aff. Ex. 1: 2/24/03 Routh Letter

to CFTC  (quoted above), with Routh Aff. Ex. 2: 4/15/03 Routh letter to CFTC, FERC, DOJ.)

In May 2003, in response to follow-up requests, AEP produced additional materials

to the CFTC and FERC under the same non-waiver agreement.  (Routh Aff. ¶ 14.)

In September 2003, the CFTC filed a civil action against AEP in the United States

District Court for the Southern District of Ohio alleging that AEP had knowingly reported inaccurate

data to the trade publications and attempted manipulation.  (Id. ¶ 16.)  In January 2005, the CFTC

and AEP settled that litigation.  (Id.)  At no point during that litigation did the CFTC identify which

trades had been allegedly false or knowingly inaccurate.  (Id.)

**Aquila**

In response to a subpoena, Aquila produced "Confidential Materials" including the

Kroll Report to the CFTC in July 2003 (5/2/05 Plfs. Letter Br. Ex. E: 7/14/03 Orrick, Herrington

Letter to CFTC), but only after delineating the terms of a non-waiver agreement:

> Please be advised that by producing the Confidential Materials pursuant to
> this agreement, Aquila does not intend to waive the protection of the attorney work
> product doctrine, attorney-client privilege, or any other privilege applicable as to
> third parties.  Aquila believes that the Confidential Materials are protected by, at a
> minimum, the attorney work product doctrine and the attorney-client privilege.
> Aquila believes that the Confidential Materials warrant protection from disclosure.
>
> The CFTC will maintain the confidentiality of the Confidential Materials
> pursuant to this agreement and will not disclose them to any third party, except to the

extent that the CFTC determines that disclosure is otherwise required by law or would be in furtherance of the CFTC's discharge of its duties and responsibilities.

The CFTC will not assert that the production of the Confidential Materials to the CFTC by Aquila constitutes a waiver of the protection of the attorney work product doctrine, the attorney-client privilege, or any other privilege applicable as to any third party. The CFTC agrees that production of the Confidential Materials by Aquila to CFTC does not effect a subject matter with regard to additional testimony, documents or other materials. Any grounds for additional production by Aquila to CFTC that may exist apart from the production provided for in this agreement shall remain unaffected by this agreement.

(Id. at 1-2.) Aquila, like AEP, also requested confidential treatment of its documents under 17 C.F.R. § 145.9 for FOIA purposes. (Id. at 2.) The CFTC counter-signed the letter as "Agreed and Accepted." (Id.) The "confidential materials" "primarily included the Kroll comparison analysis" (5/16/05 AMS Letter Br. at 2), supplemented by documents identified on Aquila's privilege log in this case (see 5/2/05 Plaintiff Letter Br. Ex. B). In September 2003, Aquila produced the same materials to the FBI after obtaining an agreement by the FBI to abide by the terms of the confidentiality agreement with the CFTC. (5/2/05 Plfs. Letter Br. Ex. B: 9/12/03 Orrick, Herrington Letter to FBI; see 5/16/05 AMS Letter Br. at 3.)

**Plaintiffs' Motion to Compel**

On May 2, 2005, plaintiffs moved to compel production of the documents that AEP and Aquila previously disclosed to the governmental agencies but in this litigation have withheld from plaintiffs (including the Kroll and Cornerstone Reports) because defendants claim attorney-client and/or work product privilege, and rely on the non-waiver agreements to respond to plaintiffs' waiver claim. (See 5/2/05 Plfs. Letter Br. at 2; Plfs. Letter Br. Exs. A-B: AEP & Aquila Privilege Logs.)

Plaintiffs argue that if a work product privilege applies to the documents, plaintiffs' substantial need overcomes that protection for factual material. (5/2/05 Plfs. Letter Br. at 4.) Mostly, however, plaintiffs contend that defendants' production of these documents to the governmental agencies constituted a waiver of any privilege and therefore that defendants should be compelled to produce all the withheld documents. (Id. at 8-12.)[3/]

## ANALYSIS

## I. PRIOR DISCLOSURE OF PRIVILEGED DOCUMENTS TO GOVERNMENTAL AGENCIES UNDER A NON-WAIVER AGREEMENT

Plaintiffs contend that defendants waived any privilege when they disclosed documents to the governmental agencies in connection with a previous investigation. (5/2/05 Plfs. Letter Br. at 8-12.) In contrast, defendants contend that their non-waiver agreements were sufficient to preserve the privilege.

