UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------- x
   IN RE: NATURAL GAS                         :
   COMMODITY LITIGATION                       :   Master File No. 03-CV-6186(VM)
------------------------------------------------------------------- x
THIS DOCUMENT RELATES TO                      :   Hon. Victor Marrero, USDJ
ALL ACTIONS                                   :
                                              :
------------------------------------------------------------------- x
```

## PLAINTIFFS' CORRECTED MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL OF PROPOSED PLAN OF DISTRIBUTION

| | |
|---|---|
| LOVELL STEWART HALEBIAN LLP<br>61 Broadway, Suite 501<br>New York, New York 10006<br>Telephone: (212) 608-1900 | LOWEY DANNENBERG COHEN<br>  & HART, P.C.<br>White Plains Plaza, One North Broadway<br>White Plains, NY 10601<br>Telephone: (914) 997-0500 |
| FINKELSTEIN THOMPSON LLP<br>1050 30th Street, NW<br>Washington, D.C. 20007<br>New York, NY 10017<br>Telephone: (202) 337-8000 | LABATON SUCHAROW LLP<br>140 Broadway<br>New York, New York 10005<br>Telephone: (212) 907-0700 |

Attorneys for Plaintiffs

**PRELIMINARY STATEMENT**

Plaintiffs' Class[1] Counsel respectfully submit this memorandum in support of the motion for preliminary approval of the Proposed Plan of Distribution ("Proposed Plan") of the proceeds of the two groups of settlements[2] herein (*see* Proposed Plan attached as Ex. A hereto).

After this motion is granted, then plaintiffs' Lead Counsel will submit a form of proposed class notice and a proposed schedule for sending the proposed Notice to the Class members who submitted proofs of claim.

**Overview of the Plan's Provisions**

Defendants' allegedly manipulated the prices of NYMEX natural gas cash futures and options contracts during the Class Period by allegedly reporting inaccurate, misleading and false trading information to trade publications that compile and publish indices of natural gas spot prices ("Publications").

Plaintiffs alleged that the Publications' reported false prices of physical natural gas transactions artificially affected prices of NYMEX natural gas contracts.

---

[1] The Class consists of all persons or entities who purchased, sold, settled or otherwise traded NYMEX Natural Gas Contracts, as an opening or closing transaction or otherwise, between June 1, 1999 and December 31, 2002, inclusive (the "Class Period") (the "Class" or "Settlement Class"). Excluded from the Class are the defendants herein, any parents, subsidiaries, or affiliates thereof, members of the immediate family of each of the individual defendants, any entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants.

[2] The 2006 Judgment of Settling Defendants are Cinergy Marketing and Trading, L.P.; CMS Field Services (n/k/a Cantera Gas Co., LLC); CMS Marketing Services & Trading Co. (n/k/a CMS Energy Resource Management Co.); Cook Inlet Energy Supply, LLC; Duke Energy Trading and Marketing, LLC; Dynegy Marketing & Trade (including West Coast Power, LLC); Enserco Energy, Inc.; Entergy-Koch Trading, LP; e-prime, Inc.; MidAmerican Energy Co.; Mieco, Inc.; ONEOK Energy Services Company, L.P. (f/k/a ONEOK Energy & Marketing Company, L.P.); ONEOK, Inc.; Reliant Energy Services, Inc.; Sempra Energy Trading Corp.; WD Energy Services, Inc.; Western Gas Resources, Inc.; Williams Companies, Inc.; and Williams Power Company (f/k/a Williams Energy Marketing and Trading Company) (the "2006 Settling Defendants").

The 2007 Judgment Settlement Defendants are American Electric Power Co., Inc. and AEP Energy Services, Inc.; Aquila Energy Marketing Corp. and Aquila Merchant Services, Inc.; Coral Energy Resources, LP; Dominion Resources, Inc.; and El Paso Marketing, L.P. (formerly known as El Paso Merchant Energy, L.P.)(the "2007 Settling Defendants").

Part I of the Proposed Plan provides as follows. The different entitlements for which an eligible Class member qualifies to receive a payment in respect of the Final Judgment and Order entered by the Court on May 24, 2006 (the "2006 Judgment") and/or the Final Judgments and Orders entered by the Court on June 15, 2007 (the "2007 Judgments") are set forth in Parts III and IV of the Proposed Plan. Those payments and entitlements shall be additive and not alternative. *See* Part I.

