UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\-------------------------------------------------------X

In re:

Natural Gas Commodity Litigation

\-------------------------------------------------------X

Master File No. **03 CV 6186(VM)(AJP)**

ECF Case

**Hon. Victor Marrero, USDJ**

**INTERVENOR NORDILICHT'S
REPLY AFFIRMATION**

      SAUL E. FEDER, an attorney at law duly admitted to practice before this Court, and a member of the firm of Regosin, Edwards, Stone & Feder, Esqs., attorneys for Intervenor Mark Nordlicht ("Nordlicht"), hereby sets forth the following Reply Affirmation on behalf of Nordlicht:

      1.    In order to adequately and properly evaluate and review the documents, schedules and information thusfar disclosed to Nordlicht by the Plaintiffs' Lead Class Counsel ("LCC"), Nordlicht has consulted with Dr. Robert E. Conner to review and evaluate the various Expert Opinions thusfar submitted, together with the various proposed allocation options currently being considered, with a view towards obtaining his Expert Opinion recommendation of a proposal of a "fund distribution that is fair and reasonable".

      2.    Dr. Conner's November 9, 2009 Expert Opinion Affirmation recommending same, together with his extensive c.v., are submitted herewith in support hereof.

      3.    Contrary to the LCC's assertion in their November 4, 2009 Reply Memorandum

that this is merely a "battle of the experts." (LLC Br.9). The fact is that all of the experts' opinions, including those submitted by Plaintiffs, disagree with the proposals in LLC's Plan of Allocation ("POA").

**First Five Trading Days of Each Month**:

4.       For the reasons set forth in both the Nordlicht Cross Motion and in the Bolling Intervenors' Opposition to Plaintiffs' Motion, Nordlicht strongly opposes limiting any of the Settlement distributions to only calculations made of trades which occurred in only the first five trading days of each month,- as opposed to the entire Class Period.

5.       Robert Conner's Expert Opinion agrees that such a limitation is inappropriate.

6.       LLC's Reply Memorandum again refers to an "expert report" from Dr. Mark Dwyer,- which allegedly found that 76% of the "artificial impact occurred during the first five trading days after the publication of the report" (LLC Br.14).  However, no such "expert report" by Dr. Dwyer has ever been produced.

7.       Further,- Dr. Dwyer's alleged fundings are <u>not</u> that artificial impact <u>losses</u> occurred then,- but only that the "artificial impact" took place then.  The losses caused by that artificial impact could have been incurred in the following week or weeks upon the sale of the position.

8.      Additionally,- although the LCC now seeks to justify their "First Five Day" decision based on the harm done by the Defendants' monthly manipulation of the data that was included in the monthly reports,- the fact is that their own expert Dr. Dwyer confirms that the Defendants' manipulation,- and the harm done thereby,- was far broader and more pervasive.  As Dr. Dwyer says under his caption "*Types of Manipulative Conduct*",- "*Our methodology is capable of measuring the impact of misreporting, wash trades, and any other manipulative activity specifically identified in the data.*"  (Dwyer May 9, 2005 Declaration, par. 50, pg. 23).

9.      While LCC concedes that they have insufficient data to identify each of Defendants' manipulative acts and the damage caused by each of those numerous acts,- they nonetheless seek to limit most of the distribution of the Settlement Funds to only the Class Members who suffered damage as a result of the monthly publications,- whereas far greater damage may have been caused by Defendants' wash trades and other manipulative conduct.

10.     It is certainly not fair or reasonable to limit so much distribution to the "first five days."  That category should equitably be eliminated so as to allow the Settlement Funds to go to those Class Members whose damages were incurred throughout the month.

11.     As Dr. Dwyer himself opined,- the distortions caused by Defendants' manipulations were <u>not</u> limited to the "first five days", but rather,- "*I have found that the distortions in bidweek indices induced by AEP, Aquila, Coral and El Paso distorted daily*

*NYMEX futures prices.  These distortions were strongest within the first half of each month of the Class Period.*" (Dwyer Report October 23, 2006, Par. 4, Page 2).

12.     In fact, Dr. Dwyer "Data Description" specifically points out that, "*for example, the futures contract for gas delivery during the following month (November) is traded through the end of the <u>third business day before the end of the current month</u> (Friday, October 27).*" (Dywer Report, October 23, 2006, Par. 14, pg. 5).

13.     Similarly, LCC's expert Dr. Harris opines on bid-week transactions as occurring "*the last five business days of the month*" (Harris October 23, 2006 Report, Par. 18, page 11).

14.     Thus, both of Plaintiffs' experts refer to the trading in the <u>last few days of the month</u> as being artificially impacted!

