UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re:                                    Master File No. **03 CV 6186(VM)(AJP)**

                                          ECF Case

Natural Gas Commodity Litigation          **Hon. Victor Marrero, USDJ**


-----------------------------------------------------------X


# DR. ROBERT E. CONNOR'S
# EXPERT OPINION
# SUBMITTED BY
# INTERVENOR MARK NORDLICHT
# IN OPPOSITION TO FINAL APPROVAL OF
# CURRENT PROPOSED PLAN OF DISTRIBUTION


**Dated: March 25, 2010**

                                      **Respectfully Submitted By:**
                                      **Saul E. Feder, Esq.**
                    ***REGOSIN, EDWARDS, STONE & FEDER, ESQS.***
                      Attorneys for the Intervenor Mark Nordlicht
                                Office and P.O. Address
                                225 Broadway, Suite 613
                                New York, New York 10007
                                212-619-1990

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re:  
　　　　　　　　　　　　　　　　　　　　　Master File No. 03 CV 6186(VM)(AJP)

　　　　　　　　　　　　　　　　　　　　　ECF Case

Natural Gas Commodity Litigation　　　　　Hon. Victor Marrero, USDJ

------------------------------------------------------------X

## AFFIRMATION OF ROBERT E. CONNER

I have been asked by counsel for Intervenor Mark Nordlicht to provide opinions with respect to whether the corrected proposed Plan of Allocation (the Plan) is fair and reasonable.

A list of the documents which I have reviewed in connection with forming my opinions is attached, as is a copy of my c.v.

This Affidavit is focused on those aspects of the Plan which, in my opinion, fall short of being 'fair and reasonable.'

Day-Trading:　It would appear uncontested that 'day traders' were little affected by the artificial price manipulation at issue in this case, yet a significant allocation of the pool of Settlement Funds is earmarked for distribution to such Class Members. This anomaly should be corrected by excluding Day Traded contracts from the allocation of Settlement Funds.

As stated by Dr. Pirrong, "although floor traders trade in heavy volume, they typically reverse their positions very rapidly, meaning that the amount of artificiality they buy and sell over time is almost certainly nearly equal."[1] More specifically, Dr. Pirrong further states that "floor traders who trade in heavy volume suffered little damage as [a] result of the type

---

[1] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 4, ¶ #11

1

of manipulation alleged here."[2] By its nature, no day traded natural gas contract should qualify for any distribution of the Settlement Funds subject to the Plan, regardless of when during a given calendar month such trading took place.

First Five Days of the Month:   The Plan allocates the predominant share of settlement funds distribution to Class Members whose losses and/or volume of trades, whether in futures or option contracts, occurred within the first five days of each calendar month.

The rationale proffered for this allocation is that the effects of the manipulation would be confined to a short period of time following the release of mis-reported information on the theory that "over time traders would be able to observe additional information that would contradict the manipulation-affected price reports." It is also asserted that Dr. Mark Dwyer's expert reports in this matter empirically support this position by opining that "the bulk of the price artificiality resulting from manipulation affected price reporting occurred within the first five trading days following release of bid-week prices in trade publications."[3]

In fact, no expert report by Dr. Dwyer makes any mention of a five day period, much less one after which the effects of mis-reported price information would cease to affect the market. Dr. Dwyer does state that such "distortions should not be expected to influence the course of natural gas prices over the long run," and that "such index manipulations caused temporary distortions in futures prices."[4] Dr. Dwyer does state that that "86 percent of distortion in the futures price occurs within the first half of the month."[5] Needless to say, five days is a shorter period than the first half of any month. With all due respect to Dr. Pirrong, his statement that "it is reasonable to limit the period of time over which artificiality is presumed to affect prices to the five trading days subsequent to the release of the affected reports"[6] appears to conflict with the expert report of Dr. Dwyer.

---

[2] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 3, ¶ #10
[3] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 2, ¶ #4
[4] Expert Report of Mark Dwyer, PhD., October 23, 2009, Pg.12, ¶ #31
[5] Expert Report of Mark Dwyer, PhD., October 23, 2009, Pg.14, ¶ #35
[6] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 2, ¶ #6

The Plan's proposed distribution of Settlement Funds based on a mere five days of a calendar month represents an over-concentration of damage compensation to that subset of futures and options contracts traded by Class Members within those few initial days of each calendar month in the Class Period. It further ignores the fact that a portion of contracts initiated during those days were not closed-out until afterward, when the impact of price artificiality during that period, of any subset of a month, would be realized.

