UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

| | | |
|---|---|---|
| IN RE: NATURAL GAS (VM)(AJP) | : | Master File No. 03-CV-6186 |
| COMMODITY LITIGATION | : | |

---------------------------------------------------x

| | | |
|---|---|---|
| THIS DOCUMENT RELATES TO | : | Hon. Victor Marrero, USDJ |
| ALL ACTIONS | : | |

---------------------------------------------------x

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
FINAL APPROVAL OF PROPOSED PLAN OF DISTRIBUTION**

LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900

LOWEY DANNENBERG COHEN &
HART, P.C.
White Plains Plaza, One North Broadway
White Plains, NY 10601
Telephone: (914) 997-0500

 FINKELSTEIN THOMPSON LLP
1050 30th Street, NW
Washington, D.C. 20007
Telephone: (202) 337-8000

LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

Attorneys for Plaintiffs

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT AND STATEMENT OF FACTS .................................. 1

II.   ARGUMENT .......................................................................................... 9

    A.    A PLAN OF ALLOCATION NEED ONLY BE REASONABLE
         AND FAIR TO MERIT FINAL APPROVAL ....................................................... 9

    B.    THE LEGAL BASIS FOR DAMAGES IN MANIPULATION
         CLAIMS HAS BEEN NET ARTIFICIAL IMPACT AND, IN
         CERTAIN CIRCUMSTANCES, NET LOSSES (BUT NEVER
         NET VOLUME LET ALONE GROSS VOLUME) ............................................ 10

    C.    THE PLAN IS REASONABLE BECAUSE IT PRIORITIZES
         THE LEARNING IN THIS CASE AND WHAT COULD HAVE
         BEEN PROVED AT TRIAL, FOLLOWED BY WHAT
         COULD HAVE BEEN LEGALLY PERMISSIBLE DAMAGES,
         AND THEN GIVES APPROPRIATE EQUITABLE
         CONSIDERATION TO NET VOLUME (AND TO OPTIONS) ........................ 12

    D.    THE OBJECTIONS SHOULD BE OVERRULED ............................................ 20

         1.    THE OBJECTIONS TO THE PLAN ARE
             DIAMETRICALLY OPPOSED TO ONE
             ANOTHER AND THEREBY FURTHER
             DEMONSTRATE THE PLAN'S REASONABLENESS ...................... 21

         2.    Bolling Intervenors ................................................................. 22

         3.    SCANA ................................................................................... 23

             a.    Objections to Hedging Deduction................................. 23

             b.    Objections to Procedure ............................................... 25

             c.    Objections to Cost Sharing ........................................... 27

             d.    Objections to the Complications of the Plan................. 29

         4.    Mark Nordlicht........................................................................ 30

             a.    Plaintiffs Have Produced the Expert Report
                 Supporting the First Five Trading Days Allocation..................... 30

i

b.    Hedging Deduction ........................................................ 33

c.    Net Losses and Net Volume ........................................... 33

d.    Nordlicht's Trading Data .............................................. 33

5.    Robert Richert ...................................................................... 35

6.    Plaintiff Dominick Viola's Objections To The
      Treatment of Spread Trading ................................................ 36

7.    Steven Ardizzone ................................................................. 42

a.    Steven Ardizzone's Request for Inclusion in the
      2006 Settlement Has Already Been Denied................................ 42

CONCLUSION ........................................................................................ 44

# TABLE OF AUTHORITIES

## Cases

*Beecher v. Able*, 575 F.2d 1010 (2d Cir. 1978) ............................................................. 10

*Board of Trade of City of Chicago v. S.E.C.*
   187 F.3d 713 (7th Cir. 1999) (Easterbrook, J.) ............................................................ 6

*Gordon v. Hunt*, 98 F.R.D. 573 (S.D.N.Y. 1983) ........................................................ 11

*In re Chicken Antitrust Litigation*, 669 F.2d 228 (5th Cir. 1982) ................................. 10

*In re Equity Funding Corp. Securities Litig.*, 603 F.2d 1353 (9th Cir. 1979) .............. 10

*In re Ivan F. Boesky Securities Litigation*, 948 F.2d 1358 (2d Cir. 1991) .................... 9

*In re Natural Gas Commodity Litigation*, 231 F.R.D. 171 (S.D.N.Y. 2005) .......... 2, 19

*In re Natural Gas Commodity Litigation*, 232 F.R.D. 208 (S.D.N.Y. 2005) ................ 2

*In re Natural Gas Commodity Litigation*, 235 F.R.D. 241 (S.D.N.Y. 2006) .......... 2, 12

*In re Natural Gas Commodity Litigation*, 337 F.Supp.2d 498 (S.D.N.Y. 2004) ........... 2

*In re Natural Gas Commodity Litigation*, 358 F.Supp.2d 336 (S.D.N.Y. 2005) ........... 2

*In re Prudential Securities Inc. Ltd. Partnerships Litig.*, 1996 Fed.Sec.L.Rep. (CCH) .............. 10

*In re Salomon Inc. Securities Litig.*, 1994 WL 265917 (S.D.N.Y. June 16, 1994) ..................... 10

*In re Soybeans Futures Litig.,* 89 C 7009 (N.D. Ill.) (CRN) ...................................... 11

*In re Sumitomo Copper Litig.,* 96 Civ. 4584 (MP) (S.D.N.Y.)........................................ *passim*

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) .................................................. 6

*Maywalt v. Parker & Parsley Petroleum Co.*, 1997 WL 7668 (S.D.N.Y. 1997) ............ 9

*Munford v. Graham*, No. 09 Civ. 7899(DLC) (AJP),
   Slip Copy, 2010 WL 644435 (S.D.N.Y. Feb. 24, 2010)........................................... 43

*Sarlie v. E.L. Bruce Co.*, 265 F.Supp. 371, 373-74, 376 (D.C.N.Y. 1967)..................... 11, 12, 19

*State of West Virginia v. Chas. Pfizer & Co.*, 404 U.S. 871 (1971) ............................................. 10

*State of West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079 (2d Cir.) ........................................ 10

*Strobl v. New York Mercantile Exchange,* 582 F.Supp. 770 (S.D.N.Y. Mar. 20, 1984) .............. 10

*Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 (1985) ..................................................... 43

*Walsh v. The Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956 (3rd Cir. 1983) ...................... 9

*Weinberger v. Kendrick*, 464 U.S. 818 (1983) .............................................................. 9

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) ....................................................... 9

*White v. Nat'l Football League*, 822 F.Supp. 1389 (D. Minn. 1993) ............................................ 9

## Statutes

7 U.S.C. § 4, *et seq.* ....................................................................................... 24

7 U.S.C. § 13(a) ............................................................................................. 1

7 U.S.C. § 25(a) ............................................................................................. 1

## Other Authorities

Bailey, Roy E., "The Economics of Financial Markets" ............................................... 6

Dr. Craig Pirrong, *Commodity Market Manipulation law; A (very) Critical
    Analysis of Existing Doctrine and a Proposed Alternative*, Wash & Lee
    Annual Review of Securities & Commodities L. (Sept. 1994)................................ 6, 7

Dr. Craig Pirrong, *Detecting Manipulation in Futures Markets; The Ferruzzi
    Soybean Episode*, 6 Am. Law. & Econ Rev. 28 (2004)................................... 6

Dr. Craig Pirrong, *Manipulation of Cash-Settled Futures Contracts*,
    74 J. of Business 221 (2001)......................................................... 6

Dr. Craig Pirrong, *Mixed Manipulation Strategies in Commodity
    Futures Markets*, 15 J. Of Future Markets 13 (1995) ...................................... 6, 7

*Dr. Craig Pirrong, The Economics, Law, And Public Policy of
    Market Power Manipulation (1996)* ..................................................... 6, 7

Dr. Craig Pirrong, *The Inefficiency of US Commodity Manipulation Law:
    Diagnosis and Proposed Cure*, 18 Research in L. & Econ (1997)........................ 6, 7

Dr. Craig Pirrong, *The Self-Regulation of Commodity Exchanges: The case of Market Manipulation*, 39 J. of L. & Econ. 141 (1995)..................................... 6, 7

Dr. Craig Pirrong. *Commodity Futures Market Regulation; The Inefficiency of the Anti-Manipulation Provision of the Commodity Exchange Act,* Regulations (Fall ed., 1994)....... 6, 7

## I.     PRELIMINARY STATEMENT AND STATEMENT OF FACTS

In support of their motion for final approval of the Plan of Distribution ("Plan") of the proceeds of the two groups of settlements[1] herein, Class Counsel for the plaintiff Class[2] respectfully submit this consolidated memorandum, the accompanying affidavits,[3] and the accompanying proposed Order Establishing Plan of Distribution.

The Plan is attached as Ex. A to the proposed Order.

Defendants allegedly manipulated the prices of NYMEX natural gas cash futures and options contracts during the Class Period in violation Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(a), 25(a).

---

[1]     The 2006 Judgment of Settling Defendants are Cinergy Marketing and Trading, L.P.; CMS Field Services (n/k/a Cantera Gas Co., LLC); CMS Marketing Services & Trading Co. (n/k/a CMS Energy Resource Management Co.); Cook Inlet Energy Supply, LLC; Duke Energy Trading and Marketing, LLC; Dynegy Marketing & Trade (including West Coast Power, LLC); Enserco Energy, Inc.; Entergy-Koch Trading, LP; e-prime, Inc.; MidAmerican Energy Co.; Mieco, Inc.; ONEOK Energy Services Company, L.P. (f/k/a ONEOK Energy & Marketing Company, L.P.); ONEOK, Inc.; Reliant Energy Services, Inc.; Sempra Energy Trading Corp.; WD Energy Services, Inc.; Western Gas Resources, Inc.; Williams Companies, Inc.; and Williams Power Company (f/k/a Williams Energy Marketing and Trading Company) (the "2006 Settling Defendants").

The 2007 Judgment Settlement Defendants are American Electric Power Co., Inc. and AEP Energy Services, Inc.; Aquila Energy Marketing Corp. and Aquila Merchant Services, Inc.; Coral Energy Resources, LP; Dominion Resources, Inc.; and El Paso Marketing, L.P. (formerly known as El Paso Merchant Energy, L.P.) (the "2007 Settling Defendants").

[2] The Class consists of all persons or entities who purchased, sold, settled or otherwise traded NYMEX Natural Gas Contracts, as an opening or closing transaction or otherwise, between June 1, 1999 and December 31, 2002, inclusive (the "Class Period") (the "Class" or "Settlement Class"). Excluded from the Class are the defendants herein, any parents, subsidiaries, or affiliates thereof, members of the immediate family of each of the individual defendants, any entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants.

[3] The Affirmation of Dr. Craig Pirrong ("Pirrong Aff."), dated March 25, 2010; the Affirmation of Dr. Craig Pirrong, dated October 6, 2009; the Reply Affirmation of Dr. Craig Pirrong, dated November 4, 2009; the Affirmation of Mark Dwyer, dated March 22, 2010; Affidavit of Bernard Persky, Esq. ("Persky Aff."), sworn to March 25, 2010; and the Affirmation of Thomas A. Faucher, sworn to March 24, 2010.

Defendants allegedly did so by reporting inaccurate, misleading and false trading information to trade publications. These publications compile and publish daily and monthly indices of natural gas spot prices ("Publications").

Plaintiffs alleged that the false prices reported by the Publications manipulated NYMEX prices. Plaintiffs allegedly suffered damages from transacting in NYMEX natural gas futures and options at these artificial prices.

In a series of decisions earlier in this action, this Court denied the Defendants' motions to dismiss, granted class certification, and determined important First Amendment objections to discovery. *In re Natural Gas Commodity Litigation*, 337 F.Supp.2d 498 (S.D.N.Y. 2004) (denying motions to dismiss); *In re Natural Gas Commodity Litigation*, 358 F.Supp.2d 336 (S.D.N.Y. 2005) (denying motion to dismiss); *In re Natural Gas Commodity Litigation*, 231 F.R.D. 171 (S.D.N.Y. 2005) (certifying class); *In re Natural Gas Commodity Litigation*, 232 F.R.D. 208 (S.D.N.Y. 2005) (denying motion to compel); *In re Natural Gas Commodity Litigation*, 235 F.R.D. 241 (S.D.N.Y. 2006) (holding qualified reporter's privilege did not necessarily protect trade data reported in natural gas industry publications from disclosure at all natural gas physical trading locations).

In the latter respect, the Defendants did not retain records of their false reporting. (This was most convenient for the Defendants but is the original cause of most of the objections to the Plan that are presently before the Court.)

Plaintiffs were able, through subpoenas to the Publications, to obtain such records --- albeit only for monthly reports and **only for four groups** of settling defendants. (These four groups of defendants comprised 96.97% of the settlement payment in the 2007 Judgments

($27,237,500 million compared to $28,087,500.)[4]  Those four groups of settling Defendants all would have been tried together had it not been for the settlements creating the 2007 Judgments.