---

[3/] Plaintiffs also contended that the Court should grant their motion on the ground that defendants have put these documents "at issue." (Id. at 3.) At the May 19, 2005 discovery conference, this Court denied plaintiffs' motion on this point. (5/19/05 Conf. Tr. at 46.) Plaintiffs also contended that the "short-cut" proposal amounted to a waiver by defendants of any privilege they now claim. (5/2/05 Plfs. Letter Br. at 8 n.1.) The Court also denied plaintiffs' motion on this point at the May 19, 2005 conference. (5/19/05 Conf. Tr. at 46-47.) Finally, plaintiffs in a throw-away paragraph in their letter brief assert that "[p]laintiffs do not concede that defendants' submissions to the government are protected by the attorney-client or work-product privilege in the first instance. Indeed, the burden of demonstrating both that the privilege exists and has not been waived is on Defendants." (5/2/05 Plfs. Letter Br. at 8.) Defendants have clearly established that these analyses – by counsel and by consultants hired by counsel because of government investigations and potential litigation – are at least subject to the work product privilege, and plaintiffs did not renew this argument in their reply letter brief or at oral argument. The Court accordingly finds that the material is subject to the work product privilege. The issue that remains is whether defendants waived that privilege.

A.    <u>State of the Law</u>

The Second Circuit has not directly answered the question posed by plaintiffs' motion to compel: whether disclosure of privileged documents to governmental agencies in response to a subpoena constitutes a waiver of that privilege for subsequent litigations where the disclosing party (defendants, here) entered into a confidentiality, "non-waiver" agreement before producing the documents to the governmental agencies.  In <u>In re Steinhardt Partners, L.P.</u>, 9 F.3d 230, 235 (2d Cir. 1993), the Second Circuit held that the defendant Steinhardt had waived its work product privilege when it voluntarily submitted a privileged memorandum to the SEC in a previous investigation.  The Second Circuit in <u>Steinhardt</u> found the disclosure to have been voluntary despite the fact that it was made in response to an SEC subpoena, because no compulsory legal process had been necessary to compel production to the SEC.  <u>Id.</u> at 234.  The defendant in <u>Steinhardt</u> had not entered into a confidentiality agreement before disclosing its privileged documents to the government.

The Second Circuit in <u>Steinhardt</u> explained the background to work-product protection and waiver:

> The logic behind the work product doctrine is that opposing counsel should not enjoy free access to an attorney's thought processes.  An attorney's protected thought processes include preparing legal theories, planning litigation strategies and trial tactics, and sifting through information.  At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.  The doctrine grants counsel an opportunity to think or prepare a client's case without fear of intrusion by an adversary.
>
> Common sense and the practicalities of litigation define the limits of the work product doctrine.  Once a party allows an adversary to share the otherwise privileged thought processes of counsel, the need for the privilege disappears.  Courts therefore accept the waiver doctrine as a limitation on work product protection.  <u>The waiver</u>

> doctrine provides that voluntary disclosure of work product to an adversary waives
> the privilege as to other parties.

In re Steinhardt Partners, L.P., 9 F.3d at 234-35 (citations & internal quotations omitted, emphasis added).

The Second Circuit in Steinhardt, after reviewing decisions from other Circuits, rejected a "selective waiver" approach, and found that Steinhardt had waived the privilege by producing the document to the SEC. In re Steinhardt Partners, L.P., 9 F.3d at 235. The "selective waiver" approach adopted by the Eighth Circuit preserves privilege in a civil litigation for documents previously disclosed to the government in response to litigation or investigation. See Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir. 1978). The Second Circuit agreed with the D.C. Circuit "that selective assertion of privilege should not be merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage." In re Steinhardt Partners, L.P., 9 F.3d at 235 (citing Permian Corp. v. United States, 665 F.2d 1214, 1221 (D.C. Cir. 1981)).