Part II of the Proposed Plan sets forth defined terms relating thereto.

Part III of the Proposed Plan provides for the distribution from the settlement fund created by the 2007 Judgments (Proposed Plan, Part II, Defined Terms, the "2007 Net Settlement Fund").

Under the proposed plan, the 2007 Net Settlement Fund will be distributed to Eligible 2007 Class Members as follows: 90% on the basis of futures contract net price artificiality paid; and 5% on the basis of Net Futures Volume to Eligible 2007 Class Members unable to submit transaction data sufficient to be able to track all futures contract purchases and sales by date (*see* Plan of Allocation, Part IIIA); and 5% on the basis of options transactions. With respect to the 5% being paid to options, 55% will be distributed on the basis of net options losses during the first five trading days of each month during the Class Period; 22.5% on the basis of net options losses during the entire Class Period; and 22.5% on the basis of net options volume during the first five trading days of each month.

Part IV of the Proposed Plan provides for the distribution from the settlement fund created by the 2006 Judgment (*see* Proposed Plan, Part II, Defined Terms, the "2006 Net Settlement Fund"). The 2006 Net Settlement Fund will be distributed to Eligible 2006 Class Members as follows: 95% on the basis of futures contracts and 5% on the basis of options. *See*

2

Plan Part IV.  The futures payments will be 50% on the basis of net losses in futures contracts during the first five days of each month during the Class Period, 22.5% on the basis on net losses in futures contracts during the entire Class Period, and 22.5% on the basis of Net Volume of futures trades during the first five days of each month during the Class Period.

The option payments will be 5% of the Net Settlement Fund.  Of this, 55% will be allocated on the basis of net options losses during the first five trading days of each month, 22.5% on the basis of net options losses during the entire Class Period, and 22.5% on the basis of net options volume during the first five trading days of each month.

Part V of the Proposed Plan provides for a minimum payment to Class members who qualify thereunder.

Hedgers are subject to the deductions set forth in the proposed plan.  *See* below, and Plan of Allocation, Parts III and IV.

More than 917 Class members have submitted proofs of claim.  *See* Affidavit of Thomas A. Faucher In Support of Motion for Preliminary Approval of Plan of Allocation, sworn to October 6, 2009 ("Faucher Affd."), par. 4.  The Settlement Administrator has reviewed such proofs of claim.  *Id*.  The Settlement Administrator has sent letters to Class members who submitted proofs of claim informing them of deficiencies.  Class Counsel has conferred with economists, the Settlement Administrator, and other experts about the Settlement Administrator's tentative calculations and the Class members' response thereto.  Class Counsel have now developed the Proposed Plan of Distribution attached as Ex. A hereto.

Plaintiffs now seek preliminary approval from the Court of such Proposed Plan and such Notice so that the Class can be notified of a Hearing to be held when Class members may object.

3

**ARGUMENT**

**I.  THE PROPOSED PLAN AND PROPOSED NOTICE THEREOF SHOULD BE PRELIMINARILY APPROVED**

As held by the Second Circuit in *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 145, 170 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988):

> There is ... no absolute requirement that [a distribution] plan be formulated prior to notification of the class.... The formulation of the plan in a case such as this is a difficult, time-consuming process.

*Accord, e.g.,* Manual for Complex Litigation, Fourth, §21.312 at 296 ("Often ... the details of allocation and distribution are not established until after the settlement is approved.").

For purposes of preliminary approval, the Court need only find that the Proposed Plan is within the range of reasonableness, so that notice should be given with an opportunity for Class members to be heard. *See* subpoint B *infra*.

This Court has continuing jurisdiction with respect to the motion and Proposed Plan under Paragraph 7 of the 2006 Judgment and Paragraph 6 of the 2007 Judgments, which provide in relevant part:

> Without affecting the finality of this Final Judgment and Order of Dismissal, the Court hereby <u>reserves and retains continuing</u> and exclusive <u>jurisdiction</u> over all matters relating to the <u>administration</u>, consummation and enforcement of the terms of the Settlement Agreements and the settlements embodied therein....

*Id*. (emphasis added).

Co-Lead Plaintiffs Counsel's judgment is that they are proposing a plan to facilitate recovery in the fairest and most cost efficient manner, and that the plan is fair, reasonable, and adequate. Notice should be given to the Class of a Hearing on the Proposed Plan.