15.     It must be pointed out that the hypothetical assertion that the artificial impact caused by Defendants' manipulation would be less corrosive in the latter part of the month because traders would be more aware of the impact by then,- is contested by Dr. Dwyer's own Declaration in which he criticizes Professor Watson's "*misunderstanding of the nature of the spot market for natural gas.  This OTC market is one in which gas is traded confidentially and privately.  Participants in the futures' market simply do not and cannot observe these private, bilateral trades*" (Dwyer May 9, 2005 Declaration, pg. 13).

4

16.    As Dr. Conner points out in his November 9, 2009 Expert Opinion Affirmation: *"The Plan's proposed distribution of Settlement Funds based on a mere five days of a calendar month represents an over concentration of damage compensation to that subset of futures and options contracts traded by Class Members within those few initial days of each calendar month in the Class Period."*

17.    As correctly pointed out in Dr. Conner's Affirmation,- the expert opinions relied on by LLC do not support the proposed five day limitation randomly chosen by LCC.

18.    Dr. Connor goes on to point out that *"most of the futures and option positions that were opened during the first half of a given month..."* were *"closed-out during the second half of a month, when price distortions had attenuated."*   Mr. Connor opines that: *"Far from being a reason to endorse the over-allocation of distributed Settlement Funds to the first five days of each month contained in the Plan, <u>it is a reason to take the entire month into consideration, and give greater, if not equal, weight to the second half of each month</u>."*

**"Hedger" and "Swap" Traders**:

19.    Nordlicht further joins in the Bolling Intervenors' Objections to the unjustifiably small reduction asserted against the trades made by "hedgers" and "swap" traders, and Nordlicht joins with the Bolling Intervenors proposed far larger reduction for purposes of fairness and

reasonableness.

20.     LCC appears to have reluctantly agreed therewith for a proposed larger 92.5% reduction for "swap" traders,- but has not done so for "hedgers",- leaving their reduction at only 60%,- without explanation (LLC Br.5),- despite Dr. Pirrong's assertion in his Reply Affirmation that he "advised Plaintiffs' counsel that a substantial reduction for hedgers is justified and reasonable..." (par. 26, age 8).

**Distribution to Class Members based on Volume of Trades and on Net Losses**:

21.     Nordlicht supports the Bolling Intervenors' request that the Court approve a portion of the distribution of the Class Settlement Sum in accordance with Volume of trades during the Class Period,- but Nordlicht agrees with Plaintiffs that there should be a limitation on that category of distribution to Class Members as hereinafter set forth, and supports a distribution of the balance of the Settlement Sum to Class Members as hereinafter set forth in accordance with their net losses throughout the Class Period. [1]

22.     While it is difficult to calculate with any degree of accuracy the effect that the market manipulation had on each Class Member's periodic trades so as to calculate the exact amount of their profit or loss with absolute certainty,- it would be inequitable to divide all of the

---

[1] While it is indisputable that the Class Period runs from June 1, 1999 through December 31, 2002,- the LCC submits a never before-seen seventeen page "Definitions" supplement to their proposed Plan of Allocation which is barely comprehensible,- and seems to include eight pages (pages 7-14) which speak of losses either initiated or liquidated during various periods running between June 24, 1993 and June 15, 1996, without explanation!

Class Settlement Sum amongst the Class Members based solely upon the volume of their trades,- because there would certainly be an unjust distribution to volume traders who were not adversely affected by the Defendants' market manipulations,- thus giving those Class Members an unjust bounty to which they are not entitled.

23.     In order to offset that inevitable result if the entire Class Settlement Sum was distributed by volume, Nordlicht proposes that 50% of the Class Settlement Sum be distributed based upon volume and 50% based upon net losses during the Class Period.

24.     As Dr. Conner opines in his Expert Opinion:  "'*A fair and reasonable' allocation of Settlement Funds distribution, while it may take net volume into account, must look beyond it. It must also take into account the direct damage consequences of manipulated prices-net dollar losses.*"

25.     Nordlicht also proposes that the distribution based upon volume not include those trades by Class Members which trades are categorized as "day trades" during the Class Period,- because those day trades were unlikely to have been affected by the Defendants' market manipulations,- because buying and selling Futures or Options within the day,- frequently minute by minute,- are trades that are done either at an Artificial high price or an Artificial low price resulting from the Defendants' market manipulation for that day,- so that both the buy and sell of that day are at either the Artificial high price or the Artificial low price,- thereby not suffering

any net effect on the traders' profit or loss for the trades of that day.