As pointed out by Dr. Pirrong, "a trader is damaged by a manipulation if he purchases and sells at different levels of artificiality."[7] For precisely that reason, futures and option positions that were opened during the first half of a given month, the period cited by Dr. Dwyer as comprising 86 percent of the price distortion in NYMEX natural gas contracts, but closed-out during the second half of a month, when price distortion had attenuated, would fit that description, and could incur damage due to the lessened degree of price distortion present in the second half of each month. Far from being a reason to endorse the over-allocation of distributed Settlement Funds to the first five days of each month contained in the Plan, it is a reason to take the entire month into consideration, and give greater, if not equal, weight to the second half of each month.

<u>Net Volume & Net Losses:</u>   While agreeing with Dr. Pirrong's observation that "net volume is highly preferable to gross volume as a measure of harm resulting from the manipulation alleged here,"[8] neither does net volume suffice on its own as a basis for damage calculation in this case. As pointed out by Dr. Harris, "The change in open interest provides the minimum amount of new buys and sales that were made but not liquidated on a given day. . . . Multiplying the change in open interest time the amount of artificiality provides an actual dollar amount of damages that, given the way the market works, significantly understates aggregate class members' damages on that day. This is because the change in open interest does not represent all new buyers or new sellers who entered the market each day."[9] A 'fair and reasonable' allocation of Settlement Funds distribution,

---

[7] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 5, ¶ #16
[8] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 7, ¶ #22
[9] Report of Michael J. Harris, Ph.D., October 23, 2006, Pg. 19

while it may take net volume into account, must look beyond it. It must also take into account the direct damage consequences of manipulated prices – net dollar losses.

As acknowledged by Dr. Pirrong, "a trader suffers damage from manipulation to the extent that artificiality changes (in an adverse direction) over the period in which a position is open. A trader that buys more than he sells (or *vice versa*) over a period of time that manipulation has affected prices . . . is more likely to have suffered a loss, because such an imbalance between buys and sells implies the maintenance of a net open position."[10] The most reliable measure of damage over such a period of time would be net dollar losses, reflecting the magnitude of the open positions and the degree of change in price artificiality that have been determined to occur between the first and second halves of the month, an attenuation reflecting the diminishing effect of price misinformation injected into the marketplace during bid week. Contrary to the position espoused by Dr. Pirrong with respect to endorsing the Five Trading Day subdivision, but consistent with the logic of his statement that "artificiality must change for a trader to be damaged by a manipulation"[11], "it is reasonable to confine the net volume-based allocation to the period of time when manipulation is like to have had the greatest impact"[12], but not the greatest impact on 'prices', per se, but the greatest impact on 'net losses' incurred by the Class Members, which , excluding Day Traders, will tend to encompass those who held open positions over the course of the steady attenuation of the market price distortion from the beginning to the end of each calendar month, certainly from Dr. Dwyer's first-half to the second-half of the month as the level of manipulated price distortion dissipated.

A re-weighting of the allocation based on net volume and net dollar losses is called for, and must be considered in the absence of any inclusion of volume and losses associated with Day Traded contracts, and independent of any arbitrary (not adequately supported by an expert opinion) Five Day period following the dissemination of the misinformation that created the price distortions that gave rise to this case.

---

[10] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 7, ¶ #22
[11] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 7, ¶ #23
[12] Reply Affirmation of Dr. Craig Pirrong, November 4, 2009, Pg. 7, ¶ #23

*Robert E. Conner* (signature)                                   November 9, 2009

Robert E. Conner
General Factotum
Thornapple Associates, Inc.
450 Springfield Avenue
Summit, New Jersey 07901
(908) 277-0003