 To this extent, Plaintiffs had available --- thanks to subpoena and their successful appeal to this Court of the initial denial by the Magistrate Judge of Plaintiffs' motion to compel --- the records necessary to calculate the total net amount of such four groups of Defendants' lies for each monthly report.

Specifically, Plaintiffs were able to submit the expert report of Dr. Mark Dwyer concerning, among other things, the daily amount of NYMEX natural gas artificial prices and Plaintiffs' damages to be proved at such trial.  See Expert Report of Mark Dwyer, Ph.D., dated October 23, 2006 ("Dwyer Report").

In his report, Dr. Dwyer used the amounts of the "lies" in the Publications for each month to perform a regression analysis.  This analysis estimated the daily amount of price artificiality in NYMEX natural gas futures contracts caused by the four groups of Defendants who were the only Defendants who had not settled and who faced a joint trial together of Plaintiffs' manipulation claims.

Dr. Dwyer's regression determined that the overwhelming majority of the artificial impact occurred during the first five days of each month.  This is logical because the monthly reports were issued at the beginning of each month.

The actual damages caused by the 2007 Judgment Defendants to the Class was greater than that reflected in Dr. Dwyer's expert formula because Plaintiffs had only limited records.  But Plaintiffs nonetheless had succeeded through Dr. Dwyer's report in being ready to go to trial, within the tight time limits set by the Magistrate Judge, with proof of not only the exact amounts

---

[4]  A fifth settling Defendant in the 2007 Judgments was Dominion Resources, Inc.  They contributed the smallest settlement amount ($850,000).  They did so, in part, on the understanding that they would not be subject to discovery.

of Defendants lies to the Publications.  Plaintiffs also had a "gold standard" economic analysis measuring Defendants' artificial impact on NYMEX natural gas futures contract prices.

With respect to the 2006 Judgment Defendants, however, the Court sustained the Publications' First Amendment objections to producing the documents that would establish the amount of the lies in even the monthlies.  Therefore, Plaintiffs did not and do not have the documents necessary to ascertain the exact amount of the lies in the reports by the Publications caused by the first group of Settling Defendants.  Much less do Plaintiffs have the information needed to prepare a precise formula for the amount of NYMEX natural gas contract price artificiality caused by such Defendants.  See Reply Affirmation of Professor Craig Pirrong, dated November 4, 2009 ("Pirrong Reply Aff."); and Affirmation of Craig Pirrong, dated March 25, 2010 ("Pirrong Aff.").

## WHAT CLASS COUNSEL LEARNED FROM BEING TRIAL-READY

Although the foregoing litigation experience did not provide Class Counsel with all of the information they needed, it nonetheless provided Plaintiffs with substantial information.  For example, Class Counsel knew that all Defendants' false **monthly** reports likely had a significant impact on NYMEX futures prices.

Class Counsel further know that that effect likely dissipated after the first five days of each month.

Also, from all the data that could be obtained by Plaintiffs' experts, there was no consistent directional movement in prices or in the amount of artificiality.  See Mark Dwyer Affirmation, dated March 22, 2010.

Class Counsel further knew that they had not been able to prove that the daily reports had any effect, significant or other, on the prices reported in the Publications.  Much less could Class

Counsel prove that any falsity in the Publications, in turn, artificially impacted NYMEX futures contract prices. (Some information indicated to Class Counsel that the Publications' monthly reports were more watched by the futures markets than were the daily reports.)

Nonetheless, Class Counsel would have sought to convince the finder of fact that there was falsity in all Defendants' daily reports every day. Class Counsel would have offered the adverse inference from Defendants' failure to retain and produce any records of their lies on the daily and other reports as well as other evidence.

Class Counsel believe that it is reasonable to surmise that there was an artificial effect on the Publications from what could have been found to be such widespread daily false reporting. Class Counsel also believe there was some chance to prove that NYMEX natural gas futures prices were caused to be artificial by such false daily reports. But the chances of success of such proof were much, much less than with respect to the "gold standard" record that the false monthly reports caused artificial impact and damages.

## THE SETTLEMENTS AND THE DEVELOPMENT OF THE PLAN

Before and after this Court's grant of class certification, Plaintiffs achieved herein settlements totaling $100,800,000, the second largest class action settlement in the history of the Commodity Exchange Act. See fn. 1. After final approval by this Court of those settlements and this Court's entry of final judgment, an extensive proof of claims process occurred.

More than 917 Class members had submitted proofs of claim. See Affidavit of Thomas A. Faucher In Support of Motion for Preliminary Approval of Plan of Allocation, sworn to October 6, 2009, ¶ 4. The Settlement Administrator has reviewed such proofs of claim. Id.

Class Counsel conferred with economists, the Settlement Administrator, and other experts about the Settlement Administrator's tentative calculations and developed a plan of

allocation.  Class Counsel worked the most with a leading expert on price manipulation,

Professor Craig Pirrong.  While teaching university undergraduate and graduate students about

the futures markets for twenty years, Professor Pirrong has authored no less than six peer-

reviewed articles and one book on the subject of the manipulation of prices in commodity

markets.[5]  *Compare Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150-153 (1999) (peer

reviewed article is a indicator of reliability).

Dr. Pirrong's "Detecting Manipulation" article in the prestigious *American Law and

Economics Review* was the first of its kind, and has been hailed as an "exemplar" of financial

analysis of price manipulation.  Bailey, Roy E., "The Economics of Financial Markets," at p. 387

("[a]nother exemplar of applied economics in unraveling his evidence for market manipulation is

that provided by Pirrong (2004)").

Also, Dr. Pirrong has repeatedly testified for and consulted with government agencies

and commodity exchanges regarding whether commodity futures contract prices have been

manipulated.[6]

---

[5] *See, e.g.*, Dr. Craig Pirrong, *Detecting Manipulation in Futures Markets; The Ferruzzi Soybean Episode*, 6 Am. Law. & Econ Rev. 28 (2004); Dr. Craig Pirrong, *Manipulation of Cash-Settled Futures Contracts*, 74 J. of Business 221 (2001); Dr. Craig Pirrong, *The Inefficiency of US Commodity Manipulation Law: Diagnosis and Proposed Cure*, 18 Research in L. & Econ (1997)l; Dr. Craig Pirrong, *The Self-Regulation of Commodity Exchanges: The case of Market Manipulation*, 39 J. of L. & Econ. 141 (1995); Dr. Craig Pirrong, *Mixed Manipulation Strategies in Commodity Futures Markets*, 15 J. Of Future Markets 13 (1995); Dr. Craig Pirrong. *Commodity Futures Market Regulation; The Inefficiency of the Anti-Manipulation Provision of the Commodity Exchange Act,* Regulations (Fall ed., 1994); Dr. Craig Pirrong, *Commodity Market Manipulation law; A (very) Critical Analysis of Existing Doctrine and a Proposed Alternative*, Wash & Lee Annual Review of Securities & Commodities L. (Sept. 1994).  Dr. Pirrong's book is *The Economics, Law, And Public Policy of Market Power Manipulation* (1996).  Dr. Pirrong's work on power manipulation in commodity futures markets (*i.e.*, the type of manipulation Plaintiffs allege that PIMCO engaged in here) has been cited the Seventh Circuit Court of Appeals. *Board of Trade of City of Chicago v. S.E.C.* 187 F.3d 713, 724 (7th Cir. 1999) (Easterbrook, J.) (citing to Craig Pirrong, *The Economics, Law, And Policy of Market Power Manipulation* (1996)).
[6] *See, e.g.*, Dr. Craig Pirrong, *Detecting Manipulation in Futures Markets; The Ferruzzi Soybean Episode*, 6 Am. Law. & Econ Rev. 28 (2004); Dr. Craig Pirrong, *Manipulation of Cash-Settled Futures Contracts*, 74 J. of Business 221 (2001); Dr. Craig Pirrong, *The Inefficiency of US Commodity Manipulation Law: Diagnosis and Proposed Cure*, 18 Research in L. & Econ (1997)l; Dr. Craig Pirrong,

Class Counsel relied largely on Dr. Pirrong and Plaintiffs' other experts but also considered their own knowledge of the prospective relative strengths and weaknesses of the case at trial, as well as the input from various Class members (including the Bolling Intervenors). Based on this consideration, Class Counsel formulated and adjusted a plan of allocation.

Plaintiffs then moved for preliminary approval of a proposed plan of allocation on October 13, 2009 [Document 542]. On December 29, 2009, this Court preliminarily approved the modified plan and the form of notice and directed that a hearing on final approval be held on March 15, 2010.

Pursuant to the Court's Order dated December 29, 2009, the Notice of Proposed Plan of Allocation, Right to Object Thereto, and Hearing Thereon with the Plan of Allocation (annexed thereto as Exhibit A) was mailed on January 12, 2010 to the then 909 eligible Class members who had submitted proofs of claim. See Affidavit of Thomas A. Faucher, dated March 25, 2010 ("Faucher Aff.") ¶ 4.

Notice has been properly provided to Class members in accordance with this Court's Order dated December 29, 2009 [Document 570]. See Faucher Affd. ¶ 4.

No objection has been submitted by any Class member to the procedure, the method the substance or other aspects of the Notice.

---

*The Self-Regulation of Commodity Exchanges: The case of Market Manipulation*, 39 J. of L. & Econ. 141 (1995); Dr. Craig Pirrong, *Mixed Manipulation Strategies in Commodity Futures Markets*, 15 J. Of Future Markets 13 (1995); Dr. Craig Pirrong. *Commodity Futures Market Regulation; The Inefficiency of the Anti-Manipulation Provision of the Commodity Exchange Act,* Regulations (Fall ed, 1994); Dr. Craig Pirrong, *Commodity Market Manipulation law; A (very) Critical Analysis of Existing Doctrine and a Proposed Alternative*, Wash & Lee Annual Review of Securities & Commodities L. (Sept. 1994). Dr. Pirrong's book is *The Economics, Law, And Public Policy of Market Power Manipulation* (1996). Dr. Pirrong's work on power manipulation in commodity futures markets (*i.e.*, the type of manipulation Plaintiffs allege that PIMCO engaged in here) has been cited the Seventh Circuit Court of Appeals. *Board of Trade of City of Chicago v. S.E.C.* 187 F.3d 713, 724 (7th Cir. 1999) (Easterbrook, J.) (citing to Craig Pirrong, *The Economics, Law, And Policy of Market Power Manipulation* (1996)).

Six objections to the Plan or the treatment of a Class member's claim under the Plan were received from various Class members. See Argument D *infra*.

This Court has extended itself to accommodate such objecting Class members by issuing a subsequent Order to adjourn the final hearing until 9:30 a.m. on Friday, March 26, 2010.

Class Counsel will seek final approval from the Court of the Plan, which is summarized below, at or after the March 26 hearing.

However, Class Counsel acknowledge that the Court may, without further notification to the Class, modify the Plan. See Notice of Proposed Plan of Allocation, Right to Object Thereto, And Hearing Thereon, dated January 12, 2010, at ¶¶ 11-12 (notifying Class members that the Plan could be modified by the Court without further opportunity to object or be heard).

### The Plan

With respect to the allocation of the settlement proceeds from the 2007 Judgments, Class counsel were able to use Dr. Dwyer's impact analysis to allocate settlement monies according to the net price artificiality that each Class member paid and received. This payment constituted 40% of the 2007 Judgment Settlement Fund and provided a payout to each Class member of 170% of their damages (representing full prejudgment interest).

Because the typical class action settlement produces 5-10% of the expert's damages, the payment of 100% of damages plus all of the prejudgment interest is an excellent result for these Class members.

Next, as in at least one prior case, 5% of the proceeds from the 2007 Judgment as well as 5% of the proceeds from the 2006 Judgment will be paid in respect of options on futures. See *In re Sumitomo Copper Litig.*, 96 Civ. 4584 (MP) (S.D.N.Y.) (class members were entitled to both profit-loss rescissiory payments and net impact payments) (May 1, 2002 Order (No. 110)

Establishing Plan of Allocation; Document No. 349).  As in *Sumitomo*, so here, the Defendants wanted a release from options trading and there was no certified class for options here except through each Settlement itself.

With respect to the remaining 55% of the 2007 Judgment and the remaining 95% of the 2006 Judgment proceeds, Plaintiffs worked closely with Dr. Pirrong to determine a priority of payouts that follows what Class Counsel knows from discovery in this case (as set forth *supra*) and from CEA manipulation law.  This hierarchy of priorities described in Argument Point C *infra*.

## ARGUMENT

### A.    A PLAN OF ALLOCATION NEED ONLY BE REASONABLE AND FAIR TO MERIT FINAL APPROVAL

All aspects of settlement approval, including but not limited to the plan of distribution, rest in the sound discretion of the district court.  *See, e.g., In re Ivan F. Boesky Securities Litigation*, 948 F.2d 1358, 1368 (2d Cir. 1991).