Nevertheless, the Second Circuit in Steinhardt "decline[d] to adopt a per se rule that all voluntary disclosures to the government waive work product protection." Id. at 236. Instead, according to the Second Circuit:

> Crafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis. Establishing a rigid rule would fail to anticipate situations in which the disclosing party and the government may share a common interest in developing legal theories and analyzing information, or situations in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials.

Id. (emphasis added).[4]

_____

[4]        Cf. In re Grand Jury  Proceedings, 219 F.3d 175, 185 (2d Cir. 2000) (In case concerning
                                                                                              (continued...)

Subsequent to Steinhardt, in cases where the parties disclosed privileged material to the government in a prior litigation/investigation, the district courts within this Circuit have found significant the presence or absence of a non-waiver/confidentiality agreement. See, e.g., Maruzen Co. v. HSBC USA, Inc., 00 Civ. 1079, 00 Civ. 1512, 2002 WL 1628782 at *2 (S.D.N.Y. 2002) (Since defendants, who claimed the privilege, had "explicit confidentiality agreements with the authorities satisfying Steinhardt, [and other cases], plaintiffs' motion to compel is hereby denied in all respects."); In re Leslie Fay Cos. Sec. Litig. ("Leslie Fay II"), 161 F.R.D. 274, 282-84 (S.D.N.Y. 1995) ("[W]hen the Company has voluntarily disclosed to the SEC the ACR [Audit Committee Report] exonerating Leslie Fay management and later sued BDO based on the report's findings," subject matter waiver of attorney-client privilege found in Report and factual underlying documents. Court found no further waiver from disclosures to U. S. Attorney's Office and bankruptcy examiner, which "were made pursuant to confidentiality agreements intended to preserve any privilege applicable to the disclosed documents. . . . We think that the May 23 [confidentiality] agreement satisfies the standard articulated in Steinhardt."); In re Leslie Fay Cos. Sec. Litig. ("Leslie Fay I"), 152 F.R.D. 42, 44 (S.D.N.Y. 1993) (Court need not determine whether Audit Committee Report constitutes work product "because we find that the Audit Committee waived any work product immunity it may have had when it voluntarily disclosed the Report to the SEC without first obtaining

---

4/      (...continued)
        whether corporation's chairman's grand jury testimony waived the corporation's privilege, the
        Second Circuit stated that "we believe that the implied waiver analysis should be guided
        primarily by fairness principles. . . . Since fairness depends on context, we believe it is not
        prudent to formulate a per se rule in this area of the law.") (citing, inter alia, Steinhardt).

a confidentiality agreement."); see also, e.g., Spanierman Gallery, Profit Sharing Plan v. Merritt, 00 Civ. 5712, 2003 WL 22909160 at *3, 5 (S.D.N.Y. Dec. 9, 2003) (defendant waived attorney-client and work product privileges for documents produced to FBI; defendant "took no precautions to preserve the privilege when the documents were produced to the FBI. They were not labeled 'confidential' or 'privileged,' and there was no agreement with the FBI that the documents were to be treated as privileged and confidential, and should not be produced to third parties."); Bank of America v. Terra Nova Ins. Co., 212 F.R.D. 166,172-73 (S.D.N.Y. 2002) (disclosure of work-product material to government agencies in hope they would prosecute person who stole from company is not trial preparation, so waiver found; Court notes that "[w]hen material is disclosed to a law enforcement agency without any agreement regarding confidentiality, there is a strong potential that the material may ultimately become public and thus available to an adversary." "In re Steinhardt left open the possibility that a waiver might not be found if there is an explicit agreement to maintain confidentiality, see 9 F.3d at 236 – a circumstance that does not exist in this case.")

It appears that while the Second Circuit in Steinhardt declined to adopt a per se waiver approach, the majority of Circuits have adopted such a position, leaving the Second Circuit (and the different Eighth Circuit approach) in the minority. See, e.g., In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289, 302-07 (6th Cir. 2002) (adopting per se waiver approach for attorney-client and work product privilege),[5] cert. denied, 539 U.S. 977, 124

---

[5] The Sixth Circuit in Columbia noted that a "review of the positions presented by the various courts reveals three general opinions on the issue – selective waiver is permissible; selective waiver is not permissible under any situations; and selective waiver is permissible in
(continued...)