4

### 1. The Ultimate Standards For Final Approval And This Court's Flexibility At That Time

Ultimately, all aspects of settlement approval, including but not limited to the plan of distribution, rest in the sound discretion of the district court. *See*, *e.g.*, *In re Ivan F. Boesky Securities Litigation*, 948 F.2d 1358, 1368 (2d Cir. 1991).

Here, as in *In re Salomon Inc. Securities Litig.*, 1994 WL 265917 (S.D.N.Y. June 16, 1994) at *7 and other class settlements, the notice will expressly reserve this Court's right to:

> approve Plaintiffs' Revised Proposed Plan of Allocation with such further modifications... as the Court may deem proper, without further notice to members of the Class.

*Id*.

In this regard, district courts enjoy "broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members ... equitably." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978). *Accord*, *e.g.*, *In re Chicken Antitrust Litigation*, 669 F.2d 228, 238 (5th Cir. 1982); *In re Equity Funding Corp. Securities Litig.*, 603 F.2d 1353, 1362 (9th Cir. 1979); *State of West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir.), *cert. denied*, 404 U.S. 871 (1971). *See also*, *e.g.*, *In re Prudential Securities Inc. Ltd. Partnerships Litig.*, 1996 Fed. Sec. L. Rep. (CCH) ¶ 98,978 at pp.93,753-54 and 93,759-60 (S.D.N.Y. Nov. 20, 1995).

Distribution formulas, such as those employed in the Proposed Plan, are recognized as an appropriate means to reflect the comparative strength and value of different categories of claims. *E.g.*, *Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir. 1982), *cert. denied*, 464 U.S. 818 (1983).[3]

---

[3] An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel. *White v. Nat'l Football League*, 822 F. Supp. 1389, 1420-24 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994). "The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable...." *Walsh v. The Great Atlantic & Pacific Tea Co.,*
*(continued ... )*

### B. The Reduced Standards For Preliminary Approval Are Satisfied

For purposes of preliminary approval, the Court need only find that the Proposed Plan is within the range of reasonableness, so that notice should be given to the Class with an opportunity to be heard. *See*, *e.g.*, Manual for Complex Litigation, Fourth, §13.14 ("Manual Fourth").

As stated by the Manual Fourth:

> First, the judge reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing. If so, the final decision on approval is made after the hearing.

Manual Fourth § 13.14 at 173; *In re Nasdaq Market-Makers Antitrust Litig.*, 1997-2 Trade Cases (CCH) ¶ 71,981 at p. 80,817 (S.D.N.Y. 1997).

As with other aspects of settlement, the opinion of experienced and informed counsel is entitled to considerable weight. *E.g.*, *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998); *In re Salomon Inc. Securities Litig.*, 1994 WL 265917 (S.D.N.Y. 1994) at *13; *RJR Nabisco, Inc. Securities Litig.*, 1992 Fed. Sec. Rep. (CCH) ¶ 96,984 at p.94,267 (S.D.N.Y. 1992).

Here, experienced counsel recommend that the Proposed Plan be preliminarily approved.

### C. The Plan Is Fair

From the first price manipulation trial under the Commodity Exchange Act, as amended in 1974, forward, one recognized measure of the damages, has been the difference between the price artificiality paid and any price artificiality received by the plaintiff on her purchase and sale transactions in the manipulated market. *Strobl v. New York Mercantile Exchange*, 582 F. Supp.

---

*( … continued)*
*Inc.*, 726 F.2d 956, 964 (3rd Cir. 1983). *Accord*, *e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 1997 WL 7668 (S.D.N.Y. 1997) at *4.

6

770, 779 (S.D.N.Y. Mar. 20, 1984) (No. 79 CIV. 1834 (LFM)), *aff'd*, 768 F.2d 22 (2d Cir.), *cert. denied*, *Simplot v. Strobl*, 474 U.S. 1006 (1985).[4]

Similarly, settlements of CEA manipulation class action claims have been allocated on the basis of the daily amounts of artificial impact. *In re Soybeans Futures Litig.*, 89 C 7009 (N.D. Ill.) (CRN) (net impact payment only) (October 10, 1997 Order For Partial Distribution Of Net Settlement Fund; Docket Item Nos. 477-478).