26.    As Dr. Connor points out in his Expert Opinion:  *"It would appear uncontested that "day traders" were little affected by the artificial price manipulation at issue in this case, yet a significant allocation of the pool of Settlement Funds is earmarked for distribution to such Class Members.  This anomaly should be corrected by excluding Day Traded contracts from the allocation of Settlement Funds."*

27.    Dr. Conner then goes on to say that:  *"By its nature, no day traded natural gas contract should qualify for any distribution of the Settlement Funds subject to the Plan, regardless of when during a given calendar month such trading took place."*

28.    We agree with Dr. Pirrong's assertion in his Reply Affirmation that *"the way that artificiality behaves make it very clear that floor traders who trade in heavy volume suffered little damage as result of the type of manipulation alleged here"* (par. 10, page 3).

29.    The distribution of the portion of the Settlement Sum to Class Members based upon volume should be limited only to those whose trades are not day trades, and are therefore inevitably affected by Defendant's market manipulation for which this Settlement Sum was created.

8

**Inaccuracies Regarding the Nordlicht Submissions**
**Set Forth in the Horn Declaration dated November 4, 2009:**

30.    Despite Geoffrey Horn's confirmation that Mr. Nordlicht's net future losses as

calculated by the Settlement Administrator over the entire Class Period was $34,281,440.00

(Horn's par. 2, page 2), Horn nonetheless cavalierly seeks to justify the Plaintiffs' distribution

methodology and calculations which resulted in Nordlicht not being qualified "for a distribution

under the 2007 Judgment futures contract net price artificiality paid" category (page 4, par. 9) by

arguing that Mr. Nordlicht does not qualify for that distribution "because he did not provide

requested futures' transaction detail, including purchase date and purchase and sale date and

price, which are necessary to determine whether a Claimant suffered positive or negative

artificial impact."

31.    As can be seen from Exhibits "A" and "B" hereto,- Mr. Horn's assertions are

incorrect.

32.    As unmistakably set forth by Claims Administrator Thomas Faucher in his

February 5, 2009 e-mail to me, (Exhibit "A") he asserted that:

> "The deficiencies that were noted in the deficiency letter were cured by
> obtaining information from the hardcopy documentation sent. The
> documentation is "incomplete" as we both agreed, as there are months
> that are either missing or incomplete. The statements received begin in
> January of the year 2000; we have not received documentation for the
> period of July 1999 through January 2000 which your client indicated he
> was unable to obtain. For the documentation received the available data
> has been captured and there are no remaining deficiencies."

9

33.     While it is true that my client Mark Nordlicht did not submit any documentation

for the six month period running from July 1999 through December 1999,- as explained to the

Claims Administrator,- that is because Mr. Nordlicht had no such documentation,- because he

had little or no trading during that period of time,- and the trading house he had used at that time

was no longer in business and records were no longer available.

34.     However, Thomas Faucher confirms therein that,- for the period running from

January 2000 through December 31, 2002, the end of the Class Period "there are no remaining

deficiencies."

35.     Further,- the following month, Thomas Faucher forwarded to me a March 10,

2009 e-mail sent by him to both the aforesaid Geoffrey Horn, Esq. and to Ian Stoll, Esq.

regarding Mark Nordlicht's "deficiency letter" (Exhibit "B") in which he advised them that:

> *"Per our phone conversation today, attached is the deficiency letter sent to Mark*
> *Nordlicht.   The actual transactions which were missing information in the*
> *electronic file are outlined on the second page of the letter.   These deficiencies*
> *listed on this letter have been cured."*

36.     It is therefore indisputable that the Claims Administrator acknowledged receipt

of all necessary documentation from Mark Nordlicht,- except for that from the small period in

which he had few, if any, trades,- and for which he had no records because the trading house had

gone out of business.

37.     The Claims Administrator thereafter did also seek additional details of daily transactions,- but,- the fact remains that Mr. Nordlicht had already <u>fully</u> met all of the requests from the "deficiency letter" seeking additional information,- and,- Mr. Nordlicht had already thereby forwarded to the Claims Administrator <u>all documentation and information available to him regarding his trades during the Class Period</u>.  He has no additional records!

38.     For the Lead Class Counsel attorneys to assert their confirmation that Mr. Nordlicht's net futures losses during the Class Period was $34,281,440.00 but that,- their proposed methodology of calculation of the distribution of the 2007 Judgment Settlement Sum allocated by them to their proposed "futures contract net price artificiality paid" category,- excludes <u>any</u> distribution to Mark Nordlicht because he "does not qualify for inclusion",- as being a "fair and reasonable" method of distribution is beyond comprehension.

39.     Clearly, the LCC's proposed distribution methodology is fundamentally flawed and cries out for equitable revision.

40.     The undersigned respectfully submits to this Court that the proposed Plan of Allocation submitted by the Plaintiffs LCC must be rejected in its entirety for being unfair and unreasonable on its face.

41.    The proposed Plan should be replaced by a simple distribution under which one-half of each Settlement sum goes to Class Members in proportion to their losses, and the other half goes to Class Members (other than to day traders) in proportion to the volume of their trades.