Documents Reviewed

1. Amended Consolidated Class Action Complaint, Master File No. 03 CV 6186(VM)(AJP) ECF Case
2. Declaration of Michael J. Harris, Ph.D., in Support of Plaintiffs' Motion for Class Certification, executed January 24, 2005
3. Declaration of Mark Dwyer, Ph.D., in Support of Plaintiffs' Motion for Class Certification, executed January 24, 2005
4. Reply Declaration of Michael J. Harris, Ph.D., in Support of Plaintiffs' Motion for Class Certification, executed May 9, 2005
5. Reply Declaration of Mark Dwyer, Ph.D., in Support of Plaintiffs' Motion for Class Certification, executed May 9, 2005
6. Reply Declaration of Franklin Edwards, dated May 9, 2005
7. United States District Court S.D.N.Y. In re Natural Gas Commodities Litigation No. 03 Civ. 6186 VM JCB September 30, 2005
8. Expert Report of Mark Dwyer, dated October 23, 2006, & Exs. 1-9 thereto
9. Report of Michael J. Harris, Ph.D., dated October 23, 2006
10. Declaration of Albert Helmig, October 23, 2006
11. Plaintiffs' Motion for Preliminary Approval of Proposed Plan of Distribution, October 3, 2009
12. Affidavit of Thomas A. Faucher in Support of Motion for Preliminary Approval of Plan of Allocation ("Faucher Affidavit"), October 6, 2009
13. Affirmation of Craig Pirrong, dated October 6, 2009
14. Plaintiffs' Corrected Memorandum in Support of Their Motion for Preliminary Approval of Proposed Plan of Distribution, October 9, 2009
15. Plaintiffs' Corrected Memorandum In Support of Their Motion for Preliminary Approval of Proposed Plan of Distribution (with a corrected proposed Plan of Allocation attached thereto as Exhibit A) (the "Corrected Memorandum"), October 9, 2009
16. Affirmation of Dr. Craig Pirrong ("Pirrong Affirmation"), October 13, 2009
17. Affidavit of Terrence Martell, Ph.D., in Opposition to Lead Class Counsels' Motion for Preliminary Approval of Proposed Plan of Distribution, October 26, 2009
18. Memorandum in Support of Mark Nordlicht's Motion for Intervention in the Action, October 27, 2009
19. Comments of the South Carolina Office of Regulatory Staff, October 27, 2009
20. Affirmation of Steven R. Goldberg in Opposition to Lead Class Counsels' Motion for Preliminary Approval of Proposed Plan of Distribution, October 27, 2009
21. Affidavit of Mark B. Fisher in Opposition to Lead Class Counsels' Motion for Preliminary Approval of Proposed Plan of Distribution, October 27, 2009
22. Affidavit of Bernard Persky in Support of Motion for Preliminary Approval of Plan of Allocation. November 2, 2009
23. 2006-2007 Settlement Fund Proposed Distributions, November 4, 2009
24. Reply Affirmation of Craig Pirrong, November 4, 2009
25. Declaration of Geoffrey M. Horn, November 4, 2009
26. Plaintiffs' Reply Memorandum in Support of Their Motion for Preliminary Approval of Proposed Plan of Distribution (Corrected), November 4, 2009

ROBERT E. CONNER

Founding member of Thornapple Associates, Inc., a firm engaged in expert witness services in connection with trials, arbitrations and regulatory proceedings related to the securities and commodities industries. Testimonial and analytic experience since 1983 in over 750 disputes involving both equity and income instruments and their specific-issue and index derivatives, as well as options, futures and forward contracts on commodities, financial indices and foreign currencies. Expertise extends to asset allocation, portfolio management and hedging, fundamental security analysis, trading, prime broker operations, margin, structured products, CMOs, securities industry practice and standards, after-tax considerations, suitability, adequacy of risk disclosure, risk arbitrage and direct investments, loss causation and damages.

Clientele have included the Securities and Exchange Commission, the Internal Revenue Service, U.S. and state-level Attorneys General and Securities, Banking and Insurance Commissioners, both U.S. and foreign individual and institutional investors, banks and insurance companies, operating corporations and LLCs, brokerage firms, ERISA pension and profit-sharing plans, registered investment advisors, market-makers, hedge funds, non-profit organizations and foundations, bankruptcy trustees, trusts and estates.

Thirty-two years experience in the securities industry. President and portfolio manager, from 1983-1998, of Conner Capital Corp., an independent firm that engaged in the portfolio management of U.S. and foreign corporate, pension and individual accounts, including portfolio hedging and after-tax investment strategies employing stock and equity index options and futures contracts, convertibles and warrants.