Distribution formulas, such as those employed in the Plan, are recognized as an appropriate means to reflect the comparative strength and value of different categories of claims. *E.g., Weinberger v. Kendrick*, 698 F.2d 61, 78 (2d Cir. 1982), *cert. denied*, 464 U.S. 818 (1983).

An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel.  *White v. Nat'l Football League*, 822 F.Supp. 1389, 1420-24 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994).  "The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable...."  *Walsh v. The Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 964 (3rd Cir. 1983).  *Accord, e.g., Maywalt v. Parker & Parsley Petroleum Co.*, 1997 WL 7668 (S.D.N.Y. 1997) at *4.

In this regard, district courts enjoy "broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members ... equitably." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978). *Accord, e.g., In re Chicken Antitrust Litigation*, 669 F.2d 228, 238 (5th Cir. 1982); *In re Equity Funding Corp. Securities Litig.*, 603 F.2d 1353, 1362 (9th Cir. 1979); *State of West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir.), *cert. denied*, 404 U.S. 871 (1971). *See also, e.g., In re Prudential Securities Inc. Ltd. Partnerships Litig.*, 1996 Fed.Sec.L.Rep. (CCH) ¶98,978 at pp.93,753-54 and 93,759-60 (S.D.N.Y. Nov. 20, 1995).

Here, as in *In re Salomon Inc. Securities Litig.*, 1994 WL 265917 (S.D.N.Y. June 16, 1994) at *7 and other class settlements, the notice will expressly reserve this Court's right to:

> approve Plaintiffs' Revised Proposed Plan of Allocation with such further modifications... as the Court may deem proper, without further notice to members of the Class.

*Id*.

### B.    THE LEGAL BASIS FOR DAMAGES IN MANIPULATION CLAIMS HAS BEEN NET ARTIFICIAL IMPACT AND, IN CERTAIN CIRCUMSTANCES, NET LOSSES (BUT NEVER NET VOLUME LET ALONE GROSS VOLUME)

Beginning with the first price manipulation trial under the Commodity Exchange Act, as amended in 1974, one recognized measure of the damages, has been the difference between the price artificiality paid and any price artificiality received by the plaintiff on her purchase and sale transactions in the manipulated market. *Strobl v. New York Mercantile Exchange,* 582 F.Supp. 770, 779 (S.D.N.Y. Mar. 20, 1984) (No. 79 CIV. 1834 (LFM)), *aff'd*, 768 F.2d 22 (2d Cir.), *cert. denied*, *Simplot v. Strobl*, 474 U.S. 1006 (1985).

In fact, in *Strobl*, the plaintiff was awarded approximately the same amount as the net losses reflected on its trading statements ($462,000).[7]

Similarly, settlements of CEA manipulation class action claims have been allocated on the basis of the daily amounts of artificial impact. *In re Soybeans Futures Litig.,* 89 C 7009 (N.D. Ill.) (CRN) (net impact payment only) (October 10, 1997 Order For Partial Distribution Of Net Settlement Fund; Document Nos. 477-478).

However, where the defendants' conduct renders the determination of the amount of artificial impact impracticable, another recognized measure of damages is the net profit-loss on the transactions made in the market during the manipulated period. *Sarlie v. E.L. Bruce Co.*, 265 F.Supp. 371, 373-74, 376 (D.C.N.Y. 1967); *Strobl, supra,* 582 F.Supp. at 779 (citing *Sarlie* with approval). And CEA manipulation claims have apparently been allocated solely on the basis of a rescissory net profit-loss calculation over the class period. *E.g., Gordon v. Hunt*, 98 F.R.D. 573 (S.D.N.Y. 1983).

Also, futures manipulation class action settlements have been allocated on the basis of a blend between the prior two methods. See *In re Sumitomo Copper Litig.*, 96 Civ. 4584 (MP) (S.D.N.Y.) (class members were entitled to both profit-loss rescissiory payments over specified periods and net impact payments) (May 1, 2002 Order (No. 110) Establishing Plan of Allocation; Document No. 349).

---

[7] "Having found that defendants' manipulation resulted in artificially low prices during the conspiracy period, the jury had to determine what the prices would have been absent the manipulation. In essence, the jury was required to estimate how much higher the prices would have been when plaintiff liquidated his contracts but for defendants' unlawful conduct, and the court so instructed it. The $460,000 figure reached by the jury, therefore, was the equivalent of a finding that the price of the May potato futures contract would have been approximately $18.00, instead of $9.25, had the market been operating solely on the basis of supply and demand."
*Strobl*, 582 F.Supp. at 779.

In this particular class action alleging manipulation under the CEA, Defendants did not retain and produce to Plaintiffs sufficient records to enable Plaintiffs to do the following: (1) determine what Defendants' false reports were; (2) compare those false reports to the actual transactions; (3) calculate the net amount of the "lie" to the market contained in each published index contained in each publication. *E.g., In re Natural Gas Commodity Litigation*, 235 F.R.D. at 204-205 ("[N]one of the defendants have a 'complete set' of the reported trades (*i.e.*, what their traders reported to the Publications, as opposed to actual transactions) for the Class Period.").

Therefore, this might have been a case in which the settlement funds were allocated on the basis of each class member's net loss on all trades during the Class Period. *Sarlie v. E.L. Bruce Co.*, 265 F.Supp. at 373-74, *supra*. However, such argument would have faced difficulties in this case because there are many causes (in addition to price artificiality) of trading losses. Also, based on what Class Counsel learned during discovery, the priority of payouts set forth below is by far the best hierarchy of priorities (or, at the very least, is one reasonable hierarchy of priorities).

      **C.**    **THE PLAN IS REASONABLE BECAUSE IT PRIORITIZES THE LEARNING IN THE CASE AND WHAT COULD HAVE BEEN PROVED AT TRIAL FIRST, FOLLOWED BY WHAT COULD HAVE BEEN LEGALLY PERMISSIBLE DAMAGES SECOND, AND THEN GIVES SOME APPROPRIATE EQUITABLE CONSIDERATION TO NET VOLUME (AND TO OPTIONS)**

The first priority in the Plan is to pay to Class members who suffered damages under Plaintiffs' artificiality formula. This formula is the only method of damages that would surely have been permitted at trial. This expert report was the contemplated fact or (with the later settlements) the actual fact that motivated the Defendants to settle. Class Counsel's considerable hours of time and efforts, and more than $1,000,000 in expert fees, were devoted to obtaining the

records of the lies in the monthly reports and putting forth Dr. Dwyer's expert report.  Dr. Dwyer's report --- its threat and, later, its reality --- was critical to the settlements in this case.

In Class Counsel's judgment, all other forms of allocation in the Plan had a far, far lesser chance of being accepted as a method of damages at trial.  Accordingly, the Plan provides a 170% payout --- representing full damages and prejudgment interest --- in respect of Class members' artificiality damages.  This constitutes approximately fifteen percent of the total proceeds to be distributed.

After this priority, the next priority is the Class Counsel's common sense belief that the false monthly reports --- which were what Plaintiffs knew they could prove ---had their main artificial impact during the first trading days of each month.  Here again, all the efforts to compel production of the Publication records and prepare the damages report confirmed that the overwhelming majority of impact occurred during the first five trading days each month.

Also, Professor Pirrong, the leading expert on CEA manipulation claims, expressly opined that this first five days of each trading month was likely when the overwhelming account of harm was suffered.

Given all this learning, Class Counsel do not believe that the forgoing data points may be lightly or otherwise disregarded.  On the contrary, the second highest priority in the Plan of Allocation is the attempt to compensate likely harm suffered from the manipulation here during the first five trading days of each month.

Professor Pirrong recommended that expression be given to this priority both through net trading losses during the first five trading days of each month and though net volume of trades during those days.  As is set for in the Plan and summarized below the Plan does exactly that. (The attempts by certain objectors to disregard the priority of the first five days of each trading

month are, in Class Counsel's judgment, an ill-advised attempt to disregard the very work that produced the settlement proceeds being allocated here.)

The next priority in Class Counsel's judgment was the general legal standard that net trading losses are permitted, in certain circumstances, as a compensable form of damages.  See B *supra* (collecting cases).

Class Counsel recognize full well the difficulties in this argument.  But they gave expression to this priority through net losses during the first five days of the Class Period, net losses during the wash sale period, and net losses over the entire Class Period.  See *infra*.

Descending down substantially to the last priority, Professor Pirrong opined that diversification of the method of payment to Class members was economically preferred.  Dr. Pirrong opined that the net volume of transactions by a Class member during the first five days of the month was a proxy for harm from the manipulation here.  But he opined that net volume is far less of a proxy than net trading losses during the first five days of the trading month.

Again, net volume (as well as gross volume) have never been recognized as a permissible form of damages in a CEA manipulation case.  Because Professor Pirrong opined that such net volume is an approximate proxy here, and Class Counsel largely accepted Dr. Pirrong's recommendation as to the appropriate amount of the recognition of net volume during the first five trading days of each month.  With Dr. Pirrong's approval, Class Counsel somewhat enhanced the amount paid to net volume in order to account for cost savings from the handling of, and recommendations by, the Bolling Intervenors.

Also, as in the settlements in the *Sumitomo* action, the Plan here provides for a 5% payout in respect of options.  See Statement of Facts, *supra*.

Finally, the Plan imposes a deduction in the rate of payment under the foregoing categories to those traders who are hedgers, *i.e.,* who have offsetting or opposite positions in the cash market.  Pirrong March 25, 2010 Aff. at ¶¶ 6-7.  The manipulation here and the expert report here were unlike those in prior cases.  First, the manipulation started in the cash market.  Therefore, in this peculiar manipulation, hedgers were likely to have suffered adverse impact in the cash market as well as the futures market.

Second, unlike in prior cases, the expert report here did not measure the futures price manipulation as a degree of deviation from the cash market prices.  (It might have been impossible to do this.)  Unlike in previous cases, therefore, there was no proof in the expert report in this case that hedgers suffered any incremental artificial impact from their NYMEX natural gas transaction.

Therefore, in Class Counsel's judgment, a greater discount for hedging traders was appropriate in this case than the discounts that have been made in previous cases.

*****

The foregoing facts, realities and other priorities are very relevant context for the Plan.  Indeed, the Plan is a reasonable method of allocation because it follows the foregoing reasonable hierarchy of priorities.

As is set forth below, nothing in the submissions of the objectors changes or disturbs this hierarchy.  Therefore, while adjustments in the exact line drawing by the Plan could be made, the Plan is clearly a reasonable method of allocation.  This is based upon the chances of success at trial of the claims here.  It is based on the controlling law of CEA manipulation damages.  It is based on the learning about the facts that were developed at great cost in discovery in this case.  And it is based on all the other factual, legal and equitable considerations here.

In the foregoing context, Part V of the Plan provides for a minimum payment to all Class members who qualify thereunder.

Part I of the Plan provides as follows.  The main entitlements for which an eligible Class member qualifies to receive a payment in respect of the Final Judgment and Order entered by the Court on May 24, 2006 (the "2006 Judgment") and/or the Final Judgments and Orders entered by the Court on June 15, 2007 (the "2007 Judgments") are set forth in Parts III and IV of the Plan. Those payments and entitlements shall be **additive** and not alternative.   See Part I.

Part II of the Plan sets forth defined terms relating thereto.

Part III of the Plan provides for the distribution from the settlement fund created by the 2007 Judgments (Plan, Part II, Defined Terms, the "2007 Net Settlement Fund").  Under the Plan, the 2007 Net Settlement Fund will be distributed to Eligible 2007 Class Members as follows:

(a)   Forty percent (40%) on the basis of futures contract net price artificiality paid;

(b)   Twelve point five percent (12.5%) of the 2007 Judgment will be paid to Net Futures Volume to Eligible 2007 Class Members unable to submit transaction data sufficient to be able to track all futures contract purchases and sales by date (see Plan of Allocation, Part IIIA).[8]

(c)   Thirty two percent (32%) of the 2007 Judgment Net Settlement Fund should be paid to persons who had net losses on futures transactions opened on or after June 1, 2000 and closed on or before March 31, 2001 ("wash sales period").  *See* Final Plan, ¶ IIID.[9]

---

[8] This reflects the net savings to other class members in administrative costs resulting from the Bolling Intervenors' decision not to submit their daily trading records and the Settlement Administrator's avoidance of the costs of inputting the voluminous trading records of floor brokers.  *See* Affidavit of Bernard Persky, filed November 5, 2009 [Document No. 560], at ¶ 3.  Also, it further implements Dr. Pirrong's diversification theory.  (And responds to and satisfies a portion of the Bolling Intervenors' objections.)