S. Ct. 27 (2003); <u>United States</u> v. <u>MIT</u>, 129 F.3d 681, 686, 688 (1st Cir. 1997) (rejecting selective waiver approach, finding attorney-client and work product privileges waived by disclosure to government agency, but leaving open issue of whether waiver would apply to <u>opinion</u> work product documents); <u>Westinghouse Elec. Corp.</u> v. <u>Republic of the Philippines</u>, 951 F.2d 1414, 1418, 1426-30 (3d Cir. 1991) (Finding attorney-client and work product privileges waived because of prior disclosure of privileged documents to governmental agency; even if government and disclosing party had entered into a confidentiality agreement, result would be the same.); <u>In re Chrysler Motors Corp. Overnight Evaluation Program Litig.</u>, 860 F.2d 844, 846-47 (8th Cir. 1988) (defendant waived work product privilege for documents sought by government which defendant had disclosed to adversary in civil litigation, despite confidentiality agreement); <u>Permian Corp.</u> v. <u>United States</u>, 665 F.2d 1214, 1217-18, 1219-22 (D.C. Cir. 1981) (attorney-client privilege was waived when party disclosed documents to the SEC, regardless of intent to preserve privilege against other government agencies; affirmed district court's finding that work product privilege had not been waived as to other documents because of written confidentiality agreement); <u>cf.</u> <u>Genentech, Inc.</u> v. <u>United States Int'l Trade Comm'n</u>, 122 F.3d 1409, 1417 (Fed. Cir. 1997)(rejecting limited waiver approach in an "inadvertent disclosure" case);[6/] <u>see generally</u> Theodore R. Lotchin, <u>No Good Deed Goes</u>

_____

[5/]    (...continued)

situations where the Government agrees to a confidentiality order." <u>Id.</u>, 293 F.3d at 295 (citations omitted). The Second Circuit does not explicitly fall into any of those three categories, but would appear to be closest to the last category; indeed, the Sixth Circuit in <u>Columbia</u> categorized the Second Circuit's position, based on <u>Steinhardt</u> and district court decisions, as falling in the third group. 293 F.3d at 300-01.

[6/]    District court decisions in those Circuits which have not decided the issue mostly have

(continued...)