However, where the defendants' conduct renders the determination of the amount of artificial impact impracticable, another recognized measure of damages is the net profit-loss on the transactions made in the market during the manipulated period. *Sarlie v. E.L. Bruce Co.*, 265 F. Supp. 371, 373-74, 376 (D.C.N.Y. 1967); *Strobl*, *supra*, 582 F.Supp. at 779 (citing *Sarlie* with approval). And CEA manipulation claims have apparently been allocated solely on the basis of a rescissory net profit-loss calculation over the class period. *E.g.*, *Gordon v. Hunt*, 98 F.R.D. 573 (S.D.N.Y. 1983).

Also, futures manipulation class action settlements have been allocated on the basis of a blend between the prior two methods. *See In re Sumitomo Copper Litig.*, 96 Civ. 4584 (MP) (S.D.N.Y.) (class members were entitled to both profit-loss rescissiory payments over specified periods and net impact payments) (May 1, 2002 Order (No. 110) Establishing Plan of Allocation; Docket Item No. 349).

---

[4] Therein, plaintiff was awarded damages approximately the sum of plaintiffs' actual losses:
> Having found that defendants' manipulation resulted in artificially low prices during the conspiracy period, the jury had to determine what the prices would have been absent the manipulation. In essence, the jury was required to estimate how much higher the prices would have been when plaintiff liquidated his contracts but for defendants' unlawful conduct, and the court so instructed it. The $460,000 figure reached by the jury, therefore, was the equivalent of a finding that the price of the May potato futures contract would have been approximately $18.00, instead of $9.25, had the market been operating solely on the basis of supply and demand.

*Id.*, 582 F. Supp. at 779.

In this particular class action alleging manipulation under the CEA, Defendants did not retain and produce to Plaintiffs sufficient records to enable Plaintiffs to do the following: (1) determine what Defendants' false reports were; (2) compare those false reports to the actual transactions; (3) calculate the net amount of the "lie" to the market contained in each published index contained in each publication. *E.g.*, *In re Natural Gas Commodity Litigation*, 235 F.R.D. at 204-205 ("[N]one of the defendants have a 'complete set' of the reported trades (i.e., what their traders reported to the Publications, as opposed to actual transactions) for the Class Period.").

Therefore, this might have been a case in which the settlement funds were allocated on the basis of each class member's net loss on all trades during the Class Period. *Sarlie v. E.L. Bruce Co.*, 265 F. Supp. at 373-74, *supra*.

But Plaintiffs were able, through subpoenas to the Publications, to obtain such records— albeit **for only four groups** of settling defendants. These defendants comprise 96.97% of the settlement payment in the 2007 Judgments ($27,237,500 million compared to $28,087,500).[5] Those four groups of settling defendants all would have been tried together had it not been for the settlements creating the 2007 Judgments.

To this extent, Plaintiffs had available, thanks to subpoena, the records necessary to calculate the total net amount of such Defendants' lies for each monthly report. Plaintiffs were able to estimate the net artificial effect on futures prices of the alleged "lies" of these four groups of settling defendants involved in such trial. Specifically, Plaintiffs were able to submit the expert report of Dr. Mark Dwyer concerning, among other things, artificial prices and Plaintiffs'

---

[5] A fifth settling Defendant in the 2007 Judgments was Dominion Resources, Inc. They contributed the smallest settlement amount ($850,000). They did so, in part, on the understanding that they would not be subject to discovery.

8

damages to be proved at such trial.  *See* Expert Report of Mark Dwyer Report, Ph.D., dated October 23, 2006.

In his report, Dr. Dwyer used the amounts of the "lie" for each month to perform a regression analysis.  This analysis estimated what the daily amount of price artificiality caused by Defendants in the futures contracts were.  Dr. Dwyer's regression determined that the overwhelming majority of the artificial impact occrued during the first five days of each month.

Thus, with respect to the allocation of the settlement proceeds from the 2007 Judgments, Class counsel is able to use Dr. Dwyer's impact analysis to allocate the settlement monies according to the net price artificiality that each Class member paid and received.

However, as with prior settlements of CEA manipulation claims, Class counsel has not proposed that 100% of the proceeds from the 2007 Judgments be distributed in this manner. Rather, Class counsel have proposed two exceptions.