## CONCLUSION

42.    It is clear from the submissions thusfar made to the Court both for and in opposition to the Plaintiffs' Motion for Approval of their Proposed Plan of Allocation that the proposes POA submitted on behalf of the Plaintiffs is not fair and reasonable, and that is unjust under the circumstances.

43.    Based upon the foregoing, it is respectfully proposed that the New Plan of Allocation should be limited to solely those Class Members whose volume of trades are not day trades, and to those Class Members who have Net Losses during the Class Period in a manner as hereinbefore suggested, or as may be set forth either by the Court or as a result of a conference hereinafter scheduled to create a fair and reasonable Plan of Allocation to which the entire Class can be reimbursed in accordance with their entitlements.

**WHEREFORE**, it is respectfully prayed that the proposed Plan of Allocation submitted by the Plaintiffs' LCC be rejected, and that the Court grant other and further and appropriate

relief as may be just and proper under the circumstances.

Dated:  November 10, 2009
         New York, New York

                    Respectfully submitted,

                    *REGOSIN, EDWARDS, STONE & FEDER, ESQS.*
                    Attorneys for Intervenor Mark Nordlicht

                    By: _____
                         Saul E. Feder, Esq. (SF-3524)
                         Office and P.O. Address
                         225 Broadway, Suite 613
                         New York, New York  10007
                         212-619-1990

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:

Natural Gas Commodity Litigation

-----------------------------------------------------------X

Master File No. **03 CV 6186(VM)(AJP)**

ECF Case

**Hon. Victor Marrero, USDJ**

### AFFIRMATION OF ROBERT E. CONNER

I have been asked by counsel for Intervenor Mark Nordlicht to provide opinions with respect to whether the corrected proposed Plan of Allocation (the Plan) is fair and reasonable.

A list of the documents which I have reviewed in connection with forming my opinions is attached, as is a copy of my c.v.

This Affidavit is focused on those aspects of the Plan which, in my opinion, fall short of being 'fair and reasonable.'

Day-Trading:     It would appear uncontested that 'day traders' were little affected by the artificial price manipulation at issue in this case, yet a significant allocation of the pool of Settlement Funds is earmarked for distribution to such Class Members.  This anomaly should be corrected by excluding Day Traded contracts from the allocation of Settlement Funds.

As stated by Dr. Pirrong, "although floor traders trade in heavy volume, they typically reverse their positions very rapidly, meaning that the amount of artificiality they buy and sell over time is almost certainly nearly equal."[1]  More specifically, Dr. Pirrong further states that "floor traders who trade in heavy volume suffered little damage as [a] result of the type

---

[1] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 4, ¶ #11

of manipulation alleged here."[2]  By its nature, no day traded natural gas contract should qualify for any distribution of the Settlement Funds subject to the Plan, regardless of when during a given calendar month such trading took place.

First Five Days of the Month:        The Plan allocates the predominant share of settlement funds distribution to Class Members whose losses and/or volume of trades, whether in futures or option contracts, occurred within the first five days of each calendar month.

The rationale proffered for this allocation is that the effects of the manipulation would be confined to a short period of time following the release of mis-reported information on the theory that "over time traders would be able to observe additional information that would contradict the manipulation-affected price reports."  It is also asserted that Dr. Mark Dwyer's expert reports in this matter empirically support this position by opining that "the bulk of the price artificiality resulting from manipulation affected price reporting occurred within the first five trading days following release of bid-week prices in trade publications."[3]

In fact, no expert report by Dr. Dwyer makes any mention of a five day period, much less one after which the effects of mis-reported price information would cease to affect the market.  Dr. Dwyer does state that such "distortions should not be expected to influence the course of natural gas prices over the long run," and that "such index manipulations caused temporary distortions in futures prices."[4]  Dr. Dwyer does state that that "86 percent of distortion in the futures price occurs within the first half of the month."[5]  Needless to say, five days is a shorter period than the first half of any month.  With all due respect to Dr. Pirrong, his statement that "it is reasonable to limit the period of time over which artificiality is presumed to affect prices to the five trading days subsequent to the release of the affected reports"[6] appears to conflict with the expert report of Dr. Dwyer.

---

[2]  Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 3, ¶ #10
[3]  Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 2, ¶ #4
[4]  Expert Report of Mark Dwyer, PhD., October 23, 2009, Pg.12, ¶ #31
[5]  Expert Report of Mark Dwyer, PhD., October 23, 2009, Pg.14, ¶ #35
[6]  Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 2, ¶ #6

The Plan's proposed distribution of Settlement Funds based on a mere five days of a calendar month represents an over-concentration of damage compensation to that subset of futures and options contracts traded by Class Members within those few initial days of each calendar month in the Class Period. It further ignores the fact that a portion of contracts initiated during those days were not closed-out until afterward, when the impact of price artificiality during that period, of any subset of a month, would be realized.