As Director, Options Management, Prudential Insurance Company of North America from 1980-1983, inaugurated Prudential's use of derivative hedging instruments in a $50 million pilot option program. Co-portfolio manager of over $300 million in mutual fund assets, to include special purpose tax-managed strategies, as well as the first U.S. mutual fund to incorporate the use of stock index futures contracts. Additional functions in both the bond and stock departments included both other hedging activities as well as the use of convertible bonds and preferred stocks. Established trading desk, stock loan, and multiple prime broker clearing operations for both fixed-income and equity securities employing stocks, stock and index options, and financial futures contracts. Treasurer of a bank subsidiary.

Registered representative of Donaldson, Lufkin & Jenrette (1977-1979), and Drexel Burnham Lambert (1979-1980), where he was co-head and Vice President of Institutional Options, and authored option-related commentaries as part of firm equity research. Managed discretionary accounts for individual investors, pension plans and college endowments, and serviced non-discretionary accounts of high net worth individuals, investment advisors, mutual funds, insurance companies, corporations, partnerships, hedge funds, foundations, endowments, trusts and pension and profit-sharing plans.

Formerly an adjunct assistant professor of finance and statistics at the Graduate School of Business, Pace University, New York; an options instructor at the New York Institute of Finance, and member of the Financial Instruments Advisory Committee of the Chicago Mercantile Exchange (1982-1985) regarding financial index, foreign currency and Treasury-Eurodollar futures contracts, and options thereon.

Arbitrator: FINRA, National Futures Association, AAA

BA, University of California at Santa Barbara; history & political science
MPA, John F. Kennedy School of Government, Harvard University
MBA, Harvard Business School (finance and real estate emphasis)
Ph.D. studies in government, foreign policy, economics & statistics, Harvard University

Foreign Languages: Spanish, Italian, Russian, German, French, Vietnamese

Military Service: U.S. Army, 1966-1971, Captain, Military Police
West Berlin, Germany (1967-1969): Russian Liaison Officer; Executive Officer, 287th M.P. Company
South Vietnam (1969-1971): Company Commander, Criminal Investigator, Provost Marshal, Advisor

ROBERT E. CONNER                                                                       Publications

The Unsuitability of the "Suitability Rule" – Why FINRA's Current Interpretation of Conduct Rule 2310 Undermines Investor "Holding Claim" Entitlements in Contemporary Markets, co-authored with Laurence A. Steckman, Esq., The Journal of Business, Entrepreneurship & the Law, Pepperdine University School of Law, Volume II Number I, April 2009, pp. 122-141 (reprinted in modified form from 2008 Securities Arbitration, Ch. 15, pp. 177-230, Practising Law Institute (PLI), New York)

"Mitigation of Damages in Securities and Commercial Litigation and Arbitration", co-authored with Laurence A. Steckman, Esq. and Courtney B. Bellaire, Journal of Securities Law, Regulation & Compliance, Volume 2 Number 2, March 2009, pp. 103-114, Henry Stewart Publications, London, U.K., reprinted Securities Arbitration 2009, Ch. 13, pp. 491-505, PLI, New York.

"The Unsuitability of the 'Suitability Rule': Why FINRA's Current Interpretation of Conduct Rule 2310 Undermines Investor 'Holding Claim' Entitlements in Contemporary Markets," co-authored with Laurence A. Steckman & James Trainor, Securities Arbitration 2008, Practising Law Institute (PLI), New York

"Option Backdating: Important as to Corporate Integrity, but not Material as to Stock Valuation," Business Torts, Volume 11, No. 3, Spring 2007, American Association for Justice, Washington, D.C.

"Looking for the Exits: A Fiduciary's Sell Strategy Under the Prudent Investor Act", co-authored with John Jeffrey Pankauski, Vol. 20 Probate & Property (No. 6, Nov./Dec. 2006) at 40, Pub. Real Property, Probate & Trust Law Section, American Bar Association, Chicago, IL.