(d)  Ten point five percent (10.5%) of the 2007 Judgment will be paid to persons who had overall net losses on futures trading throughout the Class Period.  This item further reflects Dr. Pirrong's diversification reasoning.  Pirrong Reply Aff. ¶¶ 8-9.  (It also responds to and partially satisfies South Carolina's and Nordlicht's original request that a greater amount be allocated to overall net losses.)[10]

(e) Finally, five percent (5%) of the 2007 Net Settlement Fund will be distributed on the basis of options transactions.  With respect to the five percent (5%) being paid to options, fifty five percent (55%) will be distributed on the basis of net options losses during the first five trading days of each month during the Class Period; twenty two point five percent (22.5%) on the basis of net options losses during the entire Class Period; and twenty two point five percent (22.5%) on the basis of net options volume during the first five trading days of each month.

Part IV of the Plan provides for the distribution from the settlement fund created by the 2006 Judgment (see Plan, Part II, Defined Terms, the "2006 Net Settlement Fund").  The 2006 Net Settlement Fund will be distributed to Eligible 2006 Class Members as follows:  ninety five percent (95%) on the basis of futures contracts; and five percent (5%) on the basis of options.  See Plan Part IV.  The futures payments will be fifty percent (50%) on the basis of net losses in futures contracts during the first five days of each month during the Class Period, twenty two

---

[9] This selective rescission reflects the wash sales and non-false reporting activities responds to and alleged in the complaint.  *See* Amended Consolidated Class Action Complaint ("Complaint") ¶¶ 143-158 (such wash trades peaked in October 2000).

Also, this selective rescission period implements Dr. Pirrong's reasoning to diversify the types of payments, in order to have a better chance at compensating economic harm.  (Also, this satisfies Objector Nordlicht's earlier argument that losses during this period were undercompensated.)

[10] The amount paid from the 2007 Judgment to net losses for the entire Class Period is smaller than that paid from the 2007 Judgment to the net losses during the June 2000 – March 2001 period.  This is appropriate for many reasons.  For example, there was already a substantial compensation paid in respect of net losses for the entire Class Period in the 2006 Judgment but no compensation in that allocation for the wash sales period.  Further, the 2006 Net Settlement Fund is two and a half times as large as the 2007 one.

point five percent (22.5%) on the basis on net losses in futures contracts during the entire Class Period, and twenty two point five percent (22.5%) on the basis of Net Volume of futures trades during the first five days of each month during the Class Period.

The option payments will be five percent (5%) of the Net Settlement Fund.  Of this, fifty five percent (55%) will be allocated on the basis of net options losses during the first five trading days of each month, twenty two point five percent (22.5%) on the basis of net options losses during the entire Class Period, and twenty two point five percent (22.5%) on the basis of net options volume during the first five trading days of each month.

Hedgers are subject to the deductions set forth in the Plan.  See Plan of Allocation, Parts III and IV; *see* Statement of Facts and Argument C *supra* reflecting the considerations relating to hedging.  These hedger deductions are greater than the hedger deductions that have been made in allocations of prior CEA manipulations settlements. *Id.* However, Dr. Pirrong observed that the type of wrongdoing here (a fraud of the index) did not begin in the futures market.

Moreover, Dr. Pirrong observed that Dr. Dwyer's artificiality report, unlike the artificiality reports in prior CEA manipulation cases, did not compute artificiality on the basis of the separation of the futures price from other prices.  Rather, Dr. Pirrong observed that Dr. Dwyer's Report solely based artificiality upon the amount of change in the futures price that would result from the alleged false reports.  Further, Dr. Pirrong observed that hedgers and swaps dealers, if they are conducting their businesses according to the norm, may have offsetting gains from their losses that they suffered in the futures markets or from any net volume exposure during the five day windows.

Had the settlements in the 2006 Judgment not been made, Plaintiffs would have argued that the entire net loss suffered by each Class member should be attributed to Defendants as

actual damages.  Again, the outcome of any such legal argument is uncertain, at best.  It must be recognized that profits and losses may occur due to many factors, rather than just manipulative impact, and that even persons with gains may be negatively impacted by the causation of artificial prices.  *In re Natural Gas Commodity Litig.*, 231 F.R.D. at 179-180, fn. 1.  But there was an argument that could have been made that, in this particular case, Defendants should be responsible for each Class member's net losses.  See *Sarlie*, *supra*.

But, the first five trading days of each month, was the period when Dr. Dwyer's Report showed that the overwhelming majority of the artificial impact occurred.  Pirrong Reply Aff. ¶¶ 4, 24.  This was also the time immediately following Defendants' false reports for which Plaintiffs had sufficient evidence.  A key fact that Plaintiffs could support at trial was that Class members were transacting in a manipulated market during the first five days of each month.[11]

Although Dr. Pirrong emphasized the first five days of each month, he acknowledged that Plaintiffs are "in a fallen state" in which Plaintiffs do not have the information as to artificial impact.  Dr. Pirrong opined that it would also be reasonable to allocate settlement proceeds to overall net losses for the entire Class Period.  He opined that the best proxies for such impact were the net loss and net volume proxies set forth above in the Plan.  See Statement of Facts, *supra*.  Further, Dr. Pirrong opined that the net loss proxy was much better than the net volume proxy as a basis for distribution.  Dr. Pirrong's reasoning for the latter judgment included his information that a substantial majority of the volume of transactions was conducted by floor traders.  See Pirrong Reply Aff. ¶¶ 12-23.

---

[11] Again, the overwhelming majority of the artificial impact found by Dr. Dwyer occurred during the first five trading days of each month.  Such impact did not necessarily dissipate altogether.  Nonetheless, Dr. Pirrong observed as follows.  Various of the remaining artificiality readings during the approximately fifteen trading days later in each month were so low as to be of questionable significance.

In all these circumstances, Class counsel have determined that it would be fair also to allocate 22.5% of the Net Settlement Fund for the 2006 Judgment on the basis of Net Futures Losses throughout the Class Period, 22.5% on the basis of Net Futures Volume during the first five trading days of each month and 50% on the basis of net trading losses during the first five trading days of each month.

Class Counsel have followed a similar breakdown within the allocation of the 5% of each Settlement Fund that is being paid in respect of options.

Under the circumstances, the Court should approve the Plan.

### D.    THE OBJECTIONS SHOULD BE OVERRULED

#### 1. THE OBJECTIONS TO THE PLAN ARE DIAMETRICALLY OPPOSED TO ONE ANOTHER AND THEREBY FURTHER DEMONSTRATE THE PLAN'S <u>REASONABLENESS</u>

Objections to the Plan have been filed by (1) the Bolling Intervenors ("Bolling"), (2) the South Carolina Office of Regulatory Staff ("South Carolina"), (3) Mark Nordlicht ("Nordlicht"), (4) Robert Richert ("Richert"), (5) Plaintiff Dominick Viola ("Viola"), and (6) Steven Ardizzone ("Ardizzone").[12]

Contrary to the implication by some of the objectors, the Plan need not be perfect nor even the best method of distribution.  See Argument Point A *supra*.  It merely needs to be one reasonable method.  *Id*.  Nonetheless, based on the priorities articulated in C *supra*, Class Counsel believe it is the best allocation here.

Corroborating this, the steps that some Objectors ask this Court to take to change the Plan, seek to move it away from its present middle ground towards each Objector's self-interest.

---

[12] Mr. Ardizzone is a member of the Bolling Intervenors Group.  Mr. Ardizzone filed a separate *pro se* motion effectively seeking to overturn Magistrate Judge Peck's order denying his motion to participate in the 2006 Judgment as a late claimant.

Because the Objectors' respective self-interests hopelessly conflict with and are diametrically opposed to one another, their objections directly contradict one another.

Specifically:

▪    Nordlicht asserts that the amount of the net settlement funds allocated to futures losses during the Class Period should be **increased**.  Mark Nordlicht's Comments and Objections to Final Approval of Current Proposed Plan of Distribution, filed February 17, 2010 [Document 573], ("Nordlicht Br.") at ¶ 7. But the Bolling Intervenors assert that the amount allocated to "trading statement" losses should be **decreased or eliminated**.  Bolling Intervenors' Notice of Intention to be Heard – Objections to Proposed Plan of Allocation, filed February 23, 2010 [Document 575] ("Bolling Intervenors' Br."), at ¶¶ 5(a), 36.

▪    SCANA suggests that the amount of the hedging deduction in the Plan should be **reduced**.  Notice of Intention to be Heard on the Proposed Plan of Allocation by SCANA Corporation, filed February 23, 2010 [Document 574] ("SCANA Br."), at ¶ 2.  But the Bolling Intervenors and Nordlicht assert that the amount of the hedging deduction should be **increased**. Bolling Intervenors' Br. at ¶¶ 53;  Nordlicht Br.  ¶¶ 35-36.

▪    Bolling Intervenors repeatedly assert that very large amounts should be allocated to trading volume.  Bolling Br., *passim*.  But Mr. Nordlicht asserts that lesser amounts should be allocated, and Mr. Viola may favor eliminating volume altogether.  Nordlicht Br.  ¶¶ 37, 39, 45; Affidavit of Dominick Viola In Opposition To Final Approval Of The Preliminary Plan Of Allocation, filed February 24, 2010 [Document 576], at ¶¶ 14, 17-18.  Indeed, SCANA intimates that trading volume is not even a legally cognizable measure of damages, and that Class Counsel have been intimidated by the Bolling Intervenors into including even the **net volume** measure proposed by Class Counsel.  SCANA Br., at ¶¶ 5, 11.

21

Working backwards from their respective self-interest and desired outcomes set forth above, various Objectors provide expert reports and some degree of reasoning why various parts of the Plan should be increased or decreased.  Affirmation of Robert E. Conner, dated November 9, 2009 (annexed to Intervenor Mark Nordlicht's Comments and Objections to Final Approval of Current Proposed Plan of Distribution, filed February 17, 2010) [Document 573]; Affidavit of Todd Olson In Support of Dominick Viola's Opposition to Final Approval of the Preliminary Plan of Allocation, dated February 24, 2010 [Document 576]; Affidavit of Richard Schaeffer In Opposition To Final Approval Of The Preliminary Plan Of Allocation, filed March 22, 2010 [Document 586]; Affidavit of Mark B. Fisher In Opposition to Final Approval Of The Preliminary Plan Of Allocation, filed March 22, 2010 [Document 587]; Affidavit of Dr. Terrence Martell In Opposition To Final Approval Of The Preliminary Plan Of Allocation, filed March 22, 2010 [Document 588].

However, once again, these reasons frequently conflict with one another and often tend to cancel one another out.  *See* Argument, Point III A *infra*.  On net, they leave the Plan squarely in the reasonable middle of the range of outcomes suggested by those motivated to object.  *Id*.  Moreover, Dr. Pirrong has considered all the objections.  He continues to find the Plan to be the most reasonable the way it is.

## 2.  <u>Bolling Intervenors</u>

As demonstrated in Arg. Point B, *supra,* the Objector whose argument is, by far, the weakest in legal and factual entitlement to damages is the Bolling Intervenors.  Ironically, the Bolling Intervenors have submitted three expert reports.  In addition, the common defect in the Bolling Intervenors' lengthy submissions and the submissions by the other objectors is that they do not give effect to the factors and realities that produced the settlement proceeds that are being

distributed to them.  See Arg. C *supra* explaining same and the resulting priorities for the distributions.

Volume is **not** nearly the indicium of loss that trading loss is.  Pirrong March 25, 2010 Aff.  ¶¶ 4, 8-9.

The Bolling Intervenors are a group representing less than one-sixth of the total number of Class members but they have more than 60% of the total volume of trades.  Their self interest would be inequitably furthered by the allocation they propose.

Last, Dr. Pirrong opines not only that loss is a much better proxy for artificial impact than volume but that net volume is a much better proxy than gross volume.

### 3.  SCANA

SCANA is an energy holding company that has filed objections to the Plan on behalf of two operating subsidiaries, SCANA Energy Marketing, Inc., ("SEMI") and South Carolina Pipeline Corporation ("SCPC").  See SCANA Br.  SCANA's subsidiaries are involved generally in the production and sale of electricity and in the purchase, sale and transportation of natural gas. SEMI is a regulated interstate natural gas pipeline.  The two SCANA subsidiaries engage in futures and options transactions in natural gas on the NYMEX in order to hedge their physical natural gas transactions.

#### a.  Objections to Hedging Deduction

In connection with the Motion for Preliminary Approval of the Plan, the South Carolina Office of Regulatory Staff ("South Carolina") filed comments on behalf of the SCANA entities, in which South Carolina urged that the 60% deduction for hedgers be reduced, without providing any alternative proposal or theory to support any specific reduction.  While the recent objections of the SCANA entities themselves do not explicitly reiterate the objection to the amount of the

hedging deduction, Plaintiffs believe it appropriate to address the matter for completeness of the record.

As a general matter, hedgers attempt to offset price risk by taking futures and options positions that are opposite to their positions in the cash or physical market – *i.e.*, a purchaser of natural gas for resale to retail or wholesale customers may sell futures contracts to lock in the sale price and avoid the risk of a drop in price before completion of the sales; if the price falls the seller will lose money on his physical market sales but recoup the loss by the profit made when he covers (buys back) his short future position at a lower price.