---

(...continued)
rejected the selective waiver approach. <u>Compare</u>, <u>e.g.</u>, <u>Hobley</u> v. <u>Burge</u>, No. 03 C 3678, 2004 WL 856439 at *7 (N.D. Ill. Apr. 21, 2004) (work product privilege waived because City had previously disclosed documents to Special Prosecutor); <u>In re Bank One Sec. Litig., First Chicago Shareholder Claims</u>, 209 F.R.D. 418, 423-25 (N.D. Ill. 2002) (in accord with <u>Westinghouse</u> and <u>Columbia/HCA Healthcare</u>, defendant Bank One's voluntary production to governmental investigative body, Office of the Comptroller of the Currency, waived its work product privilege because the relationship was adversarial notwithstanding existing confidentiality agreement); <u>United States</u> v. <u>Bergonzi</u>, 216 F.R.D. 487, 494, 496-98 (N.D. Cal. 2003) (company waived its attorney-client and work product privileges when it disclosed documents to government where the confidentiality agreements were not unconditional), <u>appeal dismissed as moot</u>, 403 F.3d 1048, 1050 (9th Cir. 2005) ("Given our finding of mootness, we do not reach [company's] argument that we should recognize a form of 'selective' or 'partial' waiver . . ."); <u>United States</u> v. <u>South Chicago Bank</u>, No. 97 CR 849, 1998 WL 774001 at *4-5 (N.D. Ill. Oct. 30, 1998) (report produced to governmental regulatory agency under confidentiality agreement waived privilege); <u>with</u>, <u>e.g.</u>, <u>In re McKesson HBOC, Inc. Sec. Litig.</u>, No. 99-CV-20743, 2005 WL 934331 at *9-10 (N.D. Cal. Mar. 31, 2005) (Company's confidentiality agreements with the government were sufficient to preserve work product privilege as to subsequent adversaries because "the presence of a confidentiality agreement ensures, to the extent possible under the law, that disclosure of the protected materials will not reach adverse parties."); <u>Saito</u> v. <u>McKesson HBOC, Inc.</u>, No. Civ. A. 18553, 2002 WL 31657622 at *11(Del. Ch. Nov. 13, 2002) (applies selective waiver rule: McKesson HBOC, due to its confidentiality agreement, reasonably expected its privilege would be preserved in disclosure of documents to SEC), <u>aff'd</u>, 870 A.2d 1192 (Del. 2005); <u>cf.</u> <u>LaBelle</u> v. <u>Philip Morris Inc.</u>, No. 2-98-3235-23, 2000 WL 33957169 at *5-7 (D.S.C. Oct. 23, 2000) (defendants waived attorney-client and work product privileges for documents produced to government in response to grand jury subpoena despite confidentiality agreement); <u>In re M & L Bus. Mach. Co., Jobin</u> v. <u>Bank of Boulder</u>, 167 B.R. 631, 637 (D. Colo. 1994) ("Production of documents under a grand jury subpoena does not automatically vitiate the attorney-client privilege, much less in an unrelated civil proceeding brought by a non-governmental entity. This is especially true in a case such as this, where the record demonstrates that the [defendant] has consistently sought to protect its privilege" through production pursuant to a confidentiality agreement); <u>In re M & L Bus. Mach. Co., Jobin</u> v. <u>Bank of Boulder</u>, 161 B.R. 689, 695-97 (D. Colo. 1993) (recognizing split in circuits on limited waiver and that 10th Circuit had yet to rule on the issue, and holding defendant had not waived its attorney-client privilege through previous disclosure of documents to United States Attorney in connection with grand jury investigation for purposes of subsequent

(continued...)

Unpunished? Establishing a Self-Evaluative Privilege for Corporate Internal Investigations, 46 Wm. & Mary L. Rev. 1137, 1157 (2004) ("[T]he disclosure of confidential information to a federal agency will usually waive the privilege for all future cases regarding communication on the same subjects, especially if the disclosure took place during the course of an investigation or administrative proceeding. Although this precedent is firmly established, several federal circuits have declined to adopt a per se rule that every voluntary production by a corporate client waives the attorney-client and work product privileges.") (fns. omitted); Jay G. Martin, Strategies for Boards of Directors Conducting Internal Investigations, 1479 PLI/Corp 473, 485 (2005) ("Recent cases are divided on whether providing these materials to the government, even under a confidentiality or nonwaiver agreement, operates as a waiver of the attorney-privilege and work product privileges as to third parties. Recent decisions favoring waiver outnumber those rejecting waiver."); Andrew J. McNally, Comment, Revitalizing Selective Waiver: Encouraging Voluntary Disclosure of Corporate Wrongdoing by Restricting Third Party Access to Disclosed Materials, 35 Seton Hall L. Rev. 823, 828 (2005) ("In most jurisdictions, a corporation's disclosure of sensitive materials to a government agency constitutes a complete waiver of the otherwise applicable privileges. A corporation's initial disclosure of otherwise privileged materials to the government, according to most courts, waives those privileges as to all other parties; thus, civil litigants seeking to sue the corporation will typically be granted unfettered access to the disclosed materials. Even confidentiality arrangements

---

6/      (...continued)
        bankruptcy proceedings because defendant had entered into a letter agreement with the
        government which specifically expressed intention to preserve confidentiality of documents
        with respect to third parties including subsequent proceedings).