First, as in at least one prior case, Plaintiffs have proposed that 5% of the proceeds be paid in respect of options on futures.  *See In re Sumitomo Copper Litig.*, 96 Civ. 4584 (MP) (S.D.N.Y.) (class members were entitled to both profit-loss rescissiory payments and net impact payments) (May 1, 2002 Order (No. 110) Establishing Plan of Allocation; Docket Item No. 349). As in *Sumitomo*, the Defendants wanted a release from options trading and there was no certified class for options here except through each Settlement itself.

Second, Class counsel have also had to consider the administrative costs of inputting the daily numbers for high volume traders.  The Settlement Administrator advises that it would have cost in excess of $1,000,000 to input the transactions of 138 Class members who have the highest volume.  Accordingly, this was not done and approximately $898,750 (or 5% of the 2007

9

Net Settlement Fund) has been allocated to net volume trades during the first five days of each month.  *See* Plan, Part III.

**2006 Judgment**

Here, Defendants' failure to retain their records made the determination of the net amount of artificial impact that they had on prices, impractical.  Moreover, the attempts to obtain through subpoena the records from the Publications that would have been necessary to calculate the net effect on price, were unsuccessful.

In this circumstance, had the settlements in the 2006 Judgment not been made, Plaintiffs would have argued that the entire net loss suffered by each class member should be attributed to defendants as actual damages.  The outcome of any such legal argument is uncertain, at best.  It must be recognized that profits and losses may occur due to many factors, rather than just manipulative impact, and that even persons with gains may be negatively impacted by the causation of artificial prices.  *In re Natural Gas Commodity Litig.*, 231 F.R.D. 171, 179-180, at fn.1 (S.D.N.Y. 2005).  But there was an argument that could have been made that, in this particular case, Defendants should be responsible for each Class member's net losses.  *See Sarlie*, *supra*.

Class counsel consulted with a leading economist on futures price manipulation, Dr. Craig Pirrong.  Dr. Pirrong opined that 75% of the 2006 Judgment should be paid to persons who suffered losses during the first five trading days of each month.  This was the period when Dr. Dwyer's Report showed that the overwhelming majority of the artificial impact occurred.  This was also the time immediately following Defendants' false reports for which Plaintiffs had sufficient evidence.

Professor Pirrong also opined that 20% of the Net Settlement Fund from the 2006 Judgment should be distributed on the basis of the net volume (that is, purchases minus sales or sales minus purchases) of each Class member during the first five trading days of each month.

Finally, Dr. Pirrong opined that 5% of the Net Settlement Fund for the 2006 Judgment should be allocated on the basis of net options losses.

The foregoing distribution allocated 95% of the Net Settlement Fund to futures traders based on their transactions during the first five trading days of the each month.[6]

Dr. Pirrong acknowledged that Plaintiffs are "in a fallen state" in which Plaintiffs do not have the information as to artificial impact, Dr. Pirrong opined that the best proxies for such impact were the net loss and volume proxies set forth above. Further, Dr. Pirrong opined that the net loss proxy was much better than the net volume proxy as a basis for distribution. Dr. Pirrong's reasoning for the latter judgment included his information that a substantial majority of the volume of transactions was conducted by floor traders. In Dr. Pirrong's experience, floor traders tend to profit off day-trading, tend to be "flat", and tend to need volatility of prices rather than a given direction (up or down) in prices to profit.

On the other hand, Dr. Pirrong repeatedly acknowledged that it is not certain that any proxy is the best proxy; and that he was offering his opinions based on his study of price manipulation for many years, Dr. Dwyer's work in this case, Dr. Harris' work, and other factors. Professor Pirrong emphasized that, in the absence of obtaining the actual records, no one can know or even definitively opine what the best proxies are or what the best "mix" of those proxies

---

[6] The overwhelming majority of the artificial impact found by Dr. Dwyer occurred during the first five trading days of each month. But such impact did not necessarily dissipate altogether. Nonetheless, Dr. Pirrong observed as follows. Various of the remaining artificiality readings during the approximately fifteen trading days later in each month were so low as to be of questionable significance.

11

would be in a diversified attempt to allocate the 2006 settlement monies to Class members via a fair proxy for their actual injury.

Class counsel have determined that, while no one knows what the best proxy would be, it is appropriate in this case to make two adjustments to Dr. Pirrong's opinions.