As pointed out by Dr. Pirrong, "a trader is damaged by a manipulation if he purchases and sells at different levels of artificiality."[7]  For precisely that reason, futures and option positions that were opened during the first half of a given month, the period cited by Dr. Dwyer as comprising 86 percent of the price distortion in NYMEX natural gas contracts, but closed-out during the second half of a month, when price distortion had attenuated, would fit that description, and could incur damage due to the lessened degree of price distortion present in the second half of each month. Far from being a reason to endorse the over-allocation of distributed Settlement Funds to the first five days of each month contained in the Plan, it is a reason to take the entire month into consideration, and give greater, if not equal, weight to the second half of each month.

Net Volume & Net Losses:        While agreeing with Dr. Pirrong's observation that "net volume is highly preferable to gross volume as a measure of harm resulting from the manipulation alleged here,"[8] neither does net volume suffice on its own as a basis for damage calculation in this case. As pointed out by Dr. Harris, "The change in open interest provides the minimum amount of new buys and sales that were made but not liquidated on a given day.   .   .   .   Multiplying the change in open interest time the amount of artificiality provides an actual dollar amount of damages that, given the way the market works, significantly understates aggregate class members' damages on that day. This is because the change in open interest does not represent all new buyers or new sellers who entered the market each day."[9]  A 'fair and reasonable' allocation of Settlement Funds distribution,

---

[7] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 5, ¶ #16

[8] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 7, ¶ #22

[9] Report of Michael J. Harris, Ph.D., October 23, 2006, Pg. 19

3

while it may take net volume into account, must look beyond it.  It must also take into account the direct damage consequences of manipulated prices – net dollar losses.

As acknowledged by Dr. Pirrong, "a trader suffers damage from manipulation to the extent that artificiality changes (in an adverse direction) over the period in which a position is open. A trader that buys more than he sells (or *vice versa*) over a period of time that manipulation has affected prices . . . is more likely to have suffered a loss, because such an imbalance between buys and sells implies the maintenance of a net open position." [10]  The most reliable measure of damage over such a period of time would be net dollar losses, reflecting the magnitude of the open positions and the degree of change in price artificiality that have been determined to occur between the first and second halves of the month, an attenuation reflecting the diminishing effect of price misinformation injected into the marketplace during bid week.  Contrary to the position espoused by Dr. Pirrong with respect to endorsing the Five Trading Day subdivision, but consistent with the logic of his statement that "artificiality must change for a trader to be damaged by a manipulation"[11], "it is reasonable to confine the net volume-based allocation to the period of time when manipulation is like to have had the greatest impact"[12], but not the greatest impact on 'prices', per se, but the greatest impact on 'net losses' incurred by the Class Members, which , excluding Day Traders, will tend to encompass those who held open positions over the course of the steady attenuation of the market price distortion from the beginning to the end of each calendar month, certainly from Dr. Dwyer's first-half to the second-half of the month as the level of manipulated price distortion dissipated.

A re-weighting of the allocation based on net volume and net dollar losses is called for, and must be considered in the absence of any inclusion of volume and losses associated with Day Traded contracts, and independent of any arbitrary (not adequately supported by an expert opinion) Five Day period following the dissemination of the misinformation that created the price distortions that gave rise to this case.

---

[10] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 7, ¶ #22
[11] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 7, ¶ #23
[12] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 7, ¶ #23

Robert E. Conner

General Factotum

Thornapple Associates, Inc.