"Mitigation of Damages in Securities Litigation and Arbitration", co-authored with Laurence A. Steckman, Steve Getzoff, and Courtney Bellaire, Securities Arbitration 2004, PLI, New York

"Expert Testimony?", co-authored with Courtney Bellaire, Securities Arbitration 2002, PLI, New York

"Computation of Benefit of the Bargain Damages in Cases Alleging Fraud in the Sale of Bonds", co-authored with Laurence A. Steckman, Esq., Securities Arbitration 2001, PLI, New York

"Loss Causation Under Rule 10b-5: A Circuit by Circuit Analysis ",co-authored with Laurence A. Steckman, Esq., Securities Arbitration 1998, PLI, New York, N.Y., reprinted RICO Law Reporter, Vol. 28, No. 2, at 173-231 (August 1998), Washington, D.C.; reprinted Securities Reform Act Litigation Reporter, Vol. 5, No. 6 at 897-956 (September 1998), Washington, D.C.

"Arbitral Awards in Excess of Actual Damages", co-authored with Laurence A. Steckman, New York Law Journal, January 11, 1996, New York

"Lost In Translation: Cross-Currency Damage Calculations", co-authored with Courtney Bellaire, Securities Arbitration 1996, PLI, New York

"Explicit Bet Recognition in Foreign Currency Applications of Options, Futures, and Forwards", Public Investors Arbitration Bar Association, 4th Annual Meeting, October, 1995, Carlsbad, California

"Computing Damages in Rule 10b-5 Unsuitability Cases: Litigating "Offset" Defenses", co-authored with Laurence A. Steckman, Esq., Securities Arbitration 1994, PLI, New York

"Catch-22(b)(5): And Other Expert Witness Reflections",co-authored with Courtney Bellaire, Securities Arbitration 1993, PLI, New York

"Limited Partnership Suitability Factors and the Flanagan v. Prudential Securities, Make-Whole Award", co-authored with Stuart C. Goldberg, Securities Arbitration 1992, PLI, New York

"A Revisionist Theory of Churning and Market Exposure", co-authored with Courtney Bellaire, Securities Arbitration 1991, PLI, New York

"Expert Witness Testimony: Practical Considerations for Counsel", Securities Arbitration 1990, PLI, New York

"Option-Related Securities Disputes: Analytical Considerations", Securities Arbitration 1989, PLI, New York

"Financial Analysis of Claim and Presentation at Hearing", Securities Arbitration 1988, PLI, New York

"I got risk?" Investment Management Review, January/February 1988, New York

"Determining the Fair Value of Stock Options", Pensions & Investment Age, May 25, 1981, New York

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2010 the foregoing the November 9, 2009 Affirmation of Dr. Robert E. Conner with his c.v. were all filed and served via the Southern District's ECF system.

Dated: March 25, 2010
      New York, New York

           Respectfully submitted,

           ***REGOSIN, EDWARDS, STONE & FEDER, ESQS.***
           Attorneys for Intervenor Mark Nordlicht

           By: _____
               Saul E. Feder, Esq. (SF-3524)
               Office and P.O. Address
               225 Broadway, Suite 613
               New York, New York  10007
               212-619-1990

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK        Master File No. 03 CV 6186(VM)(AJP)

In re:

NATURAL GAS COMMODITY LITIGATION

---

**DR. ROBERT E. CONNER'S EXPERT OPINION
SUBMITTED BY NORDLICHT IN OPPOSITION TO APPROVAL OF PLAN**

---

**REGOSIN, EDWARDS, STONE & FEDER**

*Attorney(s) for* Intervenor Mark Nordlicht

*Office and Post Office Address, Telephone*

225 Broadway, Suite 613
NEW YORK, NEW YORK 10007
(212) 619-1990
(212) 619-1910

Signature (Rule 130-1.1-a)

To

Print name beneath
Saul E. Feder

Service of a copy of the within is hereby admitted.

Attorney(s) for                                   Dated:_____

---

**PLEASE TAKE NOTICE:**

☐ **NOTICE OF ENTRY**
that the within is a *(certified) true copy of a*
duly entered in the office of the clerk of the within named court on

☐ **NOTICE OF SETTLEMENT**
that an order                                                                 of which the within is a true copy
will be presented for settlement to the HON.                           one of the judges of the
within named Court, at
on                              at              M.

Dated,

Yours, etc.

REGOSIN, EDWARDS, STONE & FEDER