Under the specific factual circumstances of this case, it is important to recognize that the manipulative activities of the Defendants were directed in the primary instance to the cash markets for natural gas, and had a more attenuated, lesser magnitude impact on futures and options markets. The Defendants falsely reported their natural gas cash market transactions to the price index publications in order to move the reported, index cash prices upwards or downwards, for the purpose of benefitting their existing fixed-price, purchase or sale contracts, which were set to execute at prices based upon those published indices. Accordingly, the price impact of the false reporting hit first and foremost in the cash (or physical) markets for natural gas.[13] The secondary price effect on the futures and options markets was more attenuated and necessarily of a lesser magnitude.

SCANA subsidiaries contracted primarily in the cash markets. The price impact of the manipulation upon SCANA's cash prices was necessarily greater than the price impact upon SCANA's futures and options transactions. Since SCANA's cash market transactions were the opposite of its futures and options transactions, any adverse impacts of the manipulation upon its

---

[13] The Commodity Exchange Act, 7 U.S.C. § 4, *et seq.*, does not provide a cause of action for losses suffered in cash commodity markets and no claim for such losses was involved in this case.

futures and options contracts would be more than offset by the opposite and greater impact upon its cash market transactions. The same would be true of any hedger in natural gas under the factual conditions that applied in this case. While it is true that lower hedging deductions have been used in other cases, the particular facts of this case argue that the hedging deduction could reasonably and fairly be set as high as 100 percent. But the Plan does not go that far, and acknowledges that there is rarely perfect correlation between futures and options, on the one hand, and cash prices, on the other, and that hedging may not be 100 percent effective.

Accordingly, SCANA has offered no justification to reduce the 60% hedging deduction that has been employed in the Plan. If there were to be an adjustment, Plaintiffs note that other objectors have argued for a larger, not a smaller, percentage deduction. On balance, Class Counsel believe, in consultation with Professor Pirrong, that the proposed reduction is well within the range of reasonableness.

### b. Objections to Procedure

SCANA argues that the Class should have been divided into separately represented subclasses for purposes of creating the allocation plan. SCANA Br., ¶¶ 5-7. While it alludes to conflicts of interest,[14] it does not point to any particular conflicts held by the Class Counsel.[15]

---

[14] SCANA references the fact that before submitting the Plan for preliminary approval, Class Counsel had input from the Bolling Intervenors as directed by the Court's (Magistrate) intervention order. As Class Counsel noted in the Motion for Preliminary Approval of the Plan, Class Counsel departed from the recommendations of Prof. Pirrong in minor respects based on comments of the Bolling Intervenors and others but Dr. Pirrong approved.

But this was the way the intervention process was supposed to work. To the extent that input from interveners was persuasive, Class Counsel took that input into consideration, and doing so is not an indication of conflict or bias.

Second, as noted, the change was not nearly enough to satisfy the Bolling Intervenors, and they have filed their objections to final approval.

Third, the change made little difference to the amounts allocated to the SCANA entities.

[15] Perhaps the best example of the **absence** of a conflict of interest or bias in the allocation process is that Dominick Viola, one of the named plaintiffs, has retained separate counsel to file his own objections to the Plan.

Rather, it argues the class is naturally divided into at least three groups -- hedgers, traders and swaps dealers. Without debating whether or not those three groups are appropriate or whether there might also exist additional groups with differing interests, it should be understood that such diverse interests are common place in commodity futures and options markets. Hedgers and speculators, for example, have different trading purposes and strategies.

Plaintiffs are not aware, however, of a single commodity class action in which hedging subclasses were created or which the resultant fund was allocated pursuant to a procedure that involved separate representation of numerous separate subclasses, based on their trading styles or strategies.

SCANA does not cite any such precedent for what it suggests. Although Class Counsel accept that SCANA and South Carolina are making a principled objection, its acceptance would delay payment herein for years.

But SCANA and South Carolina have been aware of this case, and closely following developments in it, for a long time. Indeed, they received notice of both settlements and were aware that a plan of allocation would have to be prepared to implement both settlements. But neither South Carolina nor SCANA ever suggested until now--- after the Plan has been set in amounts that SCANA dislikes, has been preliminarily approved by the Court and has been sent to all claimants --- that there be a subclassing procedure for the allocation process.

Class Counsel appreciate the principled nature of SCANA's objection but respectfully submit the Class Counsel knew what produced the settlement proceeds herein and faithfully followed that to propose an equitable, fair and most reasonable Plan.[16]

---

[16] To have done what SCANA suggests would have driven up the cost of an already costly and time-consuming allocation process. As can be seen from the comments and objections filed to this proposed Plan by the differing interests of traders, speculators and hedgers, there would likely have been no basis for those disparate groups to reach agreement among themselves on a allocation plan. The result would

Separately, the substance of SCANA's suggestion, if not the letter of it, has been achieved in the way the approval process has unfolded.  In effect, the separate representation and opportunity to be heard by the hypothesized subclasses has already taken place.  Class Counsel have received input from those representing special interest groups, such as the Bolling Intervenors' floor traders, the SCANA hedgers, and Mr. Viola, a spread trader, who have retained their own separate counsel[17] and filed their own separate objections to the Plan.  None claim they were not given adequate notice of the plan or adequate opportunity to prepare an objection.  Accordingly, due process has been satisfied.

The Court, not Class Counsel, will be the ultimate arbiter among the conflicting objections, applying the appropriate legal standard for approval of a plan of allocation.[18]

### c.   Objections to Cost Sharing

Under the Plan, all claimants will share, on a pro rata basis to the size of their claims, the costs of administration of the settlement funds. The total costs of administration will be deducted off the top prior to determining the distributable amounts to each eligible claimant.  This is the traditional way in which administrative costs have been recouped in class action distributions, and we see no reason to depart from it here.  SCANA cites no precedent for its suggestion that administrative costs be assessed to claimants on an individualized basis, according to an accounting of the costs associated with the processing of each claim.  See SCANA at ¶ 8.

---

likely have been ongoing litigation among the subclasses over the size of the shares of pie – litigation that might have dwarfed the underlying litigation against the Defendants.  The Court would have had to decide among the opposing viewpoints, just as it now has to decide among the opposing viewpoints of those who have filed objections to the reasonableness of the PLAN.

[17] The SCANA objections were signed by its Associate General Counsel.

[18] The plan and notice make it crystal clear that the Court has the power to modify the plan, without further notice, at or after the approval hearing.

There would inevitably be differences in the costs, if they were to be recognized on a fully distributed basis, to collect, input, and verify the data of different claimants, and this would be true in the case of most, if not all, class action fund distributions.   Simply put, some claims are easier to input and process than others.  Here, for one example, some claimants were able to submit their futures and options transactions in electronic format, which greatly simplified and sped up the inputting process.  Others were able only to submit paper records.  Some claimants had more transactions during the period, others had fewer transactions.  Some claimants had to be sent follow-up letters to correct deficiencies in their submissions, others did not.  The differences go on and on.

To be fair to all claimants, all were given the opportunity within reasonable and applicable deadlines to submit additional and/or corrective data and to perfect their claims.  This is as it should be in a case involving a complex settlement administration and allocation process.

SCANA attempts to belittle the process in this case.  It refers to the fact that approximately 44% of NYMEX natural gas futures and 33% of options during the Class Period were represented in the claims filed.  But those response rates are in fact at the high end of the range relative to the typical class claim response rate.[19]  The processing of all of these claims involved inputting and verifying over 58 million futures contracts and over 16 million options contracts. Based on the experience of Class Counsel these numbers are unprecedented and dwarf any prior settlement administration of which we are aware.

---

[19] In the typical securities class action, to which a commodities class is most analogous, the filed-claim rate generally falls between 20% and 35%.  See Rust Consulting, Anticipating Claims Filing Rates in Class Action Settlements, by Tiffany Allen, Principal Consultant, Nov. 2009.  The class member response rate in this case is actually higher than the percentages quoted by SCANA, since defendants, who make up a significant part of the NYSE natural gas trading volume, were excluded from the class definition and from submitting claims.

Class Counsel respectfully recommend that the Court decline to reward or punish claimants based on the ease or difficulty encountered in processing their claims. The *pro rata* method, whereby claimants bear the administrative cost in proportion to the size of their claim allocations, best comports with applicable precedent and with overall fairness. Such a method approximates the relative cost of inputting the data. To attempt now to calculate the individualized actual cost to process each claim would add undue expense and time without improving fundamental fairness to the claimants.

### d. Objections to the Complications of the Plan

SCANA makes a highly generalized, conclusory objection that the Plan is too complicated. SCANA, at ¶¶ 10-12. (This tends to refute SCANA's objection that there needs to be separate representation, subclasses and complexity in the Plan.) SCANA offers no alternative plan, much less a more simplified one. SCANA recognizes that there are different specialized interests represented in markets as complex as the NYMEX natural gas futures and options markets. But SCANA fails to accept the implications – namely, that the manipulation affected different traders and hedgers in different ways. This makes multiple tranches of allocation appropriate to fairly compensate these differences in an equitable manner.

Also, the Plan had to be divided into two separate funds to allocate the 2007 and 2006 settlements. Different data were available to Class Counsel with respect to the impact on the market of the Defendants in those two settlements. Specifically, no data as to the net price impact of the manipulation was available as to the 2006 group of Settling Defendants. Where net price impact was calculable, it became the majority factor in distribution of the 2007 fund. Where it was not available, then the 2006 fund had to be distributed primarily under various proxy criteria such as net volume or net loss.

Finally, Professor Pirrong opined that diversification of payout best compensated Class members in the circumstances of having no proof of the artificial impact by most Class members. All of the foregoing factors necessarily led to a degree of complication, but complication that was essential to serving the purposes of fairness and equity to all of a diverse group of claimants and circumstances.

The Plan, while complicated, accomplishes the goal of reasonable fairness and equity of distribution with respect to all of the diverse, and often conflicting and opposing, claimant interests. The SCANA objections should be overruled.

### 4.  <u>Mark Nordlicht</u>

As with certain other objectors, Class member Mark Nordlicht's arguments in opposition to the partial allocation of the Net Settlement Funds for Transaction Results and Volume During the First Five Trading Days of Each Month, reject (or reflect a fundamental misunderstanding of) the primary claims and the factors that produced these settlements, the second largest Commodity Exchange Act class action settlement ever.

### a.  **Plaintiffs Have Produced the Expert Report Supporting the First Five Trading Days Allocation**

Nordlicht states that Plaintiffs have not produced an expert report by Professor Mark Dwyer detailing the amount of artificial impact during the first five trading days of each month. Nordlicht at ¶ 17.  However, on October 20, 2009, Plaintiffs provided[20] Nordlicht's attorney a copy of Professor Mark Dwyer's October 23, 2006 report, which calculated the amount of artificial impact on a daily basis on NYMEX natural gas futures contracts.  *See* Dwyer Report, at ¶ 38 and Exhibit 8 thereto.

---

[20]    Nordlicht's Reply cites to this Dwyer Report at paragraphs 11, 12, and 13.

Exhibit 8 to the Dwyer Report calculates the amount of artificial impact on a daily basis and shows that the artificial impact on NYMEX natural gas futures prices was at its greatest during the first five trading days of each month.  This is an intuitive result because, as noted in the Pirrong Reply Aff., at ¶¶ 3-6, 8, and 24, the specific claim to be tried was the allegation that Defendants submitted false reports of bid-week cash market transactions to Publications which were then published at the beginning of each month.  The published false reports caused the price of NYMEX natural gas futures to deviate from the price that would have prevailed in a market free from the fraudulent reports.  Necessarily, the impact of the false reports would be at its highest following their initial publication and review by the market, and the regression analyses in Professor Dwyer's report support that.  Pirrong Reply Aff. at ¶¶ 3-6, 8.

Nordlicht then compares all Claimants' futures losses, both for the first five trading days and for the entire Class Period, and notes that only 43% of the claimed losses occurred in the first five trading days.  Of course, trading losses are completely different from artificial impact, which is what Dr. Dwyer was measuring.  Nordlicht acknowledges that fact later, at ¶ 21.

Nordlicht then argues that while the artificial impact may have been highest during the first five days, losses from the artificial impact may have occurred at a later date if a position were initiated during the first five days and liquidated later. It is likely that examples of such transactions exist.  Therefore, Class Counsel, in consultation with their expert Dr. Pirrong, recognized this fact and allocated 22.5% of the 2006 Judgments Net Settlement Fund to futures losses incurred during the entire Class Period.