between the disclosing corporation and the government agency are seldom sufficient to permit the successful assertion of privilege against a civil plaintiff if a previous disclosure was made.") (fns. omitted); Mark Robeck et al., <u>Corporate Governance in the Face of Government Investigations</u>, 17 No. 2 Health Law. 20, 26 (2005) ("The majority rule in the circuits is that a voluntary disclosure of information operates as a waiver of the surrounding privileges in subsequent actions, therefore disallowing argument for protection when future plaintiffs demand the same information provided to the government. Therefore, anything produced to the government should be expected to end up in the hands of plaintiffs in subsequent civil actions via the discovery process and requests to the government agency through the Freedom of Information Act. Despite this rule, corporations may be able to safeguard their privileges via a written agreement with the government agency.") (fns. omitted); Kara Altenbaumer-Price, <u>Assessing Risks of Sharing Internal Investigations: Target Firms Cooperating with Government Risk Waiving Their Privilege</u>, N.Y.L.J., Mar. 21, 2005, at S2 ("The D.C., 1st, 3d and 6th circuits have completely rejected the idea that the attorney-client privilege or work-product doctrine protection are not waived by virtue of the 'selective waiver' or 'limited waiver' doctrine by production to the government, even if the government and the company enter into a confidentiality agreement. . . . The Federal, 2d and 4th Circuits have rejected the 'selective waiver' doctrine but have not addressed it in a context in which the government and the company have entered into a confidentiality agreement. The 8th Circuit alone has unqualifiedly adopted the 'selective waiver' doctrine . . . [T]he majority rule clearly provides, particularly absent a strong confidentiality agreement, that disclosure to the government will destroy the protections of the attorney-client privilege and work-product doctrine.") (citations omitted); Lee G. Durst & Ariane J.

Sims, <u>Cooperation With Government Probes, Subsequent Civil Litigation</u>, N.Y.L.J., May 13, 2005, at 4 ("The cases discussed above indicate that the typical defenses against claims of waiver as related to documents produced to the government during the course of an investigation may not hold much weight in today's jurisprudence. Indeed, with the exception of the Eighth Circuit, which still permits the application of the limited waiver doctrine [fn. citing <u>Diversified</u> omitted], the best possible preemptive protection against waiver seems to be the existence of a detailed, explicit and unconditional agreement with the government that the documents are to be treated confidentially and that production does not constitute any form of waiver as to third parties."); David Francescani & Michael Autuoro, <u>Caught Between a Rock and a Hard Place</u>, N.Y.L.J., June 20, 2005, at S10 ("The doctrine of selective waiver, first set forth by the Eighth Circuit in 1978, has been rejected in most of the jurisdictions considering the issue. Although the Second Circuit has not been openly receptive to selective waiver, it has left open the possibility of whether disclosure of work product to the government under a confidentiality agreement constitutes a waiver.") (fns. omitted); Jerold S. Solovy & Robert L. Bryan, <u>Unwaiver</u>, National L.J., Apr. 4, 2005, at 11 ("If you care about the privilege, don't disclose the material. Don't assume that production with a subpoena pointed at your head is enough. Don't count on an agreement with the government in case A to persuade the judge in case B. You might as well try to put Humpty Dumpty back together again as unwaive a waived privilege.").

**B.**     **Application of the Legal Standards to This Case**

While the Second Circuit has neither re-examined <u>Steinhardt</u> in a case dealing directly with this issue, nor instructed how much weight to give to a confidentiality agreement with the government agency, this Court is not free to adopt the so-called majority view, this Court is bound by <u>Steinhardt</u> until the Second Circuit (or Supreme Court) reverses or otherwise modifies it.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Collado</u>, No. 99-1218, 201 F.3d 433 (table), 1999 WL 1212647 at *1 (2d Cir. Dec. 10, 1999) ("The fact that there is a split among the circuits on this issue, in no way changes our obligation to follow binding precedent of this court.") (citation omitted), <u>cert. denied</u>, 530 U.S. 1264, 120 S. Ct. 2724 (2000); <u>United States</u> v. <u>Foont</u>, 901 F. Supp. 729, 734 n.1 (S.D.N.Y. 1995) ("[T]his Court is bound by Second Circuit precedent on the matter; defendant's arguments about circuit splits are of no avail in this forum."), <u>aff'd</u>, 93 F.3d 76 (2d Cir. 1996); <u>Bass</u> v. <u>Coughlin</u>, 800 F. Supp. 1066, 1071 (N.D.N.Y. 1991) ("When the Court of Appeals announces a principle of law for this circuit, it remains the law until the case is overruled or reversed."), <u>aff'd</u>, 976 F.2d 98 (2d Cir. 1992). As discussed above, the Second Circuit in <u>Steinhardt</u> rejected the Eighth Circuit's "selective waiver" approach, but declined to adopt a per se rule that disclosure to the government always waives the privilege.  In adopting a case-by-case approach, the Second Circuit specifically referred to one factor relevant here – "situations in which the [government agency] and the disclosing party have entered into an explicit agreement that the [government agency] will maintain the confidentiality of the disclosed materials." <u>In re Steinhardt Partners, L.P.</u>, 9 F.3d 230, 236 (2d Cir. 1993).  The district court decisions in this Circuit have relied on the presence of an explicit confidentiality agreement