First, Class Counsel have determined to increase the amount being distributed to net futures volume from 20% to 22.5% of the Net Settlement Fund for the 2006 Judgment. In this regard, Class counsel have received input from the Bolling Intervenors. Class counsel have been unable to provide the Bolling Intervenors what they would prefer to have. Class counsel understand that there will be objections to this proposed plan from the Bolling Intervenors. But Class counsel have tried to give some effect to the comments from the Bolling Intervenors through this increase from 20% to 22.5%.

Further, somewhat consistent with *Sarlie*, Class counsel have determined that 22.5% of the Net Settlement Fund for the 2006 Judgment should be allocated on the basis of net losses during the entire Class Period. This "override" of Dr. Pirrong's recommendations is based upon multiple considerations. First, Class counsel want to give some effect to the legal decision coordinates approving distribution according to net losses over the Class Period. Second, because Dr. Pirrong's opinions are necessarily based upon incomplete information, Class counsel's judgment is that it is fair to distribute some monies in a manner consistent with *Sarlie* in this case which tends to meet *Sarlie*'s conditions.

Third, Class counsel's judgment is that allocating settlement funds according to total net losses over the Class Period will avoid the arguably harsh result of very low payouts to persons who did have large losses during the Class Period but may not have net losses during the first five trading days of each month.

Also, Defendants' alleged manipulative conduct in this case also extended to their daily reports and to some activities other than false reporting. It is highly likely, in class counsel's judgment, that they would have encountered great difficulty in proving the daily reports case. But Class counsel believes that there was some chance of success in proving such claim and some chance of success in proving the non-reporting alleged manipulative conduct.

In all these circumstances, Class counsel have determined that it would be fair also to allocate 22.5% of the Net Settlement Fund for the 2006 Judgment on the basis of Net Futures Losses throughout the Class Period.  *See* Plan of Allocation.

Class counsel have followed a similar breakdown within the allocation of the 5% of each Settlement Fund that is being paid in respect of options.

**Hedgers**

Professor Pirrong has recommended that hedgers receive a 60% reduction and swap dealers (who are also hedgers) receive a 75% reduction in their foregoing entitlements.

These hedger deductions are greater than the hedger deductions that have been made in allocations of prior CEA manipulations settlements. However, Dr. Pirrong observed that the type of wrongdoing here (a fraud of the index) did not begin in the futures market.

Moreover, Dr. Pirrong observed that Dr. Dwyer's artificiality report, unlike the artificiality reports in prior CEA manipulation cases, did not compute artificiality on the basis of the separation of the futures price from other prices. Rather, Dr. Pirrong observed that Dr. Dwyer's Report solely based artificiality upon the amount of change in the futures price that would result from the alleged false reports. Further, Dr. Pirrong observed that hedgers and swaps dealers, if they are conducting their businesses according to the norm, may have offsetting gains from their losses that they suffered in the futures markets or from any net volume exposure during the five day windows.

13

Based upon the foregoing observations and his experience, Dr. Pirrong recommended the discount for hedgers described above. Class Counsel have followed Dr. Pirrong's recommendations on these points.

## CONCLUSION

For all of the above reasons, Plaintiffs' Co-Lead Counsel respectfully request that preliminary approval be given to the Proposed Plan for purposes of sending a Class Notice and holding a final approval hearing.

Dated:  October 9, 2009

                                          */s/ Christopher Lovell*
LOVELL STEWART HALEBIAN LLP
Christopher Lovell (CL 2595)
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

                                          */s/ Geoffrey Horn*
LOWEY DANNENBERG COHEN
    & HART, P.C.
Geoffrey Horn (GH 4179)
White Plains Plaza, One North Broadway
White Plains, New York 10601
(914) 997-0500

                                          */s/ Douglas Thompson*
FINKELSTEIN THOMPSON LLP
Douglas Thompson
1050 30th Street, NW
Washington, D.C.  20007
(202) 337-8000

                                          */s/ Bernard Persky*
LABATON SUCHAROW & RUDOFF LLP
Bernard Persky (BP 1072)
140 Broadway
New York, New York 10005
(212) 907-0700

*Plaintiffs' Co-Lead Counsel*

14

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the a true and correct copy of the foregoing Plaintiffs' Corrected Memorandum in Support of Their Motion for Preliminary Approval of Proposed Plan of Distribution and a Corrected Exhibit A (Plan of Allocation) were filed electronically with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to all counsel of record on the 9th day of October, 2009.

                                                        *s/ Bernard Persky*
                                                        Bernard Persky