450 Springfield Avenue

Summit, New Jersey 07901

(908) 277-0003

November 9, 2009

Documents Reviewed

1. Amended Consolidated Class Action Complaint, Master File No. 03 CV 6186(VM)(AJP) ECF Case
2. Declaration of Michael J. Harris, Ph.D., in Support of Plaintiffs' Motion for Class Certification, executed January 24, 2005
3. Declaration of Mark Dwyer, Ph.D., in Support of Plaintiffs' Motion for Class Certification, executed January 24, 2005
4. Reply Declaration of Michael J. Harris, Ph.D., in Support of Plaintiffs' Motion for Class Certification, executed May 9, 2005
5. Reply Declaration of Mark Dwyer, Ph.D., in Support of Plaintiffs' Motion for Class Certification, executed May 9, 2005
6. Reply Declaration of Franklin Edwards, dated May 9, 2005
7. United States District Court S.D.N.Y. In re Natural Gas Commodities Litigation No. 03 Civ. 6186 VM JCB September 30, 2005
8. Expert Report of Mark Dwyer, dated October 23, 2006, & Exs. 1-9 thereto
9. Report of Michael J. Harris, dated October 23, 2006
10. Declaration of Albert Helmig, October 23, 2006
11. Plaintiffs' Motion for Preliminary Approval of Proposed Plan of Distribution, October 3, 2009
12. Affidavit of Thomas A. Faucher in Support of Motion for Preliminary Approval of Plan of Allocation ("Faucher Affidavit"), October 6, 2009
13. Affirmation of Craig Pirrong, dated October 6, 2009
14. Plaintiffs' Corrected Memorandum in Support of Their Motion for Preliminary Approval of Proposed Plan of Distribution, October 9, 2009
15. Plaintiffs' Corrected Memorandum In Support of Their Motion for Preliminary Approval of Proposed Plan of Distribution (with a corrected proposed Plan of Allocation attached thereto as Exhibit A) (the "Corrected Memorandum"), October 9, 2009
16. Affirmation of Dr. Craig Pirrong ("Pirrong Affirmation"), October 13, 2009
17. Affidavit of Terrence Martell, Ph.D., in Opposition to Lead Class Counsels' Motion for Preliminary Approval of Proposed Plan of Distribution, October 26, 2009
18. Memorandum in Support of Mark Nordlicht's Motion for Intervention in the Action, October 27, 2009
19. Comments of the South Carolina Office of Regulatory Staff, October 27, 2009
20. Affirmation of Steven R. Goldberg in Opposition to Lead Class Counsels' Motion for Preliminary Approval of Proposed Plan of Distribution, October 27, 2009
21. Affidavit of Mark B. Fisher in Opposition to Lead Class Counsels' Motion for Preliminary Approval of Proposed Plan of Distribution, October 27, 2009
22. Affidavit of Bernard Persky in Support of Motion for Preliminary Approval of Plan of Allocation. November 2, 2009
23. 2006-2007 Settlement Fund Proposed Distributions, November 4, 2009
24. Reply Affirmation of Craig Pirrong, November 4, 2009
25. Declaration of Geoffrey M. Horn, November 4, 2009
26. Plaintiffs' Reply Memorandum in Support of Their Motion for Preliminary Approval of Proposed Plan of Distribution (Corrected), November 4, 2009

ROBERT E. CONNER

Founding member of Thornapple Associates, Inc., a firm engaged in expert witness services in connection with trials, arbitrations and regulatory proceedings related to the securities and commodities industries. Testimonial and analytic experience since 1983 in over 750 disputes involving both equity and income instruments and their specific-issue and index derivatives, as well as options, futures and forward contracts on commodities, financial indices and foreign currencies. Expertise extends to asset allocation, portfolio management and hedging, fundamental security analysis, trading, prime broker operations, margin, structured products, CMOs, securities industry practice and standards, after-tax considerations, suitability, adequacy of risk disclosure, risk arbitrage and direct investments, loss causation and damages.

Clientele have included the Securities and Exchange Commission, the Internal Revenue Service, U.S. and state-level Attorneys General and Securities, Banking and Insurance Commissioners, both U.S. and foreign individual and institutional investors, banks and insurance companies, operating corporations and LLCs, brokerage firms, ERISA pension and profit-sharing plans, registered investment advisors, market-makers, hedge funds, non-profit organizations and foundations, bankruptcy trustees, trusts and estates.

Thirty-two years experience in the securities industry. President and portfolio manager, from 1983-1998, of Conner Capital Corp., an independent firm that engaged in the portfolio management of U.S. and foreign corporate, pension and individual accounts, including portfolio hedging and after-tax investment strategies employing stock and equity index options and futures contracts, convertibles and warrants.

As Director, Options Management, Prudential Insurance Company of North America from 1980-1983, inaugurated Prudential's use of derivative hedging instruments in a $50 million pilot option program. Co-portfolio manager of over $300 million in mutual fund assets, to include special purpose tax-managed strategies, as well as the first U.S. mutual fund to incorporate the use of stock index futures contracts. Additional functions in both the bond and stock departments included both other hedging activities as well as the use of convertible bonds and preferred stocks. Established trading desk, stock loan, and multiple prime broker clearing operations for both fixed-income and equity securities employing stocks, stock and index options, and financial futures contracts. Treasurer of a bank subsidiary.

Registered representative of Donaldson, Lufkin & Jenrette (1977-1979), and Drexel Burnham Lambert (1979-1980), where he was co-head and Vice President of Institutional Options, and authored option-related commentaries as part of firm equity research. Managed discretionary accounts for individual investors, pension plans and college endowments, and serviced non-discretionary accounts of high net worth individuals, investment advisors, mutual funds, insurance companies, corporations, partnerships, hedge funds, foundations. endowments, trusts and pension and profit-sharing plans.