Nordlicht's Reply reflects a fundamental misunderstanding of the case and the natural gas market.  For example, Nordlicht argues, at ¶¶ 28-30, that Plaintiffs' experts refer to trading in the last few days of a month as being artificially impacted.  In support of his position that other

trading days were artificially impacted, Nordlicht refers to the date of expiration of a NYMEX natural gas futures contract and the fact that bid-week transactions occur at the end of a month. Neither fact is relevant to the timing of the artificial impact of defendants' manipulative acts. The impact of Defendants' primary manipulation device (false reports of bid-week cash transactions) had a far greater impact at the beginning of each month. Paragraph 29 states that plaintiffs' expert Dr. Harris notes that bid-week transactions occur during "the last five business days of the month" in order to attack the first-five-days allocation. However, as noted above, the manipulative acts at the heart of the litigation were not actual end-of-month bid-week transactions, but instead the reporting of nonexistent bid-week transactions that were published at the beginning of each month. These nonexistent transactions were "seen" by the market at the beginning of each month and had their greatest impact during the first five trading days of each month.

Finally, Nordlicht even misquotes his own expert in order to inflate his position on this point. At ¶ 18, Nordlicht quotes his expert as follows:

> Dr. Connor[21] goes on to point out that "*most of the futures and option positions that were opened during the first half of a given month . . .*" were "*closed-out during the second half of a month, when price distortions had attenuated.*".

(Emphasis in original.) However, Nordlicht's expert never made that statement:

> For precisely that reason, futures and option positions that were opened during the first half of a given month, the period cited by Dr. Dwyer as comprising 86 percent of the price distortion in NYMEX natural gas contracts, but closed-out during the second half of a month, when price distortion had attenuated, would fit that description, and could incur damage due to the lessened degree of price distortion present in the second half of each month.

---

[21]    There is nothing in Mr. Conner's report indicating he completed his Ph.D. studies.

Affirmation of Robert E. Connor, at page 3. Nordlicht, by inserting the words "*most of the*," has distorted the meaning of his own expert's opinion in order to support his argument. As noted above, Class Counsel agree that some claimants may have opened positions during the first five trading days of each month and subsequently liquidated them. But the overall allocations adequately address these transactions.

### b.    Hedging Deduction

Nordlicht proposes an increased hedging deduction beyond that provided for in the Plan. But Nordlicht does not provide any support or new arguments for his position.

### c.    Net Losses and Net Volume

Nordlicht also states his preference to increase the amount of net settlement funds allocated to net future losses over the entire Class Period. Nordlicht refines his proposed allocation of 50% of the Net Settlement Funds on the basis of volume to exclude any transactions which can be characterized as day trades. Nordlicht at ¶¶ 41-45. Such an exclusion would effectively remove the Bolling Intervenors from receiving any allocation based on volume. *See* Martell Affirmation at ¶ 31. "Net volume" tends to accomplish what Mr. Nordlicht proposes. But it does not eliminate any group.

### d.    Nordlicht's Trading Data

Nordlicht challenges the Settlement Administrator's determination that he did not qualify for inclusion in the 2007 Judgments Net Settlement Fund allocation on the basis of futures contract net price artificiality paid.

To be eligible to participate in the allocation of 40% of 2007 Judgments Net Settlement Fund on the basis of futures contract net price artificiality paid, a claimant had to, at a minimum, provide trading data reflecting the date a futures contract position was initiated, the price, the

date the contract was liquidated, and the liquidation price.  Without that data, it is impossible to

determine the positive and negative effects of the artificial prices as calculated by Dr. Dwyer

from the data provided by the publications with respect to the monthly false reporting of the four

Settling Defendants who comprised the 2007 Settlement.  As a result, Class Counsel directed the

Settlement Administrator to press every claimant for the data necessary to include them in this

proposed allocation.

On May 1, 2008, Nordlicht was sent a deficiency letter, attached as Exhibit A hereto, in

which he was told: "The information you provide must contain claimant name, trade date(s),

contract description, purchase/sale quantity, and trade price."  On February 5, 2009, the

Settlement Administrator sent Nordlicht four e-mails detailing the information they required,

specifically emphasizing the fact that Nordlicht's trading statements did not include futures

purchase date and price and sale date and price.  The February 5, 2009 e-mail Nordlicht cited at

¶ 48 omits the following sentence directly following the portion quoted: "Additionally, per your

request, I will send another email outlining our recent request for purchase and sale information

for reported P&Ls."

Following the February 2009 requests for further information from Nordlicht, the

Settlement Administrator sent another letter on May 19, 2009, detailing deficiencies in his claim.

Like the February 2009 requests and the May 2008 requests, the May 2009 letter specifically

detailed 251 transactions which were missing purchase and sale dates and price information.  A

copy of the May 19, 2009 letter is attached as Exhibit B hereto with the quantity and P/L

Amount redacted.

Finally, at no point has either the Settlement Administrator or Class Counsel ever

informed Nordlicht or his attorney that his claim was complete.  Nordlicht's attempt to twist a

single March 10, 2009 e-mail acknowledging the curing of deficiencies relating to two option transactions as a blanket cure for all his deficiencies should be rejected.

The deficiencies in Nordlicht's submission do not prevent him from participating in any part of the larger 2006 Judgments Net Settlement Fund or the remaining 60% of the 2007 Judgment Net Settlement Funds. The modification of the Plan of allocation to allocate 32% of the 2007 Judgment Net Settlement Fund to claimants who had net losses on futures transactions liquidated between June 1, 2000 and March 31, 2001 significantly benefits Nordlicht.

### 5. **Robert Richert**

Objector Robert Richert has two specific objections to the Plan. Richert objects to the allocations based on losses during the first five trading days of each month. More specifically, Richert argues that his transactions outside the first five trading days were "infected by the same price distorting fraud on the market as those which affected trading activity in the first five days of the month." Richert Objection at p. 5. Richert provides no analysis or data supporting his position beyond citing Objector Nordlicht's expert report. Richert has not addressed any of the data and analyses provided by Plaintiffs in support of the Plan, and more specifically, in support of the allocation based on losses during the first five trading days. Plaintiffs' Reply in Support of Preliminary Approval of Proposed Plan of Allocation, at pp. 13-15.

Richert also objects to the allocation of a portion of the 2007 Settlement Fund on the basis of net artificial impacts. Richert at pp. 1-4. Richert objects to this allocation because, according to him, it "ignores the market distortion and disinforming effect of Defendants' fraudulent manipulation of the commodity futures trading market . . . Specifically, by measuring Gross Injury only on the days that a Class Member's positions are actually traded, the Method

ignores persons such as Claimant who purchased and sold intermittently throughout the Class Period."  Richert at pp. 1-2.

The 2007 Settlement artificial impact allocation does not "ignore" any Claimant.  It works very simply.  *See C supra.*

Richert asks this Court to scrap this allocation method based on actual results, and instead craft an entirely new method in which artificial impact would be calculated based on the closing price each day a Claimant held a position, then totaled up and added to the already calculated injury based on the actual purchase and sale.  Effectively, Richert asks the Court to craft an allocation which merges <u>unrealized</u> daily artificial impact results with <u>realized</u> artificial impact results.  Class Counsel is not aware of, nor did Richert refer to, any law, whether securities- or commodities-related, which would calculate damages of any kind on a series of daily unrealized mark-to-market valuations, much less one that would merge such valuations with actual realized profits and losses.

6.   <u>**Plaintiff Dominick Viola's Objections To The Treatment of Spread Trading**</u>

Dominick Viola, a named plaintiff and one of the class representatives in this case, has submitted an affidavit in opposition to the Plan.  See Affidavit of Dominick Viola in Opposition to Final Approval of the Preliminary Plan of Allocation ("Viola Aff.").[22] He describes his trading

---

[22] Mr. Viola also submitted a supporting affidavit of Todd Olson, another spread trader.  It merely repeats Viola's objections in an abbreviated, conclusory fashion, and we do not respond separately to it, but incorporate our responses to the Viola affidavit.

On March 22, 2010, Mr. Viola submitted an additional supporting affidavit from Carl A. Larry, who describes himself as a former floor trader and a broker and analyst in energy markets.  Larry's affidavit is merely unsupported speculation and conclusory opinion to the effect that spikes in the market price of natural gas futures were caused by the defendants and that such spikes in turn caused damage to persons who held spread positions over long time periods.  As Larry's affidavit reflects a fundamental lack of understanding of the kind of manipulative activity and the type of causation evidence that were

strategy as a spread trader who holds positions open for long time periods, and contends that the Plan does not adequately compensate spread traders.

In a spread trade, the trader initiates a long or short position in the near month contract and simultaneously initiates an opposite (short or long) position in the far month, hoping to insulate himself from the risk of an overall upward or downward movement in futures prices and to profit (or lose) only from a change in the relative price relationship of the two monthly positions. Often a spread trader looks for an abnormal price spread between near and far prices, and hopes to profit as the spread returns to a normal relationship. For example, in a long spread, the trader is betting that the price relationship between the near month contract and the far month contract has become too wide and that it will narrow again over the term of the spread. If the spread narrows because the near month price increases relative to the far month, then he will gain more on the near month long position than he loses on the far month short position, and, conversely, if the spread narrows because the far month price declines relative to the near month, then he gains more on the far month short position than he loses on the near month long position. (Note that the spread can widen or narrow when both the near and far month prices are moving in the same direction but at differing rates.

It is also important to note, as Mr. Viola himself recognizes (Viola Aff. ¶ 23), that a spread trader's positions offset each other in that he holds open long positions in one month offset by open short positions in other months, and he profits or loses, only when the "spread" between the monthly prices changes. In other words, a spread trade is "hedged" against long-term price movements in either direction that affect both near and far monthly contract prices

---

involved in this case, and is neither based on the evidentiary record nor on personal knowledge of the affiant, it should be disregarded. Moreover, it is contradicted by the Affidavit of Mark Dwyer, who performed the econometric analysis of the causative effects of the false reporting on behalf of plaintiffs in this case.

equally. For this reason, according to recognized economic theory, a spread trader is unlikely to suffer adverse impact from a long-term price manipulation that does not significantly distort the dynamic (or changing) relationship of near and far prices. Accordingly, a spread trader's volume of trading or the size and duration of his open positions, like those of a day trader or a hedger, is not a good measure of exposure to risk of loss caused by the particular kind of manipulation that was involved in this case.[23]

In fact, no evidence was developed in this case that the false reporting caused long-term, persistent, unidirectional pricing distortions that cumulated in effect over time, or that impacted the dynamic relationship of near and far futures prices. That is, there was no evidence that the false reporting would have had any effect on the relative prices of near and far month natural gas futures prices. See Affidavit of Mark Dwyer. Neither the FERC nor the CFTC found any evidence that the false reporting caused futures prices to trend in one direction or the other over time. Rather, the evidence was consistent with false reporting that was intended to benefit the defendants' individual cash market transactions on a short-term basis, but not to influence the long-term direction or relationship of prices. Indeed, arbitrage effects would have made such a long-term price impacts unlikely in highly visible and liquid market such as natural gas. See Dwyer Affidavit.

Where the data were available, with respect to the 2007 settling defendants, plaintiffs' expert Mark Dwyer looked for, but did not find, any econometric evidence that the false reporting caused price distortions that persisted and trended over time in particular directions, or that distorted the relationship of near and distant futures prices. Rather, he found that there were isolated, non-cumulating price distortions on a daily basis that tended to dissipate in effect after

---

[23] Naked open long or short positions (with no offsetting position in another month), would be at far more risk from a price manipulation, than Mr. Viola's hedged spread positions, but are also not singled out for special compensation.

the first five days of a trading month.  Moreover, these price distortions were fairly evenly distributed by sign, that is, they reflected both positive and negative price effects, and tended to cancel themselves out over time as opposed to cumulating.  See Dwyer Affidavit.

While the expert did observe certain subperiods of time lasting several months during the Class Period where prices increased or decreased dramatically, he found no evidence that these long-term price movements were caused by the false reporting conduct involved in this case, as opposed to fundamental factors affecting the supply and demand for natural gas.  Indeed, the expert observed other time periods outside the class period in which similar long-term price movements were seen to occur, showing that such price movements are not uncommon in the natural gas markets.  See Dwyer Affidavit.

We understand Mr. Viola's concern that he suffered large losses on spread positions during certain parts of the Class Period, such as the spike in natural gas prices in December 2000, even though his overall class-period spread trading was profitable. Viola Aff.  ¶¶ 27-30. However, there is no evidence to support any claim that such price spikes were caused by the false reporting as opposed to other market supply/demand factors unrelated to the manipulative activity of the defendants in this case.  See Dwyer Affidavit.[24]  The purpose of the settlement funds is to compensate claimants for those losses that were a direct, causative result of the manipulative activity, as legally required by the Commodity Exchange Act, not to provide futures traders with an insurance policy against all manner of adverse market movements during the Class Period.  To a large extent, Mr. Viola's objections simply fail to recognize the legal importance of the causation element of the cause of action for commodity manipulation.