to find no waiver from production of work product material to the government. (See cases cited at pages 11-12 above.)

Here, both AEP and Aquila had explicit written confidentiality and non-waiver agreements with the government agencies. (See pages 4-7 above.) Under Steinhardt, that goes a long way to a finding of non-waiver here. In this Court's view, however, Steinhardt does not create a "per se" rule that if there is a confidentiality/non-waiver agreement with the government, the privilege is not waived. While that is an important factor, this Court also must examine other relevant factors (although Steinhardt does not provide any further guidance on the factors this Court should consider).

The second most important factor here (besides the non-waiver agreements), is that both AEP and Aquila have produced to plaintiffs in this litigation the factual documents underlying the work product analyses provided to the government agencies. For example, if the analyses had been based on oral information from defendants' traders, or if the underlying factual trade data was no longer available, plaintiffs would have made a strong showing of substantial need for the analyses defendants produced to the governmental agencies. The analyses, however, were not based on oral information but documents, and those underlying documents have been produced to plaintiffs here. (See Dkt. No. 279: Deacon 5/26/05 Aff. ¶ 3: The Kroll Report "was limited to a review of the data contained in [the] documentary sources, and was not based on witness interviews or other non-documentary sources."; id. ¶¶ 4-7: identifies by Bates numbers the spreadsheets containing the data upon which the Kroll Report was based, which documents were produced to Plaintiffs; 5/16/05 AEP Letter Br. at 8: The underlying data AEP and Cornerstone used in their analyses was produced to

plaintiffs.)  Plaintiffs and their experts therefore can perform their own analyses of the trading data and the data reported to the trade publications.  To the extent that defendants and defendants' experts disagree with plaintiffs' analyses, plaintiffs will receive defendants' current analyses of the data during the expert discovery period.  (See  5/19/05 Conf. Tr. at 32: AEP counsel Routh: "There are analyses that can be done. We have not said that they can't be. . . . If [plaintiffs] focus on that, or ultimately if their experts do, we will have all of this out in experts discovery but it will be discovery of the testifying experts analysis, not of [counsel's] analysis.")  Plaintiffs do not have a substantial need for the analyses that defendants' counsel and experts provided to the government.  Since the data used in defendants' analyses has been provided to plaintiffs, plaintiffs suffer no hardship by not having defendants' analyses.  (See 5/16/05 AMS Letter Br. at 14; 5/16/05 AEP Letter Br. at 21-23.)

Accordingly, because defendants had explicit written confidentiality and non-waiver agreements with the governmental agencies, and because plaintiffs have not shown a substantial need for defendants' experts' and counsels' analyses, having been provided the underlying documents and data on which the analyses were based, under Steinhardt, the Court finds that defendants did not waive the work product privilege and the documents at issue need not be provided.

## CONCLUSION

For the reasons discussed above, plaintiffs' motion to compel production of defendants' privileged documents given to governmental agencies pursuant to a confidentiality non-waiver agreement is DENIED.[2/]

SO ORDERED.

Dated:     New York, New York
           June 21, 2005


Andrew J. Peck
United States Chief Magistrate Judge


Copies to:   Bernard Persky, Esq.
             Peter Kadzik, Esq.
             Judge Victor Marrero

---

[2/]     Plaintiffs also claim that as to a few of the documents, the privilege was waived by defendant AEP's inadvertent but sloppy production to plaintiffs. The Court will address that issue in a separate Opinion.