Formerly an adjunct assistant professor of finance and statistics at the Graduate School of Business, Pace University, New York; an options instructor at the New York Institute of Finance, and member of the Financial Instruments Advisory Committee of the Chicago Mercantile Exchange (1982-1985) regarding financial index, foreign currency and Treasury-Eurodollar futures contracts, and options thereon.

Arbitrator: FINRA, National Futures Association, AAA

BA, University of California at Santa Barbara; history & political science
MPA, John F. Kennedy School of Government, Harvard University
MBA, Harvard Business School (finance and real estate emphasis)
Ph.D. studies in government, foreign policy, economics & statistics, Harvard University

Foreign Languages: Spanish, Italian, Russian, German, French, Vietnamese

Military Service: U.S. Army, 1966-1971, Captain, Military Police
West Berlin, Germany (1967-1969): Russian Liaison Officer; Executive Officer, 287th M.P. Company
South Vietnam (1969-1971): Company Commander, Criminal Investigator, Provost Marshal, Advisor

ROBERT E. CONNER                                                    Publications

The Unsuitability of the "Suitability Rule" – Why FINRA's Current Interpretation of Conduct Rule 2310 Undermines Investor "Holding Claim" Entitlements in Contemporary Markets, co-authored with Laurence A. Steckman, Esq., The Journal of Business, Entrepreneurship & the Law, Pepperdine University School of Law, Volume II Number I, April 2009, pp. 122-141 (reprinted in modified form from 2008 Securities Arbitration, Ch. 15, pp. 177-230, Practising Law Institute (PLI), New York)

"Mitigation of Damages in Securities and Commercial Litigation and Arbitration", co-authored with Laurence A. Steckman, Esq. and Courtney B. Bellaire, Journal of Securities Law, Regulation & Compliance, Volume 2 Number 2, March 2009, pp. 103-114, Henry Stewart Publications, London, U.K., reprinted Securities Arbitration 2009, Ch. 13, pp. 491-505, PLI, New York.

"The Unsuitability of the 'Suitability Rule': Why FINRA's Current Interpretation of Conduct Rule 2310 Undermines Investor 'Holding Claim" Entitlements in Contemporary Markets," co-authored with Laurence A. Steckman & James Trainor, Securities Arbitration 2008, Practising Law Institute (PLI), New York

"Option Backdating: Important as to Corporate Integrity, but not Material as to Stock Valuation," Business Torts, Volume 11, No. 3, Spring 2007, American Association for Justice, Washington, D.C.

"Looking for the Exits: A Fiduciary's Sell Strategy Under the Prudent Investor Act", co-authored with John Jeffrey Pankauski, Vol. 20 Probate & Property (No. 6, Nov./Dec. 2006) at 40, Pub. Real Property, Probate & Trust Law Section, American Bar Association, Chicago, IL.

"Mitigation of Damages in Securities Litigation and Arbitration", co-authored with Laurence A. Steckman, Steve Getzoff, and Courtney Bellaire, Securities Arbitration 2004, PLI, New York

"Expert Testimony?", co-authored with Courtney Bellaire, Securities Arbitration 2002, PLI, New York

"Computation of Benefit of the Bargain Damages in Cases Alleging Fraud in the Sale of Bonds", co-authored with Laurence A. Steckman, Esq., Securities Arbitration 2001, PLI, New York

"Loss Causation Under Rule 10b-5: A Circuit by Circuit Analysis ",co-authored with Laurence A. Steckman, Esq., Securities Arbitration 1998, PLI, New York, N.Y., reprinted RICO Law Reporter, Vol. 28, No. 2, at 173-231 (August 1998), Washington, D.C.; reprinted Securities Reform Act Litigation Reporter, Vol. 5, No. 6 at 897-956 (September 1998), Washington, D.C.

"Arbitral Awards in Excess of Actual Damages", co-authored with Laurence A. Steckman, New York Law Journal, January 11, 1996, New York

"Lost In Translation: Cross-Currency Damage Calculations", co-authored with Courtney Bellaire, Securities Arbitration 1996, PLI, New York

"Explicit Bet Recognition in Foreign Currency Applications of Options, Futures, and Forwards", Public Investors Arbitration Bar Association, 4th Annual Meeting, October, 1995, Carlsbad, California

"Computing Damages in Rule 10b-5 Unsuitability Cases: Litigating "Offset" Defenses", co-authored with Laurence A. Steckman, Esq., Securities Arbitration 1994, PLI, New York

"Catch-22(b)(5): And Other Expert Witness Reflections",co-authored with Courtney Bellaire, Securities Arbitration 1993, PLI, New York

"Limited Partnership Suitability Factors and the Flanagan v. Prudential Securities, Make-Whole Award", co-authored with Stuart C. Goldberg, Securities Arbitration 1992, PLI, New York