---

[24] For example, Mr. Viola states that the large natural gas company defendants knew that this spike was the result of their and their co-conspirators' manipulations.  Viola Aff. para. 30.  But there is simply no evidence to support this claim in the record of this case, and it is contrary to the type of disparate, uncoordinated false reporting that occurred here.

In the Plan, futures claimants are compensated in several ways – based on net trading volume, based on net profit and loss, and, for the 2007 settlement fund, based on price impact. Futures claimants are not singled out for special or enhanced treatment based on the length of the holding periods of their open positions, whether those open positions represent spread trading, or merely the holding open of a long or short futures position over time. For spread traders, each leg of the spread is accounted for separately, and compensated as any other futures trade would be compensated according to the provisions, and within the limitations of, the Plan.[25]

Compensating spread traders differently from other traders, on the basis of some presumed, but not proven, distortion of the relationship of near and distant prices over the term that the spread trade is held open, would be contrary to the evidence in this case of the particular kind of short-term price manipulation by false reporting that was involved, as well as the evidence developed by the economic expert that there were no long-term price effects of the false reporting that would cause special damage to open spread positions. (See Dwyer Affidavit)

Mr. Viola states that there is a correlation between spot prices and futures spreads, and that although not 100%, often when spot prices increase (decrease) the spread increases (decreases). Viola Aff. ¶ 26. This does not, however, merit special treatment for spread trades. First, any change in the spread would be short-lived under the particular facts here, because the

---

[25] Mr. Viola states that he was advised that the Plan does not compensate his spread positions unless they were liquidated in the first five days of a month. Viola Aff. para. 14. This is not entirely correct. For the 2007 Fund, all of Mr. Viola's futures contract purchases and sales, regardless of the day of the month on which they occurred or the length of time they remained open, will participate in the net price impact portion (40%) of the fund, and all of his futures transactions, opened on or after June 1, 2000 and liquidated on or before March 31, 2001, will participate in the net loss (if any) class subperiod portion (32%) of the fund.

With regard to the 2006 Fund, Mr. Viola will participate in 50% of the fund with respect to the net losses, if any, on his contracts liquidated in the first five days of a month. His spread trades were eligible to participate in an additional 22.5% of that fund with respect to the net losses on all of his contracts liquidated at any time during the entire Class Period, but because he had a substantial net gain over the entire Class Period, he will not receive an allocation under this formula. Finally, for 2006 he will participate in 22.5% of the fund with respect to his net volume of futures trades in the first five days of a month.

spot price effects as found by the experts were not persistent but quickly dissipated, and thus would likely have no impact on the final spread at which Mr. Viola closed his positions.  (See Dwyer Affidavit)  Second, there was no econometric evidence that such effects actually occurred in this case, and because the impact on spot prices was fairly evenly distributed by sign, such effects, if any, would largely cancel each other out over the life of a spread.  (See Dwyer Affidavit)

Mr. Viola also contends that compensation for his spread trading net losses should not be limited to trades that were liquidated in the first five trading days of the month, because he also had losses on spread trades that were liquidated in later parts of the month.  Viola Aff. ¶¶ 31-35.  However, that contention ignores the evidence in the case that the price distortions were largely concentrated in the first five trading days and quickly dissipated in the remainder of the month.

Mr. Viola states also that the Plan should ignore the fact that he had net gains of over $10 million over the entire Class Period, and compensate him instead for those subperiods over which he had net losses. Viola Aff. ¶ 34.  That a trader may have been injured by the manipulation even though he had a net gain during the manipulation as whole, however, does not mean that he is free to pick and choose only those contracts or subperiods where he had losses, for purposes of compensation.  Moreover, because the price impact of the false reporting may have been positive or negative on any given day, Mr. Viola's spread trades may at times have benefitted from the manipulation as much as having been injured by it.  For these reasons, fairness and equity do not require that Mr. Viola be compensated for trading losses that took place outside of the first five days of the month, during which the false reporting was found to have a demonstrable impact.

41

Mr. Viola also argues for an increase beyond 60% in the deduction applied to the claims of hedge traders.  Viola Aff. ¶¶ 36-41.  The appropriateness of the hedge trader deduction, which is higher than normally applied in cases of this nature, is discussed elsewhere in this reply. Suffice it to note here, that while recognizing the insulation from risk provided by hedge trading, Mr. Viola fails to recognize that spread trading is indeed a form of hedging market risk, and that having reduced his risk to one involving adverse changes in the price spreads, he has failed to show that the underlying false reports had any effect on those spreads, that was in addition to the effect on the purchases and sales of the contracts that constituted the long and short legs of the spread.

### 7. <u>Steven Ardizzone</u>
#### a. **Steven Ardizzone's Request for Inclusion in the 2006 Settlement Has Already Been Denied**

By motion dated October 7, 2009, Steven Ardizzone, through his counsel, Leslie C. Greene, Esq., moved this Court for relief to file a late notice claim and participate in the first settlement reached in this action that was approved by this Court, pursuant to a Final Judgment and Order of Dismissal, on May 24, 2006 (the "2006 Settlement").  Ardizzone's motion to file his untimely claim came over three years after the 2006 Settlement was finally approved by this Court and more than two years after Ardizzone learned of the 2006 Settlement in mid-2007.  On October 21, 2009, Magistrate Judge Peck denied Ardizzone's motion in a Memo Endorsed Order (the "October 21, 2009 Order") reading as follows:

> 1.    Motion Denied.
>
> 2.    Movants learned of the 2006 settlement in mid 2007 but took no action until now, some two years later.  Their only explanation is they didn't know the Court could permit late notices.  They should have determined their legal rights at the time.

> 3. Class members who timely filed claims will <u>not</u> obtain 100% of their claim. To allow additional claims at this time is prejudicial to those who filed timely claims. Moreover, the calculation of each class member's recovery is complicated and new claims would require re-allocation and further delay.

(Emphasis in original.)

Undeterred by the October 21, 2009 Order, Ardizzone, in a *pro se* application dated February 24, 2010, again asks this Court to have his untimely claim included in the 2006 Settlement. Ardizzone failed to timely object pursuant to Rule 72 of the Federal Rules of Civil Procedure to the October 21, 2009 Order, he is precluded now from seeking relief from the October 21, 2009 Order. *Munford v. Graham*, No. 09 Civ. 7899(DLC) (AJP), Slip Copy, 2010 WL 644435, at *23 (S.D.N.Y. Feb. 24, 2010) (citing *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 (1985)).

Ardizzone's latest application provides no facts or argument as to why the October 21, 2009 should be disturbed. For these reasons, Ardizzone's request to have his untimely claim included in the 2006 Settlement should be denied.

## <u>CONCLUSION</u>

This Court should overrule all objections and grant final approval of the Plan. *See* accompanying Proposed Order.

Dated:  March 25, 2010                    Respectfully submitted,


                                          */s/ Christopher Lovell*_____
                                          LOVELL STEWART HALEBIAN JACOBSON
                                          LLP
                                          Christopher Lovell (CL 2595)
                                          Ian T. Stoll (IS 3424)
                                          61 Broadway, Suite 501
                                          New York, New York 10006
                                          (212) 608-1900

                                          LOWEY DANNENBERG COHEN & HART, P.C.
                                          Geoffrey Horn (GH 4179)
                                          White Plains Plaza, One North Broadway
                                          White Plains, New York 10601
                                          (914) 997-0500

                                          FINKELSTEIN THOMPSON LLP
                                          Douglas Thompson
                                          1050 30th Street, NW
                                          Washington, D.C.  20007
                                          (202) 337-8000

                                          LABATON SUCHAROW LLP
                                          Bernard Persky (BP 1072)
                                          140 Broadway
                                          New York, New York 10005
                                          (212) 907-0700

                                          *Plaintiffs' Class Counsel*

# EXHIBIT A

IN RE: NATURAL GAS COMMODITY LITIGATION
C/O COMPLETE CLAIM SOLUTIONS, LLC
P.O. BOX 24626
WEST PALM BEACH, FL 33416





May 1, 2008

**RESPONSE DUE DATE:  June 2, 2008**

MARK NORDLICHT                                    34
ACCT NO: R 22152 463 02764
245 TRENOR DR
NEW ROCHELLE, NY 10804

**RE: Claim No. 51919**

Dear Claimant:

We have received the Proof of Claim and Release Form ("claim") that you filed in the Natural Gas Commodity Litigation. However, we noted one or more deficiencies in the claim you submitted as follows:

(TMID) You did not provide complete transactional information for your claim reflecting purchases, sales, or settled NYMEX Natural Gas Contracts, as an opening or closing transaction or otherwise, between June 1, 1999 and December 31, 2002, inclusive.  The Transaction Missing Information Report on the reverse side of this letter or the enclosed CD lists the transactions in your claim for which transactional information is necessary.*

You must provide a list of all transactions you made during the Class Period (a) in NYMEX natural gas futures contracts, and (b) in NYMEX options on NYMEX natural gas futures contracts.

The information you provide must contain claimant name, trade date(s), contract description, purchase/sale quantity, and trade price (plus strike price and expiration date for options).   We may request additional hard copy documentation in support of an electronic file.

**Failure to provide the required documentation will result in the rejection of your claim.**

To ensure you receive the correct distribution, if any, from the Net Settlement Fund, you must return the appropriate written documentation, along with a copy of this letter, by the Response Due Date to the address listed above.  If you have any questions, please call us toll-free at (877) 741-1231.  You may receive additional letters if other deficient conditions are identified in this claim.

Sincerely Yours,

Settlement Administrator

* The electronic file submitted does not contain complete transactional information reflecting your claimed purchases, sales, or settled NYMEX Natural Gas Contracts, as an opening or closing transaction or otherwise, between June 1, 1999 and December 31, 2002, inclusive.  The transactions MUST contain claimant name, trade date(s), contract description, purchase/sale quantity, and trade price (strike price and expiration date for options).

TMID,*O* - 202036

# TRANSACTION MISSING INFORMATION REPORT

**CLAIM NUMBER: 51919**

| TRADE DATE | TYPE | BUY/SELL | SYMBOL | QUANTITY | PRICE | PREMIUM AMOUNT | P/L AMOUNT | STRIKE PRICE |
|---|---|---|---|---|---|---|---|---|
| 11/20/00 | C | Sell | NGZ0C | 0.0000 | 0.0000 | 0 | 0 | 5.8000 |
| 11/20/00 | P | Sell | NGZ0P | 0.0000 | 0.0000 | 0 | 0 | 5.8000 |

TOTAL NUMBER OF TRANSACTIONS:      2

# EXHIBIT B

IN RE: NATURAL GAS COMMODITY LITIGATION
C/O COMPLETE CLAIM SOLUTIONS, LLC
P.O. BOX 24626
WEST PALM BEACH, FL 33416





May 19, 2009

**RESPONSE DUE DATE: June 19, 2009**

1

MARK NORDLICHT
245 TRENOR DR
NEW ROCHELLE, NY 10804

**Claim No: 195**

Dear Claimant:

We have received the Proof of Claim and Release Form ("claim") that you filed in the Natural Gas Commodity Litigation.

<u>**FINAL REQUEST FOR TRANSACTION DETAIL**</u>

(FRTD) You did not provide complete transactional information for your claim reflecting purchases, sales, or settled NYMEX Natural Gas Contracts, as an opening or closing transaction or otherwise, between June 1, 1999 and December 31, 2002, inclusive. The Report on the reverse side of this letter or the enclosed CD lists the transactions in your claim for which transactional information is necessary.

You must provide a list of all transactions you made during the Class Period (a) in NYMEX natural gas futures contracts, and (b) in NYMEX options on NYMEX natural gas futures contracts. The information you provide must contain claimant name, contract description, purchase/sale quantity, purchase date and price, and contract sale date and price.

You were previously asked to provide the foregoing information and we have not received the requested additional information. You have 30 days from the date of this letter to provide the requested documentation. Your response due date is June 11, 2009. Pursuant to Order of the Court, if you do not submit the requested information to the Settlement Administrator by your response due date, you will have waived your rights to submit this information.

**Failure to provide the required documentation may affect the outcome of your claim. Unless you provide the required documentation, you may not be able to qualify to be eligible to participate in certain types of allocation which may be proposed to the Court. Please obtain your records and submit them to the Settlement Administrator now.**

To ensure you receive the correct distribution, if any, from the Net Settlement Fund, you must return the appropriate written documentation, along with a copy of this letter, by the Response Due Date to the address listed above. If you have any questions, please call us toll-free at (877) 741-1231. This will be the FINAL request for information.