"A Revisionist Theory of Churning and Market Exposure", co-authored with Courtney Bellaire, Securities Arbitration 1991, PLI, New York

"Expert Witness Testimony: Practical Considerations for Counsel", Securities Arbitration 1990, PLI, New York

"Option-Related Securities Disputes: Analytical Considerations", Securities Arbitration 1989, PLI, New York

"Financial Analysis of Claim and Presentation at Hearing", Securities Arbitration 1988, PLI, New York

"I got risk?" Investment Management Review, January/February 1988, New York

"Determining the Fair Value of Stock Options", Pensions & Investment Age, May 25, 1981, New York

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2009 the foregoing Intervenor Nordlicht's November 10, 2009 Reply Affirmation by Saul E. Feder with Exhibits and the November 9, 2009 Affirmation of Dr. Robert E. Conner with his c.v. were all filed and served via the Southern District's ECF system.


Dated:  November 10, 2009
      New York, New York


      Respectfully submitted,

      *REGOSIN, EDWARDS, STONE & FEDER, ESQS.*
      Attorneys for Intervenor Mark Nordlicht

      By: _____
          Saul E. Feder, Esq. (SF-3524)
          Office and P.O. Address
          225 Broadway, Suite 613
          New York, New York  10007
          212-619-1990

# EXHIBIT "A"

Saul Feder

| | |
|---|---|
| **From:** | Faucher, Thomas [tfaucher@rustconsulting.com] |
| **Sent:** | Thursday, February 05, 2009 11:26 AM |
| **To:** | Saul Feder |
| **Subject:** | NATG- Re Mark Nordlicht |

Dear Mr. Feder,

It was a pleasure speaking with you today. Per our phone conversation and your request for email confirmation:

The deficiencies that were noted in the deficiency letter were cured by obtaining information from the hard copy documentation sent.  The documentation is "incomplete" as we both agreed, as there are months that are either missing or incomplete.  The statements received begin in January of the year 2000'; we have not received documentation for the period of July 1999 through January 2000 which your client indicated he was unable to obtain. For the documentation received, the available data has been captured and there are no remaining deficiencies.

Additionally, per your request, I will send another email outlining our recent request for purchase and sale information for reported P&Ls.

Thank you,

Thomas A. Faucher
Project Manager
Rust Consulting, Inc. (formerly Complete Claim Solutions, LLC)
5210 Hood Rd
Palm Beach Gardens, FL 33418
561-253-7721 Direct
561-651-7788 Fax
tfaucher@rustconsulting.com



# EXHIBIT "B"

**Saul Feder**

| | |
|---|---|
| **From:** | Faucher, Thomas [tfaucher@rustconsulting.com] |
| **Sent:** | Tuesday, March 10, 2009 11:38 AM |
| **To:** | Ian T. Stoll, Esq. |
| **Cc:** | Geoffrey Horn |
| **Subject:** | Mark Nordlicht - image of Deficiency Letter sent |
| **Attachments:** | Nordlicht_Letter_Reprint_NATG (8034) TMID_Clm_51919.pdf |

Hello Ian,

Per our phone conversation today, attached is the Deficiency Letter sent to Mark Nordlicht. The actual transactions which were missing information in the electronic file are outlined on the second page of the letter. These deficiencies listed on this letter have been cured.

Please let me know if I may be of further assistance.

Best Regards,

Thomas A. Faucher
Project Manager
Rust Consulting, Inc. (formerly Complete Claim Solutions, LLC)
5210 Hood Rd
Palm Beach Gardens, FL 33418
561-253-7721 Direct
561-651-7788 Fax
tfaucher@rustconsulting.com



UNITED STATES   DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    **Master File No. 03 CV 6186(VM)(AJP)**

In re:


NATURAL GAS COMMODITY LITIGATION


---

### INTERVENOR NORDLICHT'S REPLY AFFIRMATION

---

## REGOSIN, EDWARDS, STONE & FEDER

*Attorney(s) for* Intervenor Mark Nordlicht

### *Office and Post Office Address, Telephone*

225 Broadway, Suite 613
NEW YORK, NEW YORK 10007
(212) 619-1990
(212) 619-1910

---

To

Signature (Rule 130-1.1-a)

Print name beneath

Saul E. Feder

Service of a copy of the within is hereby admitted.

**Attorney(s) for**

Dated:_____

---

**PLEASE TAKE NOTICE:**

☐ **NOTICE OF ENTRY**

that the within is a *(certified) true copy of a*
duly entered in the office of the clerk of the within named court on

☐ **NOTICE OF SETTLEMENT**

that an order                                                   of which the within is a true copy
will be presented for settlement to the HON.                   one of the judges of the
within named Court, at
on                              at              M.

Dated,

Yours, etc.