Sincerely yours,

Settlement Administrator

FRTD,*O* - 18603





## TRANSACTION MISSING INFORMATION REPORT

**CLAIM NUMBER: 195**

| TRADE DATE | TYPE | BUY/SELL | SYMBOL | QUANTITY | PRICE | PREMIUM AMOUNT | P/L AMOUNT | STRIKE PRICE |
|---|---|---|---|---|---|---|---|---|
| 1/18/00 | F | Profit/Loss | NGH0 | *REDACTED* | | | *REDACTED* | |
| 1/21/00 | F | Profit/Loss | NGK0 | *REDACTED* | | | *REDACTED* | |
| 1/27/00 | F | Profit/Loss | NGG0 | *REDACTED* | | | *REDACTED* | |
| 2/3/00 | F | Profit/Loss | NGH0 | *REDACTED* | | | *REDACTED* | |
| 2/7/00 | F | Profit/Loss | NGH0 | *REDACTED* | | | *REDACTED* | |
| 2/8/00 | F | Profit/Loss | NGH0 | *REDACTED* | | | *REDACTED* | |
| 2/14/00 | F | Profit/Loss | NGH0 | *REDACTED* | | | *REDACTED* | |
| 2/23/00 | F | Profit/Loss | NGH0 | *REDACTED* | | | *REDACTED* | |
| 2/25/00 | F | Profit/Loss | NGH0 | *REDACTED* | | | *REDACTED* | |
| 2/28/00 | F | Profit/Loss | NGH0 | *REDACTED* | | | *REDACTED* | |
| 3/9/00 | F | Profit/Loss | NGK0 | *REDACTED* | | | *REDACTED* | |
| 3/10/00 | F | Profit/Loss | NGK0 | *REDACTED* | | | *REDACTED* | |
| 3/17/00 | F | Profit/Loss | NGJ0 | *REDACTED* | | | *REDACTED* | |
| 3/24/00 | F | Profit/Loss | NGJ0 | *REDACTED* | | | *REDACTED* | |
| 3/27/00 | F | Profit/Loss | NGJ0 | *REDACTED* | | | *REDACTED* | |
| 3/28/00 | F | Profit/Loss | NGJ0 | *REDACTED* | | | *REDACTED* | |
| 3/29/00 | F | Profit/Loss | NGJ0 | *REDACTED* | | | *REDACTED* | |
| 4/14/00 | F | Profit/Loss | NGK0 | *REDACTED* | | | *REDACTED* | |
| 4/25/00 | F | Profit/Loss | NGM0 | *REDACTED* | | | *REDACTED* | |
| 4/26/00 | F | Profit/Loss | NGK0 | *REDACTED* | | | *REDACTED* | |
| 4/28/00 | F | Profit/Loss | NGM0 | *REDACTED* | | | *REDACTED* | |
| 5/12/00 | F | Profit/Loss | NGM0 | *REDACTED* | | | *REDACTED* | |
| 5/15/00 | F | Profit/Loss | NGM0 | *REDACTED* | | | *REDACTED* | |
| 5/16/00 | F | Profit/Loss | NGM0 | *REDACTED* | | | *REDACTED* | |
| 5/18/00 | F | Profit/Loss | NGM0 | *REDACTED* | | | *REDACTED* | |
| 5/19/00 | F | Profit/Loss | NGM0 | *REDACTED* | | | *REDACTED* | |
| 5/19/00 | F | Profit/Loss | NGM0 | *REDACTED* | | | *REDACTED* | |
| 5/26/00 | F | Profit/Loss | NGM0 | *REDACTED* | | | *REDACTED* | |
| 5/31/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/1/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/2/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/5/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/6/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 6/6/00 | F | Profit/Loss | NGV0 | *REDACTED* | | | *REDACTED* | |
| 6/6/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/6/00 | F | Profit/Loss | NGX0 | *REDACTED* | | | *REDACTED* | |
| 6/7/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 6/7/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/7/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/8/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 6/8/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 6/8/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/9/00 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 6/9/00 | F | Profit/Loss | NGZ0 | *REDACTED* | | | *REDACTED* | |
| 6/9/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 6/9/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/13/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 6/14/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |

## TRANSACTION MISSING INFORMATION REPORT

**CLAIM NUMBER: 195**

| TRADE DATE | TYPE | BUY/SELL | SYMBOL | QUANTITY | PRICE | PREMIUM AMOUNT | P/L AMOUNT | STRIKE PRICE |
|---|---|---|---|---|---|---|---|---|
| 6/14/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/20/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/21/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/23/00 | F | Profit/Loss | NGZ0 | *REDACTED* | | | *REDACTED* | |
| 6/23/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/24/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 6/26/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/27/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/28/00 | F | Profit/Loss | NGN0 | *REDACTED* | | | *REDACTED* | |
| 6/29/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 6/29/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 7/14/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 7/18/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 7/19/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 7/20/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 7/24/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 7/27/00 | F | Profit/Loss | NGU0 | *REDACTED* | | | *REDACTED* | |
| 7/27/00 | F | Profit/Loss | NGQ0 | *REDACTED* | | | *REDACTED* | |
| 8/16/00 | F | Profit/Loss | NGV0 | *REDACTED* | | | *REDACTED* | |
| 8/21/00 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 8/21/00 | F | Profit/Loss | NGV0 | *REDACTED* | | | *REDACTED* | |
| 8/29/00 | F | Profit/Loss | NGU0 | *REDACTED* | | | *REDACTED* | |
| 9/14/00 | F | Profit/Loss | NGV0 | *REDACTED* | | | *REDACTED* | |
| 9/15/00 | F | Profit/Loss | NGV0 | *REDACTED* | | | *REDACTED* | |
| 9/18/00 | F | Profit/Loss | NGV0 | *REDACTED* | | | *REDACTED* | |
| 9/20/00 | F | Profit/Loss | NGV0 | *REDACTED* | | | *REDACTED* | |
| 9/22/00 | F | Profit/Loss | NGV0 | *REDACTED* | | | *REDACTED* | |
| 9/27/00 | F | Profit/Loss | NGV0 | *REDACTED* | | | *REDACTED* | |
| 10/5/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 10/11/00 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 10/11/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 10/13/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 10/17/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 10/23/00 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 10/24/00 | F | Profit/Loss | NGX0 | *REDACTED* | | | *REDACTED* | |
| 10/25/00 | F | Profit/Loss | NGX0 | *REDACTED* | | | *REDACTED* | |
| 10/26/00 | F | Profit/Loss | NGX0 | *REDACTED* | | | *REDACTED* | |
| 10/27/00 | F | Profit/Loss | NGZ0 | *REDACTED* | | | *REDACTED* | |
| 10/27/00 | F | Profit/Loss | NGX0 | *REDACTED* | | | *REDACTED* | |
| 10/30/00 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 11/3/00 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 11/7/00 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 11/10/00 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 11/10/00 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 11/10/00 | F | Profit/Loss | NGZ0 | *REDACTED* | | | *REDACTED* | |
| 11/15/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 11/15/00 | F | Profit/Loss | NGZ0 | *REDACTED* | | | *REDACTED* | |
| 11/16/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |

## TRANSACTION MISSING INFORMATION REPORT

**CLAIM NUMBER: 195**

| TRADE DATE | TYPE | BUY/SELL | SYMBOL | QUANTITY | PRICE | PREMIUM AMOUNT | P/L AMOUNT | STRIKE PRICE |
|---|---|---|---|---|---|---|---|---|
| 11/16/00 | F | Profit/Loss | NGZ0 | REDACTED | | | REDACTED | |
| 11/20/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 11/20/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 11/20/00 | F | Profit/Loss | NGZ0 | REDACTED | | | REDACTED | |
| 11/21/00 | F | Profit/Loss | NGZ0 | REDACTED | | | REDACTED | |
| 11/27/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 11/27/00 | F | Profit/Loss | NGZ0 | REDACTED | | | REDACTED | |
| 11/28/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 11/28/00 | F | Profit/Loss | NGZ0 | REDACTED | | | REDACTED | |
| 11/29/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 11/29/00 | F | Profit/Loss | NGZ0 | REDACTED | | | REDACTED | |
| 11/30/00 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 11/30/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/1/00 | F | Profit/Loss | NGK1 | REDACTED | | | REDACTED | |
| 12/1/00 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 12/1/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/1/00 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 12/1/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/4/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/4/00 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 12/4/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/5/00 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 12/5/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/5/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/6/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/6/00 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 12/6/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/7/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/7/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/7/00 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 12/7/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/8/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/8/00 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 12/8/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/8/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/11/00 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 12/11/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/12/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/12/00 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 12/12/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/13/00 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 12/13/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/13/00 | F | Profit/Loss | NGF1 | REDACTED | | | REDACTED | |
| 12/14/00 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 12/15/00 | F | Profit/Loss | NGK1 | REDACTED | | | REDACTED | |
| 12/15/00 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 12/15/00 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 12/15/00 | F | Profit/Loss | NGF1 | REDACTED | | | | |

## TRANSACTION MISSING INFORMATION REPORT

**CLAIM NUMBER: 195**

| TRADE DATE | TYPE | BUY/SELL | SYMBOL | QUANTITY | PRICE | PREMIUM AMOUNT | P/L AMOUNT | STRIKE PRICE |
|---|---|---|---|---|---|---|---|---|
| 12/18/00 | F | Profit/Loss | NGH1 | | | | *REDACTED* | |
| 12/18/00 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 12/18/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 12/18/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 12/19/00 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 12/19/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 12/20/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 12/20/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 12/21/00 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 12/21/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 12/22/00 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 12/22/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 12/22/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 12/26/00 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 12/26/00 | F | Profit/Loss | NGF1 | *REDACTED* | | | *REDACTED* | |
| 12/27/00 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 12/28/00 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/2/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 1/2/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/2/01 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 1/3/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 1/3/01 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 1/4/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 1/4/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/4/01 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 1/8/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/9/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/9/01 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 1/10/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 1/10/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/10/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/10/01 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 1/10/01 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 1/11/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 1/11/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/11/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/11/01 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 1/12/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 1/12/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/12/01 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 1/16/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 1/16/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/16/01 | F | Profit/Loss | NGG1 | *REDACTED* | | | *REDACTED* | |
| 1/17/01 | F | Profit/Loss | NGK1 | *REDACTED* | | | *REDACTED* | |
| 1/17/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 1/17/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/17/01 | F | Profit/Loss | NGH1 | *REDACTED* | | | *REDACTED* | |
| 1/17/01 | F | Profit/Loss | NGG1 | | | | *REDACTED* | |

## TRANSACTION MISSING INFORMATION REPORT

### CLAIM NUMBER: 195

| TRADE DATE | TYPE | BUY/SELL | SYMBOL | QUANTITY | PRICE | PREMIUM AMOUNT | P/L AMOUNT | STRIKE PRICE |
|---|---|---|---|---|---|---|---|---|
| 1/18/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 1/18/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 1/18/01 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 1/22/01 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 1/23/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 1/23/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 1/23/01 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 1/24/01 | F | Profit/Loss | NGK1 | REDACTED | | | REDACTED | |
| 1/24/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 1/24/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 1/25/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 1/26/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 1/26/01 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 1/29/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 1/29/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 1/29/01 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 1/29/01 | F | Profit/Loss | NGG1 | REDACTED | | | REDACTED | |
| 1/30/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 1/30/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 1/31/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 1/31/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/5/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/6/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/7/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/8/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 2/8/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/12/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/13/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 2/13/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/13/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/14/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/15/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 2/15/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/16/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 2/16/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/20/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 2/20/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/21/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 2/21/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 2/21/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/21/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/22/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/23/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 2/23/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 2/26/01 | F | Profit/Loss | NGK1 | REDACTED | | | REDACTED | |
| 2/26/01 | F | Profit/Loss | NGJ1 | REDACTED | | | REDACTED | |
| 2/26/01 | F | Profit/Loss | NGH1 | REDACTED | | | REDACTED | |
| 3/7/01 | F | Profit/Loss | NGJ1 | REDACTED | | | | |

# TRANSACTION MISSING INFORMATION REPORT

**CLAIM NUMBER: 195**

| TRADE DATE | TYPE | BUY/SELL | SYMBOL | QUANTITY | PRICE | PREMIUM AMOUNT | P/L AMOUNT | STRIKE PRICE |
|---|---|---|---|---|---|---|---|---|
| 3/14/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 3/15/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 3/20/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 3/26/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 3/27/01 | F | Profit/Loss | NGK1 | *REDACTED* | | | *REDACTED* | |
| 3/27/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 3/28/01 | F | Profit/Loss | NGJ1 | *REDACTED* | | | *REDACTED* | |
| 4/24/01 | F | Profit/Loss | NGK1 | *REDACTED* | | | *REDACTED* | |
| 4/25/01 | F | Profit/Loss | NGK1 | *REDACTED* | | | *REDACTED* | |
| 4/25/01 | F | Profit/Loss | NGK1 | *REDACTED* | | | *REDACTED* | |
| 4/26/01 | F | Profit/Loss | NGK1 | *REDACTED* | | | | |

TOTAL NUMBER OF TRANSACTIONS:    251

You must provide the purchase date and price and the sale date and price for each of the Profit and Loss entries listed above.
DO NOT SEND DUPLICATES OF PREVIOUSLY SENT DOCUMENTATION